# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| and | ) | |
| THE STATE OF INDIANA, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. |
| UNITED WATER, INC., | ) | |
| UNITED WATER ENVIRONMENTAL SERVICES, INC., | ) | |
| UNITED WATER SERVICES INDIANA, LLC, and | ) | |
| UNITED WATER SERVICES, LLC, | ) | |
| Defendants. | ) | |

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United States and through its undersigned attorney, acting on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Indiana, by the authority of its Attorney General and through its undersigned attorney, acting on behalf of the Indiana Department of Environmental Management ("IDEM"), allege as follows:

1

## NATURE OF ACTION

1.      This is a civil action brought by the United States and the State of Indiana against United Water, Inc., United Water Environmental Services, Inc., United Water Services Indiana, LLC, and United Water Services, LLC (the "Defendants").  The Plaintiffs seek civil penalties for violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, Title 13 of the Indiana Code, and the Indiana Administrative Code, 327 IAC 5.

2.      The State of Indiana is a party to this action pursuant to 28 U.S.C. § 1367(a).

## JURISDICTION, VENUE, AUTHORITY AND NOTICE

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331, 1345 and 1355.

4.      This Court has supplemental jurisdiction over the State law claims alleged herein pursuant to 28 U.S.C. § 1367(a) because the State law claims are related to the federal claims and form part of the same case or controversy.

5.      Venue is proper in the Northern District of Indiana pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), because Defendants were doing business in this judicial district at the time of the occurrence of the violations.  Venue is also proper in the Northern District of Indiana under 28 U.S.C. § 1391(b), because the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district.

6.      The Attorney General of the United States has the authority to bring this civil action on behalf of the EPA Administrator pursuant to Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

2

7.     The Indiana Attorney General is authorized to appear and represent the State of Indiana in this action pursuant to IC §§ 4-6-3-2(a) and 13-14-2-6.

8.     As a signatory to this Complaint, the State of Indiana has notice of the commencement of this action as required by Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## DEFENDANTS

9.     Defendant United Water, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 200 Old Hook Road, Harrington Park, New Jersey.  United Water, Inc., among other things, operates numerous municipal water systems in the United States, including one or more wastewater treatment systems in Indiana.

10.     Defendant United Water Environmental Services, Inc. (formerly known as United Water Services, Inc.), a subsidiary of United Water, Inc., is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 200 Old Hook Road, Harrington Park, New Jersey.

11.     Defendant United Water Services Indiana, LLC, a subsidiary of United Water, Inc., is a limited liability company organized under the laws of the State of Indiana, with its principal place of business located at 200 Old Hook Road, Harrington Park, New Jersey.

12.     Defendant United Water Services, LLC, a subsidiary of United Water, Inc., is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 200 Old Hook Road, Harrington Park, New Jersey.

13.     Between 1998 and approximately July 15, 2010, one or more of the Defendants operated a publicly owned wastewater treatment system ("POTW") located at 3600 West 3rd

3

Avenue in Gary, Lake Station, Indiana, pursuant to an agreement with Gary Sanitary District and/or the City of Gary, Lake Station, Indiana (collectively, "Gary").

14.     United Water, Inc., United Water Environmental Services, Inc., United Water Services Indiana, LLC, and United Water Services, LLC are each a "person" within the meaning of CWA Section 502(5), 33 U.S.C. § 1362(5), because they are each a corporation.

## LEGAL BACKGROUND

### Prohibition Against Discharge of Pollutants

15.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person except in compliance with, *inter alia*, a permit issued pursuant to the National Pollutant Discharge Elimination System ("NPDES") by EPA or an authorized state, such as Indiana, under Section 402 of the CWA, 33 U.S.C. § 1342.  Indiana regulations prohibit the discharge of pollutants to "waters of the state" except as authorized by a duly issued NPDES permit.  327 IAC 5-2-2.

16.     Section 502(12) of the CWA defines "discharge of a pollutant" as, among other things, "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  *See also* 327 IAC 5-1.5-11 (similarly defining "discharge of a pollutant").

17.     Section 502(7) of the CWA defines "navigable waters" as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  EPA regulations promulgated pursuant to the CWA define the term "waters of the United States" to include, *inter alia*:  all waters that are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; and all interstate waters, including interstate wetlands.  40 C.F.R. § 122.2.  Indiana law defines the term

4

"waters," for purposes of water pollution control laws and environmental management laws, as, among other things, "all waters of the United States, as defined in Section 502(7) of the federal Clean Water Act (33 U.S.C. 1362(7)), that are located in Indiana." IC § 13-11-2-265.

18.     Section 502(6) of the CWA and Indiana regulations define "pollutant" as, among other things, "sewage" and "municipal . . . waste" discharged into water. 33 U.S.C. § 1362(6); 327 IAC 5-1.5-41.

19.     Section 502(14) of the CWA defines "point source" to include any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel or conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). *See also* 327 IAC 5-1.5-40 (similar definition of "point source").

### National Pollutant Discharge Elimination System ("NPDES") Permits

20.     Section 402(a) of the CWA, 33 U.S.C. § 1342(a), provides that the EPA Administrator may issue a permit that authorizes "the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) . . . upon conditions that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) . . . such conditions that the Administrator determines are necessary to carry out the provisions of the CWA." 33 U.S.C. § 1342(a)(1).

21.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), authorizes the Administrator to approve permit programs established and administered by states.

22.     At all times relevant to this complaint, IDEM has been, and continues to be, authorized by the EPA Administrator pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), to implement the NPDES permit program for discharges into navigable waters within

5

its jurisdiction.  40 Fed. Reg. 4033 (Jan. 27, 1975).  Pursuant to IC § 13-13-5-1(1), IDEM is the

water pollution agency for all purposes of the CWA, including the administration of the NPDES

permit program, and it maintains concurrent enforcement authority under the Act with EPA.

### Requests for Information Under CWA Section 308, 33 U.S.C. § 1318

23.    Section 308 of the CWA, 33 U.S.C. § 1318, provides, in relevant part:

"Whenever required to carry out the objective of [the Clean Water Act], including but not
limited to . . . determining whether any person is in violation of any . . . effluent
limitation, or other limitation, prohibition or effluent standard, pretreatment standards, or
standard of performance established under [the CWA]; . . . . the Administrator shall
require the owner or operator of any point source to . . . provide such . . . information as
he may reasonably require . . . ."

33 U.S.C. § 1318(a).

### GENERAL ALLEGATIONS

24.    At times relevant to this Complaint and until approximately July 15, 2010, the

Defendants operated the POTW owned by Gary that consists of:  (1) a wastewater treatment

plant ("WWTP") located at 3600 West 3rd Avenue in Gary, Indiana; and (2) the associated

wastewater collection system that includes approximately 375 miles of stormwater and sanitary

sewers and twelve combined sewer overflow ("CSO") regulators.  The wastewater collection

system includes both "combined sewers," which are sewer pipes that convey both storm water

and sanitary wastewater, and "separate sewers," in which storm water and sanitary wastewater

are conveyed in separate sets of pipes.

25.    The POTW is a "treatment works" within the meaning of Section 212(2) of the

CWA, 33 U.S.C. § 1292(2)(a), and a "publicly owned treatment works" within the meaning of

regulations that implement the CWA, 40 C.F.R. § 122.2 (cross-referencing the definition at 40

C.F.R. § 403.3).

6

26.     The POTW services the population of approximately 180,000 within the area of approximately 400 square miles.  The POTW collects, conveys, treats and disposes of wastewater generated by Gary, the nearby municipalities of Merrillville, Hobart and Lake Station, and numerous industrial users.

27.     The collected wastewater is conveyed to the WWTP and, after undergoing treatment at the WWTP, is discharged into the East Branch of the Grand Calumet River through two final effluent outfalls.

28.     Wastewater collected by the POTW collection system is also discharged, without undergoing any treatment at the WWTP, into the West Branch of the Little Calumet River and into the East Branch of the Grand Calumet River from the POTW's twelve combined sewer outfalls ("CSO Outfalls").

### Discharges of Pollutants from Point Sources by the Defendants

29.     The Grand Calumet River and the Little Calumet River are "navigable waters" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and "waters of the state" within the meaning of the Indiana Code, IC § 13-11-2-265.

30.     The final effluent outfalls and combined sewer outfalls of the POTW are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

31.     Wastewater that is collected, conveyed, treated and disposed by the POTW contains, among others, sewage and municipal waste, which are "pollutants" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

32.     At times relevant to this Complaint and until approximately July 15, 2010, the Defendants "discharged" wastewater that contained "pollutants" within the meaning of Section

7

502(6) and (12) of the CWA, 33 U.S.C. § 1362(6) and (12), from the POTW through "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

**Relevant Provisions of the 2006 NPDES Permit**

33.     On or about June 13, 2006, IDEM issued NPDES Permit No. IN0022977 (the "2006 NPDES Permit") to Gary pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b), and IND. CODE § 13-13-5-1(1).  The 2006 NPDES Permit became effective on July 1, 2006, was amended several times, and remained effective until 2012.  Prior to the issuance of the 2006 NPDES Permit, the POTW was operated under the terms and conditions of a NPDES permit issued by IDEM on September 30, 1994, and amended several times.  A copy of the 2006 NPDES Permit is attached to this Complaint as Attachment A.

34.     At all times between 1998 and approximately July 15, 2010, the Defendants operated the POTW pursuant to and in accordance with the terms and conditions of the Agreement for the Operation, Maintenance and Management of the Gary Sanitary District Wastewater Treatment and Collection System (the "Operator Agreement") entered into with Gary in 1998.  The Operator Agreement was extended in 2008.  Section 5.05 of the Operator Agreement provides, in relevant part, that "the Contractor [*i.e.*, one or more of the Defendants] shall comply with the terms of all applicable environmental laws, regulations, Permits, orders, judgments, administrative orders and regulations in connection with the operation of the Gary Facilities to the extent of their permitted capacity and capabilities."

35.     A notice from the Director of the Gary Sanitary District to United Water Services, Indiana, United Water, Inc. and United Water Services LLC, dated March 26, 2010, terminated

8

the Operator Agreement and provided that the "termination will be effective ninety (90) days

from [the Defendants'] receipt" of the notice.

36.     Upon information and belief, the Defendants continued operating the POTW after

the issuance of the March 26, 2010 notice described in the preceding paragraph and until

approximately July 15, 2010.

37.     At times relevant to this Complaint and until July 15, 2010, the Defendants were

required to comply with all terms and conditions of the 2006 NPDES Permit or its predecessor

NPDES permit.

38.     At all times relevant to this Complaint and until July 15, 2010, the Defendants

were authorized to discharge wastewater from the POTW into the Little Calumet River and the

Grand Calumet River only in compliance with all the terms and conditions of the 2006 NPDES

Permit or its predecessor NPDES permit.

**2006 NPDES Permit Requirements Regarding the Operation of the WWTP and Discharges
of Final Effluent.**

39.     Parts I, II and III of the 2006 NPDES Permit set forth requirements applicable to

the operation and maintenance of the POTW, including, but not limited to, standards and

limitations applicable to the discharged wastewater, monitoring and reporting requirements, and

requirements regarding the proper operation and maintenance of equipment.

40.     Part I.A.1 of the 2006 NPDES Permit authorizes the permittee to discharge final

effluent (*i.e.*, wastewater that has undergone treatment at the WWTP) from Outfalls 001 A and

001 B into the Grand Calumet River and sets limits on, among other things, the amounts and/or

concentrations of various substances or parameters in the final effluent discharged from Outfalls

9

001 A and 001 B, including but not limited to: carbonaceous biochemical oxygen demand ("CBOD5"), total suspended solids ("TSS"), ammonia-nitrogen, and phosphorus.

41.    Part I.A.1 of the 2006 NPDES Permit also provides that "[e]ffluent flow measurement is required per 327 IAC 5-2-13" and that "flow meter(s) shall be calibrated at least annually." The relevant Indiana regulations provide, in relevant part: "[t]o assure compliance with permit terms and conditions, all permittees shall monitor, as required in the permit . . . [t]he volume of wastewater flow at monitoring points specified in the permit, including the final effluent flow from each point source." 327 IAC 5-2-13

42.    Part II.B.2 of the 2006 NPDES Permit provides that "bypassing," which is defined in the 2006 NPDES Permit and Indiana regulations at 327 IAC 5-2-8(11)(A) as "the intentional diversion of a waste stream from any portion of a treatment facility," is prohibited unless the bypass was unavoidable to prevent loss of life, personal injury or severe property damage, or there were no feasible alternatives to the bypass. Part II.B.2.d(2) requires the permittee to, among other things, provide a written report within five (5) days of the time the permittee becomes aware of a bypass event, and include in such a report description, duration and cause of the bypass, as well as taken or planned steps to reduce, eliminate or prevent the recurrence of the bypass event."

43.    Part II.B.1.a of the 2006 NPDES Permit provides that:

"[i]n accordance with 327 IAC 5-2-8(8), the permittee shall at all times maintain in good working order and efficiently operate all facilities and systems (and related appurtenances) for collection and treatment that are . . . installed or used by the permittee; and . . . necessary for achieving compliance with the terms and conditions of the [2006 NPDES Permit]."

## 2006 NPDES Permit Requirements Regarding CSO Discharges

44.    Attachment A to the 2006 NPDES Permit establishes requirements that are applicable to discharges from the combined sewer portions of the POTW, *i.e.* portions of the sewer that collect and convey both stormwater and sanitary wastewater.  Section I.A. of Attachment A identifies twelve (12) CSO Outfalls numbered 004 through 015, and authorizes the permittee to discharge wastewater from those CSO Outfalls only during wet weather and only in compliance with the requirements and provisions of the 2006 NPDES Permit.  The permittee is authorized to discharge wastewater, during wet weather and subject to the provisions of the 2006 NPDES Permit into:  (1) the West Branch of the Little Calumet River from Outfalls 004, 005, 013, 014 and 015; and (2) the East Branch of the Grand Calumet River from Outfalls 006, 007, 008, 009, 010, 011 and 012.  Wastewater that is discharged from any of the designated CSO Outfalls into the Little Calumet River or the Grand Calumet River does not reach the WWTP or undergo wastewater treatment at the WWTP.  Attachment A to the 2006 NPDES Permit is subdivided into Sections I through VI.

45.    Section III.C of Attachment A to the 2006 NPDES Permit requires the permittee to "maximize the volume of flows transported to and through the . . . WWTP for treatment before and during a CSO discharge in accordance with the wet weather standard operating procedures included in the approved CSOOP [CSO Operational Plan]."  It also requires the permittee to "maximize the volume of flow through the relevant portion of the collection system before collection system overflows may occur," and provides that "the maximization of flow must continue for the duration of the discharge or diversion."  Section III.A.4, which sets forth minimum technology-based controls in accordance with EPA's CSO Policy, 59 Fed. Reg. 18688

(April 19, 1994), requires the permittee to "operate the POTW at the maximum treatable flow during all wet weather flow conditions to reduce the magnitude, frequency and duration of CSOs" and to "deliver all flows to the treatment plant within the constraints of the treatment capacity of the POTW."

46.     Section I.C of Attachment A to the 2006 NPDES Permit prohibits discharge during dry weather from any portion of the POTW's sewer collection system, including from the CSO Outfalls specified in Section I.A of Attachment A.  Section III.A.5 of Attachment A to the 2006 NPDES Permit, which requires compliance with EPA's CSO Policy described in the preceding Paragraph, similarly provides that "[d]ry weather overflows from CSO outfalls are prohibited."

47.     Section I.B.1 of Attachment A to the 2006 NPDES Permit sets forth the following requirements applicable to the discharge from the CSO Outfalls:

"At all times the discharge from any and all CSO outfalls herein shall not cause receiving waters:

. . . including the mixing zone, to contain substances, materials, floating debris, oil, scum, or other pollutants:

a.   that will settle to form putrescent or otherwise objectionable deposits;
b.   that are in amounts sufficient to be unsightly or deleterious;
c.   that produce color, visible oil sheen, odor, or other conditions in such a degree as to create a nuisance;
d.   which are in amounts sufficient to be acutely toxic to, or otherwise severely injure or kill aquatic life, other animals, plants, or humans; and
e.   which are in concentrations or combinations that will cause or contribute to the growth of aquatic plants or algae to such a degree as to create a nuisance, be unsightly, or otherwise impair the designated uses."

48.     Pursuant to Indiana regulations at 327 IAC 2-1-3(a)(1), all surface waters of the State are designated for full body recreation as provided in Section 6(d) of that rule.  Section 6(d)

12

establishes bacteriological quality for recreational uses during the recreational seasons between the months of April and October, and provides, among other things, that for full body contact recreational uses there may not be more than 235 *Escherichia coli* (*E. coli*) bacteria per 100 milliliters ("mL") of water in any sample taken in a 30-day period. 327 IAC 2-1-6(d)

49.     Section II of Attachment A to the 2006 NPDES Permit requires the permittee to monitor and report the flow from each CSO Outfall and provides that such monitoring and reporting shall include: (1) the measurement of the flow volume; (2) the time that a discharge from any of the CSO Outfalls began, and (3) the flow duration. It also states that "[t]he requirement for the measurement of flow volume may be accomplished by installing a flow measurement device or by utilizing a reliable method of estimating the flow volume."

**Facts Underlying the Alleged Violations of the 2006 NPDES Permit**

50.     Pursuant to Part I.B.3 of the 2006 NPDES Permit, the Defendants, at all times relevant to this Complaint and until July 15, 2010, were required to submit and submitted monitoring reports to IDEM. These reports include Discharge Monitoring Reports ("DMRs"), Monthly Reports of Operation ("MROs"), and CSO Discharge Monitoring Reports ("CSO DMRs").

51.     CSO DMRs described in the preceding Paragraph state that, at times relevant to this Complaint, including but not limited to the period between February 2007 and approximately July 15, 2010, the Defendants discharged wastewater from one or more of the CSO Outfalls at times when the peak influent flow rate reported on the CSO DMRs was lower than the design peak influent flow rate listed on the CSO DMRs.

52.     DMRs described in Paragraphs 50 and 51 show that, at times relevant to this Complaint, including but not limited to the period between July 2006 and September 2008, the final effluent discharged through Outfalls 001 A and 001 B contained the following pollutants in concentrations and/or quantities that exceeded weekly and/or monthly limits established in Part I.A.1 of the 2006 NPDES Permit:  carbonaceous biochemical oxygen demand (CBOD5), ammonia-nitrogen, phosphorus and total suspended solids (TSS).

53.     Reports described in Paragraphs 50 and 51 above, and other documents submitted by the Defendants to EPA and IDEM, show that, at times relevant to this Complaint, including but not limited to days in October 2008 and February 2009, the Defendants reported dry weather overflows, *i.e.*, discharges of wastewater from the CSO Outfalls during dry weather.

54.     At times relevant to this Complaint, the Defendants submitted Bypass/Incident Overflow Reports to IDEM to report, among other things, bypassing of treatment facilities.  In the Bypass/Incident Overflow Reports submitted to IDEM between approximately May 2008 and June 2009, the Defendants stated, among other things, that the wastewater undergoing treatment at the WWTP was bypassed around the effluent sand filter building throughout that time period because "fifty percent of the effluent sand filters was out of service due to cell failures."  Sand filtering constitutes a tertiary, or third, stage of wastewater treatment at the WWTP.

55.     At times relevant to this Complaint, IDEM and EPA visited and inspected the POTW, and generated reports that documented their findings and conclusions.

56.     At all times relevant to this Complaint, the Defendants monitored flow from the CSO Outfalls via a remote "telemetry system," which transmits data from the CSO Outfalls to

14

the operator(s) on duty at the WWTP. The operator(s) on duty monitor and log readings from the telemetry system on "Daily CSO Reports" that are maintained at the WWTP. The logged information includes the date, the starting time and the duration of CSO overflows, and the volume of wastewater discharged during the overflow. The operator(s) on duty is/are required to, among other things: (1) record readings from the telemetry system every two hours; (2) either note any discharges from a given CSO Outfalls at the designated two-hour intervals, or indicate that there were no overflows from a given CSO Outfall at that time; and (3) verify any discharges from the CSO Outfalls reported by the telemetry system by visiting the location of the appropriate CSO Outfall.

57.    At times relevant to this Complaint, including but not limited to the period between June 2007 and April 2010, Defendants entered "CF," *i.e.*, a "communication failure," on the Daily CSO Reports at times when they were unable to receive data from a particular CSO Outfalls due to the malfunctioning of the telemetry system.

58.    At times relevant to this Complaint, including but not limited to the period between July 2007 and December 2008, the information regarding the occurrence, the duration, and/or the volume of flow from specific CSO Outfalls contained in the Daily CSO Reports did not correspond to the information submitted to IDEM on CSO DMRs.

59.    Based on the inspections described in Paragraph 55 above and related documents, at times relevant to this Complaint, including but not limited to the time period between May 2008 and July 15, 2010, the Defendants did not measure the rate of effluent flow from Outfalls 001 A and 001 B by utilizing a meter or another reliable method. Instead, the Defendants

15

estimated the rate of effluent flow by subtracting the recycled flow from the measured influent flow.

60.    At times relevant to this Complaint, specifically during the period between approximately 1998 and July 15, 2010, Gary retained a Contract Compliance Officer ("CCO") to report on the compliance of the Defendants with the Operator Agreement described in Paragraph 35 above.  As part of its duties, the CCO submitted compliance reports to Gary (the "CCO Reports").  The CCO Reports contain, among other things, the CCO's findings based on his inspections of the POTW, including the descriptions of equipment and facilities that were out of service or in need of repair during such inspections.

61.    The CCO Reports and other documents indicate that, at times relevant to this Complaint, including but not limited to the period between February 2008 and April 2010, one or more of the seven raw sewage pumps at the POTW were out of service.

62.    At times relevant to this Complaint, including but not limited to August 2007 and May 2008, Gary and IDEM, among others, performed sampling and analyses of the receiving waters in the Grand Calumet River and the Little Calumet River.

63.    At times relevant to this Complaint, Gary performed sampling and analyses of the wastewater discharged from its CSO Outfalls.

64.    The results of analyses described in Paragraphs 63 and 64 indicate that the wastewater discharged from the CSO Outfalls has, at times relevant to the Complaint and up to approximately July 15, 2010, caused the receiving waters of the Grand Calumet River and the Little Calumet River to contain elevated concentrations of *Escherichia coli* (*E. coli*) bacteria.

### Request For Information Under
### Section 308 of the CWA, 33 U.S.C. § 1318

65.     At times relevant to this Complaint, specifically between approximately 1998 and July, 15 2010, one or more of the Defendants was/were an "operator" of a "point source" within the meaning of Section 308(a) of the CWA, 33 U.S.C. § 1318(a).

66.     On March 22, 2010, EPA issued a request for information pursuant to its authority under Section 308 of the CWA, 33 U.S.C. § 1318 (the "Request for Information").  A copy of the Request for Information is attached to this Complaint as Attachment B.

67.     The Request for Information was issued to Gary Sanitary District, which EPA defined to include "any agents, contractors, governmental bodies or other entities that have performed work or acted in any way on behalf of or at the direction of the Gary Sanitary District."

68.     On March 22, 2010, the date on which the Request for Information was issued, one or more of the Defendants was/were an agent, a contractor, and/or an entity that performed work or acted on behalf of or at the direction of Gary Sanitary District.

69.     Request for Information was received by the Defendants on or around April 27, 2010.

70.     On or around April 27, 2010, the date on which one or more of the Defendants received the Request for Information, one or more of the Defendants was/were an "operator" of the POTW within the meaning of Section 308(a) of the CWA, 33 U.S.C. § 1318(a).

71.     The Request for Information asked the Defendants to provide to EPA information, including documents and narrative responses, related to the Defendants' compliance with the

17

terms and conditions of the 2006 NPDES Permit. The specific information requested by EPA is set forth in Paragraphs 26-48 of Attachment B.

72.     The information requested by EPA through the Request for Information was reasonably required by EPA to determine whether the Defendants were in violation of the requirements of the 2006 NPDES Permit.

73.     Pursuant to the Request for Information, the Defendants were required to submit the requested information within 30 days of their receipt of the Request for Information.

74.     In a letter to the United States dated April 13, 2010, Gary stated that it was unable to comply with the Request for Information without the assistance of United Water.

75.     In a letter to the United States dated May 7, 2010, the Defendants informed the United States that they had not received the Request for Information until after the deadline to respond had passed, and proposed a modified schedule for responding to the Request for Information.

76.     In a letter to the Defendants and Gary, dated June 2, 2010, EPA granted the following extensions for responding to the Request for Information, beginning on the date(s) on which EPA's letter was received by the Defendants and Gary: (1) a 15-day extension for submitting the information requested in Paragraphs 41, 42, 46, 47 and 48 of the Request for Information; (2) a 30-day extension for submitting the information requested in Paragraphs 29, 31, 35, 37, 38, 43, 44 and 45 of the Request for Information; and (3) a 90-day extension for submitting the information requested in Paragraphs 26, 27, 28, 30, 32, 33, 34, 36, 39 and 40 of the Request for Information.

77.    During June 2010, Gary submitted information to EPA in response to several requests set forth in the Request for Information.

78.    In a letter to Gary dated October 28, 2010, after the deadline(s) described in Paragraph 77 had passed, EPA stated that it had not received complete information in response to requests set forth in Paragraphs 26, 27, 28, 30, 31, 32, 34, 35, 36, 37, 38, 43, 44 and 45 of the Request for Information.

79.    On January 3, 2011, EPA forwarded the October 28, 2010 letter via electronic mail to the Defendants' counsel.

80.    On February 9, 2011, EPA issued a separate request for information under CWA Section 308, 33 U.S.C. § 1318, to the Defendant United Water, Inc.  The February 9, 2011 request contained identical requests as the Request for Information.

81.    On February 16, 2011, the Defendants and Gary requested a 60-day extension for responding to the Request for Information, which EPA declined to extend.

82.    EPA received documents and/or narrative responses in response to its Request for Information from United Water, Inc. on March 16, 2011 and October 16, 2012.

## ENFORCEMENT PROVISIONS

83.    Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, when it finds any person in violation of, among other things:  (1) Section 301 of the CWA, 33 U.S.C. § 1311; (2) Section 308 of the CWA, 33 U.S.C. § 1318, or (3) any term or condition  implementing the provisions of the Act in a NPDES permit issued under Section 402 of the CWA, 33 U.S.C. § 1342.  33 U.S.C § 1319(a) and (b).  Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides

that any person who violates, among other things, Section 301 of the CWA, Section 308 of the CWA, or any condition or limitation that implements the provisions of the Act in a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty not to exceed $25,000 per day for each violation.

84.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Pub. L. 101-410, 104 Stat. 890 (1990)), as amended by the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701 note; Pub. L. 104-134, 110 Stat. 1321 (1996)), EPA promulgated the Civil Monetary Penalty Inflation Adjustment Rule.  Under that rule, EPA may seek civil penalties of up to $32,500 per day for each violation occurring after March 15, 2004 and on or before January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.  *See* 61 Fed. Reg. 69,360 (Dec. 31, 1996); 69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg. 75, 345 (Dec. 11, 2008).

85.    Indiana regulations at 327 IAC 5-2-20 subject the person causing or contributing to, among other violations, the discharge of a pollutant in violation of any effluent limitation in, or other term or condition of, a NPDES permit to administrative or judicial enforcement proceedings.

86.    IC § 13-30-4-1 and 13-14-2-6 provide that any person that violates any provision of environmental management or water pollution control laws, or any permit issued under environmental management or water pollution control laws, is liable for a civil penalty not to exceed $25,000 dollars per day of violation, and authorize IDEM to commence an appropriate civil action.

20

## FIRST CLAIM FOR RELIEF

### (Failure to Adequately Maintain and Operate POTW Facilities as Required by 2006 NPDES Permit, Part II.B.1)

87.     Paragraphs 1 through 86 are incorporated herein by reference.

88.     At times relevant to this Complaint and until approximately July 15, 2010, as described in Paragraphs 50 through 64, the Defendants failed to maintain in good working order and efficiently operate equipment, including raw sewage pumps, telemetry system, and sand filters

89.     The raw sewage pumps, the telemetry system and the sand filters described in the preceding paragraph were "facilities and systems for collection and treatment that [the Defendants] installed and/or were using at the POTW" within the meaning of Part II.B.1 of the 2006 NPDES Permit.

90.     The facilities and systems described in Paragraphs 50 through 64, including but not limited to the raw sewage pumps, the telemetry system, and the sand filters, are necessary for achieving compliance with the terms and conditions of the 2006 NPDES Permit, including, but not limited to:  (1) maximizing the volume of flows transported to and through the WWTP and the POTW for treatment before and during a CSO discharge in accordance with Section III.A.4 and Section III.C of Attachment A to the 2006 NPDES Permit; (2) complying with the requirement to monitor and report information about flow from the CSO Outfalls set forth in Section II of Attachment A to the 2006 NPDES Permit; and (3) preventing the "bypassing" of treatment facilities as required by Part II.B.2 of the 2006 NPDES Permit.

91.    Failure to maintain in good working order and efficiently operate facilities and systems, including but not limited to raw sewage pumps, the telemetry system, and the sand filters, as described in this Claim for Relief, violates Part II.B.1.a of the 2006 NPDES Permit.

92.    Each failure to maintain in good working order and efficiently operate each facility or system on each day is a separate violation of the 2006 NPDES Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

93.    Each failure to maintain in good working order and efficiently operate each facility or system on each day is a separate violation of the 2006 NPDES Permit, IC § 13-30-2-1 and 327 IAC 5-2-2.

94.    For each violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), referred to in this Claim for Relief, the Defendants are subject to civil penalties up to $32,500 per day for each violation occurring up to January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

95.    For each violation of IND. CODE § 13-30-2-1 and 327 IND. ADMIN. CODE 5-2-2, the Defendants are subject to civil penalties up to $25,000 per day for each violation.

## SECOND CLAIM FOR RELIEF

### (Failure to Maximize Treatable Flow as Required by 2006 NPDES Permit, Attachment A, Sections III.C and III.A.4)

96.    Paragraphs 1 through 86 of this Complaint are incorporated herein by reference.

97.    At times relevant to this Complaint, as described in Paragraphs 51-52 above, the Defendants discharged wastewater from the designated CSO Outfalls specified in Section I.A of Attachment A to the 2006 NPDES Permit during wet weather events without maximizing the

22

volume of flows transported to and through the WWTP and without operating the POTW at the maximum treatable flow.

98.     The discharge of wastewater from the CSO Outfalls by the Defendants during wet weather events without maximizing the volume of flows transported to and through the WWTP, and operating the POTW at the maximum treatable flow, is a violation of Sections III.A.4 and III.C of Attachment A to the 2006 NPDES Permit.

99.     Each discharge from each CSO Outfall on each day when the Defendants failed to maximize the volume of flows transported to and through the WWTP, or operate the POTW at the maximum treatable flow, is a separate violation of the 2006 NPDES Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

100.    Each discharge from each CSO Outfall on each day when the Defendants failed to maximize the volume of flows to and through the WWTP, or failed to operate the POTW at the maximum treatable flow, is a separate violation of the 2006 NPDES Permit, IC § 13-30-2-1 and 327 IAC 5-2-2.

101.    For each violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), described in this Claim for Relief, the Defendants are subject to civil penalties up to $32,500 per day for each violation occurring up to January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

102.    For each violation of IC § 13-30-2-1 and 327 IAC 5-2-2, the Defendants are subject to civil penalties up to $25,000 per day for each violation.

## THIRD CLAIM FOR RELIEF

**(Violations of the Prohibition on Dry Weather Discharges in 2006 NPDES Permit, Attachment A, Sections I.C and III.A.5)**

103.    Paragraphs 1 through 86 of this Complaint are incorporated herein by reference.

104.    At times relevant to this Complaint, as described in Paragraph 53, the Defendants discharged wastewater during dry weather from the designated CSO Outfalls specified in Section I.A of Attachment A to the 2006 NPDES Permit.

105.    The discharge of wastewater during dry weather from the CSO Outfalls violates the prohibition against dry weather discharges set forth in Section I.C and Section III.A.5 of Attachment A to the 2006 NPDES Permit.

106.    Each discharge during dry weather from each CSO Outfall on each day is a separate violation of the 2006 NPDES Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

107.    Each discharge during dry weather from each CSO Outfall on each day is a separate violation of the 2006 NPDES Permit, IND. CODE § 13-30-2-1 and 327 IND. ADMIN. CODE 5-2-2.

108.    For each violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), described in this Claim for Relief, the Defendants are subject to civil penalties up to $32,500 per day for each violation occurring up to January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

109.    For each violation of IC § 13-30-2-1 and 327 IAC 5-2-2 described in this Claim for relief, the Defendants are subject to civil penalties up to $25,000 per day for each violation.

## FOURTH CLAIM FOR RELIEF

**(Violations of Discharge Requirements in 2006 NPDES Permit, Attachment A, Section I.B)**

110.    Paragraphs 1 through 86 of this Complaint are incorporated herein by reference.

111.    At times relevant to this Complaint, as described in Paragraphs 62 through 64, the Defendants discharged wastewater that contained pollutants, including but not limited to *E. coli*, from the CSO Outfalls specified in Section I.A of Attachment A to the 2006 NPDES Permit into the Little Calumet River and the Grand Calumet River.

112.    The discharges from the CSO Outfalls described in the preceding Paragraph caused waters in the Little Calumet River and the Grand Calumet River to contain substances, materials, floating debris, oil, scum, and/or other pollutants, including but not limited to *E. coli*, that are in amounts sufficient to be unsightly or deleterious, in violation of discharge requirements set forth in Section I.B.1 of Attachment A to the 2006 NPDES Permit.

113.    Each discharge described in this Claim for Relief through each CSO Outfall on each day is a separate violation of the 2006 NPDES Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

114.    Each discharge described in this Claim for Relief through each CSO Outfall on each day is a separate violation of the 2006 NPDES Permit, IND. CODE § 13-30-2-1 and 327 IND. ADMIN. CODE 5-2-2.

115.    For each violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), described in this Claim for Relief, the Defendants are subject to civil penalties up to $32,500 per day for each violation occurring up to January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

116.    For each violation of IC § 13-30-2-1 and 327 IAC 5-2-2 described in this Claim for Relief, the Defendants are subject to civil penalties up to $25,000 per day for each violation.

## FIFTH CLAIM FOR RELIEF

**(Bypassing of Treatment Facilities in Violation of 2006 NPDES Permit, Attachment A, Section II.B.2)**

117.    Paragraphs 1 through 86 of this Complaint are incorporated herein by reference.

118.    At times relevant to this Complaint, as described in Paragraph 54, the Defendants bypassed treatment facilities, including but not limited to sand filters, by intentionally diverting waste stream from those facilities.

119.    The bypassing of treatment facilities, as described in the preceding paragraph and Paragraph 55, violates Section II.B.2 of Attachment A of the 2006 NPDES Permit.

120.    Each instance of bypassing of treatment facilities on each day is a separate violation of the 2006 NPDES Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

121.    Each instance of bypassing of treatment facilities on each day is a separate violation of the 2006 NPDES Permit, IND. CODE § 13-30-2-1 and 327 IND. ADMIN. CODE 5-2-2.

122.    For each violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), described in this Claim for Relief, the Defendants are subject to civil penalties up to $32,500 per day for each violation occurring up to January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

123.    For each violation of IC § 13-30-2-1 and 327 IAC 5-2-2, described in this Claim for Relief, the Defendants are subject to civil penalties up to $25,000 per day for each violation.

## SIXTH CLAIM FOR RELIEF

### (Failure to Comply with Final Effluent Limitations Established in 2006 NPDES Permit, Part I.A.1)

124.    Paragraphs 1 through 86 of this Complaint are incorporated herein by reference.

125.    At times relevant to this Complaint, as described in Paragraph 52, the final effluent discharged by the Defendants from the WWTP through Outfalls 001 A and 001 B contained five-day carbonaceous biochemical oxygen demand (CBOD5), ammonia-nitrogen, phosphorus and total suspended solids (TSS) in concentrations and/or quantities that exceeded their allowable numerical limits for those pollutants established in Part I.A.1 of the 2006 NPDES Permit.

126.    Each violation of each numerical limit set forth in Part I.A.1 of the 2006 NPDES Permit on each day is a separate violation of the 2006 NPDES Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

127.    Each violation of each numerical limit set forth in Part I.A.1 of the 2006 NPDES on each day is a separate violation of the 2006 NPDES Permit, IC § 13-30-2-1 and 327 IAC 5-2-2.

128.    For each violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), described in this Claim for Relief, the Defendants are subject to civil penalties up to $32,500 per day for each violation occurring up to January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

129.    For each violation of IC § 13-30-2-1 and 327 IAC 5-2-2 described in this Claim for Relief, the Defendants are subject to civil penalties up to $25,000 per day for each violation.

## SEVENTH CLAIM FOR RELIEF

### (Failure to Monitor Final Effluent as Required by 2006 NPDES Permit, Part I.A.1)

130.    Paragraphs 1 through 86 of this Complaint are incorporated herein by reference.

131.    At times relevant to this Complaint, as described in Paragraphs 59, the Defendants did not measure effluent flow from Outfalls 001 A and 001 B with a meter.

132.    Failure to measure effluent flow from Outfalls 001 A and 001 B violates the requirements of Part I.A.1 of the 2006 NPDES Permit.

133.    Each failure to measure effluent flow as required by Part I.A.1 of the 2006 NPDES Permit on each day is a separate violation of  the 2006 NPDES Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

134.    Each failure to measure effluent flow as required by Part I.A.1 of the 2006 NPDES Permit on each day is a separate violation of the 2006 NPDES Permit and IC § 13-30-2-1 and 327 IAC 5-2-2.

135.    For each violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), described in this Claim for Relief, the Defendants are subject to civil penalties up to $32,500 per day for each violation occurring up to January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

136.    For each violation of IC § 13-30-2-1 and 327 IAC 5-2-2 described in this Claim for Relief, the Defendants are subject to civil penalties up to $25,000 per day for each violation.

## EIGHTH CLAIM FOR RELIEF

### (Failure to Report Flow from CSO Outfalls as Required by 2006 NPDES Permit, Attachment A, Section II)

137.    Paragraphs 1 through 86 of this Complaint are incorporated herein by reference.

138.    At times relevant to this Complaint, as described in Paragraphs 57-58, Defendants did not report to IDEM on the CSO DMRs one or more of the following categories of information pertaining to discharges from the CSO Outfalls:  the volume of flow; the time that a CSO discharge began; and flow duration.

139.    Failure to report the information described in the preceding paragraph on CSO DMRs submitted to IDEM is a violation of Section II of Attachment A of the 2006 NPDES Permit.

140.    Each failure to report each  category of information specified in Section II of Attachment A of the 2006 NPDES Permit on each day is a separate violation of the 2006 NPDES Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

141.    Each failure to report each category of information specified in Section II of Attachment A of the 2006 NPDES Permit on each day is a separate violation of the 2006 NPDES Permit, IC § 13-30-2-1, and 327 IAC 5-2-2.

142.    For each violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), described in this Claim for Relief, the Defendants are subject to civil penalties up to $37,500 per day for each violation.

143.    For each violation of IC § 13-30-2-1 and 327 IAC 5-2-2 described in this Claim for Relief, the Defendants are subject to civil penalties up to $25,000 per day for each violation.

## NINTH CLAIM FOR RELIEF

### (Failure to Comply with Request for Information Issued Under 33 U.S.C. § 1318)

144.    Paragraphs 1 through 86 of this Complaint are incorporated herein by reference.

145.    As described in Paragraphs 67 through 85, the Defendants failed to provide the information requested in Paragraphs 26, 27, 28, 30, 32, 34, 35, 36, 37, 38,  42, 43, 44 and 45 of the Request for Information in a timely manner by the extended deadlines established by EPA as described by Paragraph 76.

146.    As of the date of the filing of this Complaint, EPA has not received all the information it requested in the Request for Information.

147.    EPA has reasonably required, and continues to require, the information requested in the Request for Information to determine whether the Defendants complied with the standards and limitations established in the CWA, including but not limited to the terms and conditions of the 2006 NPDES Permit.

148.    Defendants' failure to submit information that is reasonably required by EPA to determine whether the Defendants were in compliance with the standards and limitations established in the CWA during their operation of the POTW, including but not limited to terms and conditions of the 2006 NPDES Permit, violates  Section 308 of the Clean Water Act, 33 U.S.C. § 1318.

149.    Each day on which the Defendants failed to submit the information requested in the Request for Information after the applicable deadlines established in EPA, as described in Paragraph 76, is a violation of Section 308 of the CWA, 33 U.S.C. § 1318.

150.    Unless enjoined by this Court, the Defendants will continue to violate Section 308 of the CWA, 33 U.S.C. § 1318.

151.    For each violation of Section 308 of the CWA, 33 U.S.C. § 1318, described in this Claim for Relief, the Defendants are subject to civil penalties up to $32,500 per day for each

30

violation occurring up to January 12, 2009, and up to $37,500 per day for each violation occurring after January 12, 2009.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States of America and the State of Indiana, respectfully pray that this Court provide the following relief:

1. A judgment assessing civil penalties against the Defendants and in favor of the United States, not to exceed $32,500 per day for each violation of the CWA which occurred after March 15, 2004 and on or before January 12, 2009, and not to exceed $37,500 per day for each violation of the CWA which occurred after January 12, 2009;

2. A judgment assessing civil penalties against the Defendants and in favor of the State, not to exceed $25,000 per day for each violation of Ind. Code § 13-18-4-5;

3. Award the United States of America and the State of Indiana their costs in this action; and

4. Grant such other relief as this Court deems appropriate.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

SAM HIRSCH
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Signature Page for *United States and the State of Indiana v. United Water, Inc. et al.* (N.D. Ind.)


THOMAS MARIANI
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division


IVA ZIZA
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Phone: (202) 514-3211
Facsimile: (202) 616-6584
Email: iva.ziza@usdoj.gov

Signature Page for *United States and the State of Indiana v. United Water, Inc. et al.* (N.D. Ind.)

DAVID CAPP
United States Attorney

WAYNE T. AULT
Assistant United States Attorney
Northern District of Indiana
5400 Federal Plaza
Hammond, IN 46320
Phone:  219-937-5500
Fax: 219-852-2770
Email: wayne.ault@usdoj.gov

OF COUNSEL

MARK KOLLER
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 W. Jackson Blvd.
Chicago, Illinois 60604

SUSHILA NANDA
Senior Attorney Advisor
USEPA-OCE-WED
Ariel Rios Building
12th Street and Pennsylvania Avenue, N.W.
Room 4111C
Washington, D.C. 20004

Signature Page for *United States and the State of Indiana v. United Water, Inc. et al.* (N.D. Ind.)

Respectfully submitted

GREGORY F. ZOELLER
Indiana Attorney General
  Attorney No. 1958-98

By: _____
    Timothy J. Junk
    Deputy Attorney General
    Atty. No.5587-02

Office of the Attorney General
Indiana Government Center South
Fifth Floor
402 W. Washington Street
Indianapolis, IN  46204-2770
Telephone: (317) 232-6247

tim.junk@atg.in.gov

# ATTACHMENT A

# JUNE 13, 2006 NPDES PERMIT NO. IN0022977

 **INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT**
*We make Indiana a cleaner, healthier place to live.*

*Mitchell E. Daniels, Jr.*
Governor

*Thomas W. Easterly*
Commissioner

June 13, 2006

100 North Senate Avenue
Indianapolis, Indiana 46204
(317) 232-8603
(800) 451-6027
www.IN.gov/idem

<u>VIA CERTIFIED MAIL</u>        7002 0510 0003 0027 3660

Ms. Lucy Horton
Acting Director, Gary Sanitary District
3600 West 3rd Avenue
Gary, Indiana 46402

Re:    Final NPDES Permit No. IN0022977
        Gary Sanitary District's WWTP
        Lake County

Dear Ms. Horton:

Your application for a National Pollutant Discharge Elimination System (NPDES) permit has been processed in accordance with Sections 402 and 405 of the Federal Water Pollution Control Act as amended, (33 U.S.C. 1251, et seq.), and IDEM's permitting authority under IC 13-15. The enclosed NPDES permit covers your discharges to the East Branch of the Grand Calumet River. All discharges from this facility shall be consistent with the terms and conditions of this permit.

One condition of your permit requires monthly reporting of several effluent parameters. Reporting is to be done on the enclosed Monthly Report of Operation (MRO) form. You should duplicate this form as needed for future reporting. This form is also available on the internet at the following web site:

http://www.in.gov/idem/compliance/water/wastewater/compeval/forms/index.html

You will soon be receiving a supply of the computer-generated preprinted federal NPDES DMR forms. Both the state and federal forms need to be completed and submitted on a monthly basis. If you do not receive the preprinted DMR forms in a timely manner, please call this office at 317/232-8742.

Another condition which needs to be clearly understood concerns violation of the effluent limitations in the permit. Exceeding the limitations constitutes a violation of the permit and may bring criminal or civil penalties upon the permittee. (See Part II.A.1 and II.A.11 of this permit). It is very important that your office and treatment operator understand this part of the permit.

*Recycled Paper*        An Equal Opportunity Employer        *Please Recycle*

Please note that this permit issuance can be appealed.  An appeal must be filed under procedures outlined in IC 13-15-6, IC 4-21.5, and the enclosed public notice.  The appeal must be initiated by you within 18 days from the date this letter is postmarked, by filing a request for an adjudicatory hearing with the Office of Environmental Adjudication (OEA), at the following address:

> Office of Environmental Adjudication
> Indiana Government Center North
> 100 North Senate Avenue, Room 1049
> Indianapolis, IN 46204

Please send a copy of any such appeal to me at IDEM, Office of Water Quality-Mail Code 65-42, 100 North Senate Avenue, Indianapolis, Indiana 46204-2251.

Please reference the "Post Public Notice Addendum", on the final pages of the Fact Sheet, for this Office's response to comments submitted during the public notice period.

The permit should be read and studied.  It requires certain action at specific times by you, the discharger, or your authorized representative.  One copy of this permit is also being sent to your operator to be kept at the treatment facility.  You may wish to call this permit to the attention of your consulting engineer and/or attorney.

If you have any questions concerning your NPDES permit, please contact Roger Rylatt at 317/232-8619.  Questions concerning appeal procedures should be directed to the Office of Environmental Adjudication, at 317/232-8591.

Sincerely,

Bruno Pigott
Assistant Commissioner
Office of Water Quality

Enclosures
cc: Lake County Health Department
    U.S. EPA, Region V
    Northwest Regional Office, IDEM
    The Honorable Rudolph Clay, Mayor
    Donald Smales - Greeley and Hansen, LLC
    Bob Theodorou, Superintendent

Page 1 of 59
Permit No. IN0022977

STATE OF INDIANA
DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
AUTHORIZATION TO DISCHARGE UNDER THE
NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM

In compliance with the provisions of the Federal Water Pollution Control Act, as amended, (33 U.S.C. 1251 et seq., the "Act"), Title 13 of the Indiana Code, and regulations adopted by the Water Pollution Control Board, the Indiana Department of Environmental Management (IDEM) is issuing this permit to the

## GARY SANITARY DISTRICT

The permittee owns and/or operates a major municipal wastewater treatment plant located at 3600 West 3rd Avenue, Gary, Indiana. The permittee is hereby authorized to discharge from the outfalls identified in Part I of this permit to receiving waters named the East Branch of the Grand Calumet River in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in the permit. The permittee is also authorized to discharge from combined sewer overflow outfalls listed in Attachment A of this permit, to receiving waters named the West Branch Little Calumet River and the East Branch of the Grand Calumet River in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in the permit.

Effective Date:    July 1, 2006

Expiration Date:    June 30, 2011

In order to receive authorization to discharge beyond the date of expiration, the permittee shall submit such information and application forms as are required by the Indiana Department of Environmental Management. The application shall be submitted to IDEM at least 180 days prior to the expiration date of this permit, unless a later date is allowed by the Commissioner in accordance with 327 IAC 5-3-2 and Part II.A.4 of this permit.

Issued on    June 13, 2006    , for the Indiana Department of Environmental Management.

Bruno Pigott
Assistant Commissioner
Office of Water Quality

## TREATMENT FACILITY DESCRIPTION

The Gary Sanitary District's Wastewater Treatment Plant is a 60 MGD, single-stage Class IV facility consisting of a trash rack, four mechanical bar screens, two grit tanks followed by raw sewage pumps with wet well, 10 primary settling tanks, a scum concentration tank, six aeration tanks, twenty-four secondary settling tanks followed by dual wet wells and 10 granular media filters with mud well. Phosphorus removal is provided using chemical precipitation. Disinfection is by sodium hypochlorite followed by dechlorination utilizing sodium bisulfite. Sludge is thickened by gravity thickeners (primary sludge) and gravity belt thickeners (waste activated sludge) followed by anaerobic digestion and belt filter presses and is ultimately disposed of in a sanitary landfill. The final effluent is discharged through parallel Outfalls 001 A & B emanating from the chlorine contact tanks.

Mass limits are based on a peak design flow of 180 MGD.

## PART I

### A. EFFLUENT LIMITATIONS AND MONITORING REQUIREMENTS

The permittee is authorized to discharge from the outfall(s) listed below in accordance with the terms and conditions of this permit. The permittee shall take samples and measurements at a location representative of each discharge to determine whether the effluent limitations have been met. Refer to Part I.B of this permit for additional monitoring and reporting requirements.

1. Beginning on the effective date of this permit, the permittee is authorized to discharge from Outfalls 001 A & B which are located at latitude 41°37' 15" longitude 87° 23' 18". The discharge is subject to the following requirements:

### TABLE 1

| Parameter [1] | Quantity or Loading | | | Quality or Concentration | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|---|
| | Monthly Average Report | Weekly Average Report | Units | Monthly Average | Weekly Average | Units | Measurement Frequency | Sample Type |
| Flow [1] | Report | Report | MGD | ---- | ---- | ---- | Daily | 24-Hr. Total |
| CBOD5 | | | | | | | | |
| Summer [2] | 7511 | 11266 | lbs/day | 5.0 | 7.5 | mg/l | Daily | 24-Hr. Composite |
| Winter [3] | 13218 | 19828 | lbs/day | 8.8 | 13.2 | mg/l | Daily | 24-Hr. Composite |
| TSS | | | | | | | | |
| Summer [2] | 9013 | 13519 | lbs/day | 6.0 | 9.0 | mg/l | Daily | 24-Hr. Composite |
| Winter [3] | 14420 | 21630 | lbs/day | 9.6 | 14.4 | mg/l | Daily | 24-Hr. Composite |
| Ammonia-nitrogen-interim [*] | | | | | | | | |
| Summer [2] | 3004 | 4506 | lbs/day | 2.0 | 3.0 | mg/l | Daily | 24-Hr. Composite |
| Winter [3] | 3605 | 5408 | lbs/day | 2.4 | 3.6 | mg/l | Daily | 24-Hr. Composite |

## TABLE 2

| Parameter | Quality or Concentration Daily Minimum | Daily Maximum | Monthly Average | Units | Monitoring Requirements Measurement Frequency | Sample Type |
|---|---|---|---|---|---|---|
| pH [6] | 6.0 | 9.0 | ---- | s.u. | Daily | Grab |
| Dissolved Oxygen [5] | | | | | | |
| Summer [2] | 6.0 | ---- | ---- | mg/l | Daily | 12 Grabs/24-Hrs. |
| Winter [3] | 5.0 | ---- | ---- | mg/l | Daily | 12 Grabs/24-Hrs. |
| Oil & Grease | ---- | 10.0 | ---- | mg/l | 5 X Weekly | Grab |
| *E. coli* [11] | ---- | 235 | 125 | colonies/100 ml | Daily | Grab |
| Phosphorus [4] | ---- | ---- | 1.0 | mg/l | Daily | 24 Hr. Composite |

## TABLE 3

| Parameter | Quantity or Loading Monthly Average | Daily Maximum | Units | Quality or Concentration Monthly Average | Daily Maximum | Units | Monitoring Requirements Measurement Frequency | Sample Type |
|---|---|---|---|---|---|---|---|---|
| Ammonia-nitrogen-final [*] | | | | | | | | |
| Summer [2] | 1502 | 3500 | lbs/day | 1.00 | 2.33 | mg/l | Daily | 24-Hr. Composite |
| Winter [3] | 1697 | 3951 | lbs/day | 1.13 | 2.63 | mg/l | Daily | 24-Hr. Composite |
| Total Residual Chlorine [7,10][*] | | | | | | | | |
| Interim [9] | 30 | 60 | lbs/day | 0.02 | 0.04 | mg/l | Daily | Grab |
| Final [8] | 12 | 27 | lbs/day | 0.008 | 0.018 | mg/l | Daily | Grab |

[*] Refer to the Schedule of Compliance in Part I.D of this permit.

[1] Effluent flow measurement is required per 327 IAC 5-2-13. The flow meter(s) shall be calibrated at least once annually.

[2] Summer limitations apply from May 1 through November 30 of each year.

[3] Winter limitations apply from December 1 through April 30 of each year.

[4] In accordance with 327 IAC 5-10-2(b), the facility must produce an effluent containing no more than 1.0 mg/l total phosphorus (P) any month that the average phosphorus level in the raw sewage is greater than 5 mg/l. Otherwise, a degree of reduction, as prescribed below, must be achieved. Such reduction is to be calculated based on monthly average raw and final concentrations.

| Phosphorus (P) Level in Raw Sewage (mg/l) | Required Removal (%) |
|---|---|
| greater than or equal to 4 | 80% |
| less than 4, greater than or equal to 3 | 75% |
| less than 3, greater than or equal to 2 | 70% |
| less than 2, greater than or equal to 1 | 65% |
| less than 1 | 60% |

[5] The minimum daily average concentration of dissolved oxygen in the effluent shall be the arithmetic mean determined by summation of the twelve daily grab sample results divided by the number of daily grab samples. These samples are to be collected over equal time intervals.

[6] If the permittee collects more than one grab sample on a given day for pH, the values shall not be averaged for reporting daily maximums or daily minimums. The permittee must report the minimum or maximum value of any individual sample during the month on the Discharge Monitoring Report forms.

Disinfection Requirements

[7] The effluent shall be disinfected on a continuous basis such that violations of the applicable bacteriological limitations for *E. coli* do not occur from April 1 through October 31, annually. If the permittee uses chlorine for any reason, at any time including the period from November 1 through March 31, then the limits and monitoring requirements in Table 3 for total residual chlorine shall be in effect whenever sodium hypochlorite is used.

[8] The final monthly average water quality based effluent limit (WQBEL) for total residual chlorine is less than the limit of quantitation (LOQ) as specified below. Compliance with the total residual chlorine concentration limitations will be demonstrated if the monthly average effluent level is less than or equal to the monthly average WQBEL. For the purpose of calculating the monthly average value, the daily effluent values that are less than the LOQ may be assigned a value of zero (0), unless, after considering the number of monitoring results that are greater than the limit of detection (LOD), and applying appropriate statistical techniques, a value other than zero (0) is warranted.

The final daily maximum WQBEL for total residual chlorine is less than the LOD value specified in the permit. Compliance with this effluent limitation will be demonstrated if the measured daily effluent concentrations are less than the LOQ. For daily maximum mass limitations based on WQBELs which are less than the LOQ value, compliance with the daily maximum mass value is based on the LOQ value. Compliance with the daily maximum mass value will be demonstrated if the calculated mass value is less than **90.1 lbs/day**

[9] The water quality-based interim daily maximum limitation for total residual chlorine is equal to or greater than the limit of detection (LOD), but is less than the limit of quantitation (LOQ), and the interim monthly average water quality based effluent limitation for this parameter is equal to or greater than the LOD, but less than the limit of quantitation. Compliance with these effluent limitations will be demonstrated if the measured effluent concentrations are less than the limit of quantitation.

Page 5 of 59
Permit No. IN0022977

[10] At present, two methods are acceptable to IDEM measure total residual chlorine: amperometric and DPD colorimetric methods.

| Parameter | LOD | LOQ |
|-----------|-----|-----|
| Chlorine | 0.02 mg/l | 0.06 mg/l |

Case-Specific MDL

The permittee may determine a case-specific method detection level (MDL) using the analytical method specified above. The MDL shall be derived by the procedure specified for MDLs contained in 40 CFR Part 136, Appendix B, and the limit of quantitation shall be set equal to 3.18 times the MDL. Other methods may be used if first approved by the U.S. EPA and IDEM.

[11] The *E. coli* limitations and monitoring requirements apply from April 1 through October 31 annually. The monthly average *E. coli* value shall be calculated as a geometric mean.

IDEM has specified the following methods as allowable for the detection and enumeration of *Escherichia coli (E. coli)*:

1. Coliscan MF® Method
2. EPA Method 1103.1 using original m-TEC agar.
3. EPA revised Method 1103.1 using modified m-TEC agar.
4. *Standard Methods* 20th Edition Method 9223 B using Colilert® - for use of this procedure, an initial comparison study must be conducted between Colilert® and an approved membrane filtration method. This comparison study must be approved by IDEM before this method can be used by the permittee.

2.  <u>Minimum Narrative Limitations</u>

    At all times the discharge from Outfall 001 A & B shall not cause receiving waters:

    a.  including the mixing zone, to contain substances, materials, floating debris, oil, scum or other pollutants:

        (1)  that will settle to form putrescent or otherwise objectionable deposits;

        (2)  that are in amounts sufficient to be unsightly or deleterious;

        (3)  that produce color, visible oil sheen, odor, or other conditions in such degree as to create a nuisance;

        (4)  which are in amounts sufficient to be acutely toxic to, or to otherwise severely injure or kill aquatic life, other animals, plants, or humans;

        (5)  which are in concentrations or combinations that will cause or contribute to the growth of aquatic plants or algae to such a degree as to create a nuisance, be unsightly, or otherwise impair the designated uses.

    b.  outside the mixing zone, to contain substances in concentrations which on the basis of available scientific data are believed to be sufficient to injure, be chronically toxic to, or be carcinogenic, mutagenic, or teratogenic to humans, animals, aquatic life, or plants.

3. Additional Discharge Limitations and Monitoring Requirements

Beginning on the effective date of the permit, the effluent from Outfalls 001 A & B shall be limited and monitored by the permittee as follows:

TABLE 4

| Parameter [1,6] | Quantity or Loading Monthly Average | Daily Maximum | Units | Quality or Concentration Monthly Average | Daily Maximum | Units | Monitoring Requirements Measurement Frequency | Sample Type |
|---|---|---|---|---|---|---|---|---|
| Cyanide | Report | Report | lbs/day | | Report | mg/l | 1 X Weekly | See [3] Below |
| Mercury [5] [*] | | | | | | | | |
| Interim [4] | ---- | ---- | lbs/day | 30.0 | 70.0 | ng/l | 6 X Annually | Grab |
| Final | 0.00065 | 0.0016 | lbs/day | 1.30 | 3.16 | ng/l | 6 X Annually | Grab |
| Chlorides [2] | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Sulfate [2] | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Fluoride [2] | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| TDS [2] | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Chromium | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Copper | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Iron | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Lead | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Zinc | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Phenols [4AAP] | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Nickel | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Cadmium | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Arsenic [2] | ---- | Report | lbs/day | ---- | Report | mg/l | Quarterly | 24 Hr. Comp. |

[*] Refer to the 60-month Schedule of Compliance for mercury in Part I.E of this permit.

[1] All metals shall be reported as Total Recoverable Metals. Cyanide shall be reported as Free Cyanide or Cyanide Amenable to Chlorination.

[2] The above-noted parameters are to be analyzed by a test method which measures the total quantity.

[3] The maximum holding time is 24 hours when sulfide is present. Therefore, initially the CN sample should be a grab sample that is tested with lead acetate paper before pH adjustments in order to determine if sulfide is present. If sulfide is present, it can be removed by the addition of cadmium nitrate powder until a negative spot test is obtained. The sample is filtered and then NaOH is added to pH 12. The sample may then be analyzed within 14 days. Alternatively, if the permittee can demonstrate that the wastewater contains no sulfide, the permittee may collect a composite sample and analyze it within 14 days.

Page 8 of 59
Permit No. IN0022977

[4] The interim water quality-based limitations for mercury are less than the limit of detection (LOD) for EPA Method 245.1 and 245.2 as defined below. Compliance with these effluent limitations will be demonstrated if the measured effluent concentrations are less than the limit of quantitation utilizing EPA test method 245.1 or 245.2.

| Parameter | EPA Method | LOD | LOQ |
|-----------|------------|-----|-----|
| Mercury | 245.1 or 245.2 | 200 ng/l | 600 ng/l |

CASE-SPECIFIC LOD/LOQ

The permittee may determine a case-specific limit of detection or limit of quantitation using the analytical method specified above. The limit of detection shall be derived by the procedure specified for method detection limits contained in 40 CFR Part 136, Appendix B, and the limit of quantitation shall be set equal to 3.18 times the limit of detection. Other methods may be used if first approved by EPA and IDEM. When the measured effluent level is between the LOD and the LOQ, the commissioner may require a period of accelerated monitoring. For the purpose of calculating the monthly average value, the daily effluent values that are less than the LOQ may be assigned a value of zero (0), unless, after considering the number of monitoring results that are greater than the limit of detection (LOD), and applying appropriate statistical techniques, a value other than zero (0) is warranted.

[5] Mercury monitoring shall be conducted six times annually (i.e. every other month) for the term of the permit. Monitoring shall be conducted in the months of February, April, June, August, October, and December of each year. If Method 1631, Revision E is further revised during the term of this permit, the permittee and/or its contract laboratory is required to utilize the most current version of the method immediately after approval by EPA. The permittee shall measure and report this parameter as total recoverable metal.

[6] The following EPA test methods and/or Standard Methods and associated LODs and LOQs are recommended for use in the analysis of the effluent samples. Alternative 40 CFR 136 approved methods may be used provided the LOD is less than the monthly average and/or daily maximum effluent limitations.

The permittee may determine a case-specific method detection level (MDL) using one of the analytical methods specified below, or any other test method which is approved by IDEM prior to use. The MDL shall be derived by the procedure specified for MDLs contained in 40 CFR Part 136, Appendix B, and the limit of quantitation shall be set equal to 3.18 times the MDL. NOTE: The MDL for purposes of this permit, is synonymous with the "limit of detection" or "LOD" as defined in 327 IAC 5-1.5-26: "the minimum concentration of a substance that can be measured and reported with ninety-nine percent (99%) confidence that the analyte concentration is greater than zero (0) for a particular analytical method and sample matrix.

| Parameter | EPA Method | LOD | LOQ |
|---|---|---|---|
| Cyanide, Free | 335.3 or 4500 CN-G | 5.0 µg/l | 16.0 µg/l |
| Cyanide, Free | 1677 | 0.5 ug/l | 1.6 ug/l |
| Mercury - interim | 245.1 or 245.2 | 200 ng/l | 600 ng/l |
| Mercury - final | 1631, Revision E | 0.2 ng/l | 0.5 ng/l |
| Chloride | 325.2 | 1.0 mg/l | 3.2 mg/l |
| Fluoride | 340.3 | 16.0 µg/l | 50.0 µg/l |
| Sulfate | 375.4 | 1000 µg/l | 3200µg/l |
| Total Dissolved Solids | 160.1 | 10000 µg/l | 32000 µg/l |
| Chromium | 218.2, 218.3 or | | |
| | 3111 C, 3113 B | 1.0 µg/l | 3.2 µg/l |
| Copper | 220.2 or 3113 B | 1.0 µg/l | 3.2 µg/l |
| Iron | 236.2 | 1.0 µg/l | 3.2 g/l |
| Lead | 239.2 or 3113 B | 1.0 µg/l | 3.2 µg/l |
| Zinc | 200.7 or 3120 B | 2.0 µg/l | 6.4 µg/l |
| Phenols | 420.2 | 0.6 µg/l | 2.0 µg/l |
| Nickel | 249.2 or 3113 B | 1.0 µg/l | 3.2 µg/l |
| Cadmium | 213.2 or 3113 B | 0.1 µg/l | 0.32 µg/l |
| Arsenic | 206.2 or 3113 B | 1.0 µg/l | 3.2 µg/l |

Method 245.1 or 245.2 for mercury may only be utilized for a maximum of twelve (12) months following the effective date of this permit.  Afterwards, the permittee is required to sample utilizing Method 1631, Revision E.

4. <u>Additional Monitoring Requirements</u>

    Beginning on the effective date of this permit, the permittee shall conduct the following monitoring activities:

    a. Influent Monitoring

      The permittee shall monitor the influent to its wastewater treatment facility for the following pollutants. Samples shall be representative of the raw influent in accordance with 327 IAC 5-2-13(b).

TABLE 5 - Influent

| | Quality or Concentration | | | Monitoring Requirements | |
|---|---|---|---|---|---|
| Parameter [1] | Monthly Average | Daily Maximum | Unit | Measurement Frequency | Sample Type |
| Cyanide | Report | Report | mg/l | 2 X Monthly | See [2] Below |
| Mercury [3] | Report | Report | ng/l | 6 X Annually | Grab |
| Chlorides [*] | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Sulfate [*] | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Fluoride [*] | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| TDS [*] | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Chromium | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Copper | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Iron | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Lead | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Zinc | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Phenols [4AAP] | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Nickel | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Cadmium | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |
| Arsenic [*] | --- | Report | mg/l | Quarterly | 24 Hr. Comp. |

[*] The above-noted parameters are to analyzed by a test method which measures the total quantity

[1] All metals shall be reported as Total Recoverable Metals. Cyanide shall be reported as Free Cyanide or Cyanide Amenable to Chlorination.

[2] The maximum holding time is 24 hours when sulfide is present. Therefore, initially the CN sample should be a grab sample that is tested with lead acetate paper before pH adjustments in order to determine if sulfide is present. If sulfide is present, it can be removed by the addition of cadmium nitrate powder until a negative spot test is obtained. The sample is filtered and then NaOH is added to pH 12. The sample may then be analyzed within 14 days. Alternatively, if the permittee can demonstrate that the wastewater contains no sulfide, the permittee may collect a composite sample and analyze it within 14 days.

[3] Influent mercury monitoring shall be conducted six times annually (i.e. every other month) Method 245.1 or 245.2 only for a maximum of twelve (12) months following the effective date of this permit.  Afterwards, the permittee is required to sample utilizing Method 1631, Revision E.  If Method 1631, Revision E is further revised during the term of this permit, the permittee and/or its contract laboratory is required to utilize the most current version of the method immediately after approval by EPA.

Monitoring shall be conducted in the months of February, April, June, August, October, and December of each year.  The permittee shall measure and report this parameter as total recoverable metal.

b. Organic Pollutant Monitoring

The permittee shall conduct an annual inventory of organic pollutants (see 40 CFR 423, Appendix A) and shall identify and quantify additional organic compounds which occur in the influent, effluent, and sludge. The analytical report shall be sent to the Pretreatment Group. This report is due in December of each year. The inventory shall consist of:

(1) <u>Sampling and Analysis of Influent and Effluent</u>

Sampling shall be conducted on a day when industrial discharges are occurring at normal or maximum levels. The samples shall be 24-hour flow proportional composites, except for volatile organics, which shall be taken by appropriate grab sampling techniques. Analysis for the U.S. EPA organic priority pollutants shall be performed using U.S. EPA methods 624, 625 and 608 in 40 CFR 136, or other equivalent methods approved by U.S. EPA. Equivalent methods must be at least as sensitive and specific as methods 624, 625 and 608.

All samples must be collected, preserved and stored in accordance with 40 CFR 136, Appendix A. Samples for volatile organics must be analyzed within 14 days of collection. Samples for semivolatile organics, PCBs and pesticides must be extracted within 7 days of collection and analyzed within 40 days of extraction. For composite samples, the collection date shall be the date at the end of the daily collection period.

(2) Sampling and Analysis of Sludge

Sampling collection, storage, and analysis shall conform to the U.S. EPA recommended procedures equivalent to methods 624, 625 and 608 in 40 CFR 136. Special sampling and/or preservation techniques will be required for those pollutants which deteriorate rapidly.

Sludge samples for volatile organics must be analyzed within 14 days of collection. Sludge samples for semivolatile organics, PCBs and pesticides must be extracted within 14 days of collection and analyzed within 40 days of extraction.

(3) <u>Additional Pollutant Identification</u>

In addition to the priority pollutants, a reasonable attempt shall be made to identify and quantify the ten most abundant constituents of each fraction (excluding priority pollutants and unsubstituted aliphatic compounds) shown to be present by peaks on the total ion plots (reconstructed gas chromatograms) more than ten times higher than the adjacent background noise. Identification shall be attempted through the use of U.S. EPA/NIH computerized library of mass spectra, with visual confirmation by an experienced analyst. Quantification may be based on an order of magnitude estimate based upon comparison with an internal standard.

The annual program effectiveness review, required by Part III. A.7. of this permit, should identify the additional steps necessary to determine whether the pollutants that are present interfere, pass through, or otherwise violate 40 CFR 403.2. Upon such determination, the report must also identify the steps taken to develop and enforce local limitations on industrial discharges for those pollutants. This is a requirement of 40 CFR 403.5.

USDC IN/ND case 2:14-cv-00193-JD-JEM    document 1    filed 06/03/14    page 51 of 145

## B.  MONITORING AND REPORTING

1.  Representative Sampling

Samples and measurements taken as required herein shall be representative of the volume and nature of the monitored discharge flow and shall be taken at times which reflect the full range and concentration of effluent parameters normally expected to be present. Samples shall not be taken at times to avoid showing elevated levels of any parameters.

2.  Data on Plant Operation

The raw influent and the wastewater from intermediate unit treatment processes, as well as the final effluent shall be sampled and analyzed for the pollutants and operational parameters specified by the applicable Monthly Report of Operation Form, as appropriate, in accordance with 327 IAC 5-2-13.  Except where the permit specifically states otherwise, the sample frequency for the raw influent and intermediate unit treatment process shall be at a minimum the same frequency as that for the final effluent.  The measurement frequencies specified in each of the tables in Part I.A. are the minimum frequencies required by this permit.

3.  Monthly Reporting

The permittee shall submit monitoring reports to the Indiana Department of Environmental Management containing results obtained during the previous month and shall be postmarked no later than the 28th day of the month following each completed monitoring period.  The first report shall be submitted by the 28th day of the month following the month in which the permit becomes effective.  These reports shall include, but not necessarily be limited to, the Discharge Monitoring Report and the Monthly Report of Operation.  Permittees with combined sewer overflow discharges must also submit the CSO Discharge Monitoring Report to IDEM by the 28th day of the month following each completed monitoring period.  All reports shall be mailed to IDEM, Office of Water Quality – Mail Code 65-42, Data & Information Services Section, 100 North Senate Ave., Indianapolis, Indiana 46204-2251.  The Regional Administrator may request the permittee to submit monitoring reports to the Environmental Protection Agency if it is deemed necessary to assure compliance with the permit.

A calendar week will begin on Sunday and end on Saturday.  Partial weeks consisting of four or more days at the end of any month will include the remaining days of the week, which occur in the following month in order to calculate a consecutive seven-day average.  This value will be reported as a weekly average or seven-day average on the MRO for the month containing the partial week of four or more days.  Partial calendar weeks consisting of less than four days at the end of any month will be carried forward to the succeeding month and reported as a weekly average or a seven-day average for the calendar week that ends with the first Saturday of that month.

4. <u>Definitions</u>

a. Calculation of Averages

Pursuant to 327 IAC 5-2-11(a)(5), the calculation of the average of discharge data shall be determined as follows:  For all parameters except fecal coliform and *E. coli*, calculations that require averaging of sample analyses or measurements of daily discharges shall use an arithmetic mean unless otherwise specified in this permit. For fecal coliform, the monthly average discharge and weekly average discharge, as concentrations, shall be calculated as a geometric mean.  For *E. coli*, the monthly average discharge, as a concentration, shall be calculated as a geometric mean.

b. Terms

(1) "Monthly Average" -The monthly average discharge means the total mass or flow-weighted concentration of all daily discharges during a calendar month on which daily discharges are sampled or measured, divided by the number of daily discharges sampled and/or measured during such calendar month. The monthly average discharge limitation is the highest allowable average monthly discharge for any calendar month.

(2) "Weekly Average" - The weekly average discharge means the total mass or flow weighted concentration of all daily discharges during any calendar week for which daily discharges are sampled or measured, divided by the number of daily discharges sampled and/or measured during such calendar week. The average weekly discharge limitation is the maximum allowable average weekly discharge for any calendar week.

(3) "Daily Maximum" - The daily maximum discharge limitation is the maximum allowable daily discharge for any calendar day.  The daily discharge means the total mass of a pollutant discharged during the calendar day or, in the case of a pollutant limited in terms other than mass pursuant to 327 IAC 5-2-11(e), the average concentration or other measurement of the pollutant specified over the calendar day or any twenty-four hour period that represents the calendar day for purposes of sampling.

(4) A 24-hour composite sample consists of at least 12 individual flow-proportioned samples of wastewater, taken by the grab sample method over equal time intervals during the period of operator attendance or by an automatic sampler, which are taken at approximately equally spaced time intervals for the duration of the discharge within a 24-hour period and which are combined prior to analysis. A flow proportioned composite sample may be obtained by:

(a) recording the discharge flow rate at the time each individual sample is taken,

(b) adding together the discharge flow rates recorded from each individual sampling time to formulate the "total flow value,"

(c) dividing the discharge flow rate of each individual sampling time by the total flow value to determine its percentage of the total flow value, and

(d) multiplying the volume of the total composite sample by each individual sample's percentage to determine the volume of that individual sample which will be included in the total composite sample.

(5) $CBOD_5$: Five-day Carbonaceous Biochemical Oxygen Demand

(6) TSS: Total Suspended Solids

(7) *E. coli*: Escherichia coli bacteria

c. The "Regional Administrator" is defined as the Region V Administrator, U.S. EPA, located at 77 West Jackson Boulevard, Chicago, Illinois 60604.

d. The "Commissioner" is defined as the Commissioner of the Indiana Department of Environmental Management, located at the following address: 100 North Senate Avenue, Indianapolis, Indiana 46204-2251.

e. "Limit of Detection" or "LOD" means a measurement of the concentration of a substance that can be measured and reported with 99% confidence that the analyte concentration is greater than zero (0) for a particular analytical method and sample matrix. The LOD is equivalent to the method detection level or MDL.

f. "Limit of Quantitation" or "LOQ" means a measurement of the concentration of a contaminant obtained by using a specified laboratory procedure calibrated at a specified concentration about the method detection level. It is considered the lowest concentration at which a particular contaminant can be quantitatively measured using a specified laboratory procedure for monitoring of the contaminant. This term is also called the limit of quantification or quantification level.

g. "Method Detection Level" or "MDL" means the minimum concentration of an analyte (substance) that can be measured and reported with a ninety-nine percent (99%) confidence that the analyte concentration is greater than zero (0) as determined by the procedure set forth in 40 CFR Part 136, Appendix B. The method detection level or MDL is equivalent to the LOD.

h. "$TU_c$" is defined as 100/NOEC or 100/$IC_{25}$.

i. "$TU_a$" is defined as 100/$LC_{50}$ where the $LC_{50}$ is expressed as a percent effluent in the test medium of an acute whole effluent toxicity (WET) test that is statistically or graphically estimated to be lethal to fifty percent (50%) of the test organisms.

j. "Inhibition concentration 25" or "$IC_{25}$"means the toxicant concentration that would cause a twenty-five percent (25%) reduction in a nonquantal biological measurement for the test population. For example, the $IC_{25}$ is the concentration of toxicant that would cause a twenty-five percent (25%) reduction in mean young per female or in growth for the test population.

k. "No observed effect concentration" or "NOEC" is the highest concentration of toxicant to which organisms are exposed in a full life cycle or partial life cycle (short term) test, that causes no observable adverse effects on the test organisms, that is, the highest concentration of toxicant in which the values for the observed responses are not statistically significantly different from the controls.

5. Test Procedures

The analytical and sampling methods used shall conform to the current version of 40 CFR, Part 136, unless otherwise specified within this permit. Multiple editions of Standard Methods for the Examination of Water and Wastewater are currently approved for most methods; however, 40 CFR Part 136 should be checked to ascertain if a particular method is approved for a particular analyte. The approved methods may be included in the texts listed below. However, different but equivalent methods are allowable if they receive the prior written approval of the State agency and the U.S. Environmental Protection Agency.

a. Standard Methods for the Examination of Water and Wastewater
   18th, 19th, or 20th Editions, 1992, 1995 or 1998 American Public Health Association, Washington, D.C. 20005.

b. A.S.T.M. Standards, Part 23, Water; Atmospheric Analysis
   1972 American Society for Testing and Materials, Philadelphia, PA 19103.

Page 18 of 59
Permit No. IN0022977

   c.   Methods for Chemical Analysis of Water and Wastes
       June 1974, Revised, March 1983, Environmental Protection
       Agency, Water Quality Office, Analytical Quality Control Laboratory
       1014 Broadway, Cincinnati, OH 45202.

6.   Recording of Results

For each measurement or sample taken pursuant to the requirements of this permit, the permittee shall record and maintain records of all monitoring information an activities under this permit, including the following information:

   a.   The exact place, date, and time of sampling or measurements;
   b.   The person(s) who performed the sampling or measurements;
   c.   The dates and times the analyses were performed;
   d.   The person(s) who performed the analyses;
   e.   The analytical techniques or methods used; and
   f.   The results of all required analyses and measurements.

7.   Additional Monitoring by Permittee

If the permittee monitors any pollutant at the location(s) designated herein more frequently than required by this permit, using approved analytical methods as specified above, and the results of such monitoring shall be included in the calculation and reporting of the results on the Monthly Discharge Monitoring Report and on the Monthly Report of Operation form. Such increased frequency shall also be indicated on these forms.

Other monitoring data not specifically required in this permit which is collected by or for the permittee need not be submitted unless requested by the Commissioner. Any such additional monitoring data which indicates a violation of a permit limitation shall be followed up by the permittee, whenever feasible, with a monitoring sample obtained and analyzed pursuant to approved analytical methods. The results of the follow-up sample shall be reported to the Commissioner in the Monthly Discharge Monitoring Report.

8.   Records Retention

All records and information resulting from the monitoring activities required by this permit, including all records of analyses performed and calibration and maintenance of instrumentation and recording from continuous monitoring instrumentation, shall be retained for a minimum of three (3) years. In cases where the original records are kept at another location, a copy of all such records shall be kept at the permitted facility. The three-year period shall be extended:

a.   automatically during the course of any unresolved litigation regarding the discharge of pollutants by the permittee or regarding promulgated effluent guidelines applicable to the permittee; or

b.   as requested by the Regional Administrator or the Indiana Department of Environmental Management.

9.   <u>Discharge Monitoring Reports (Form 30530)</u>

a.   For parameters with monthly average water quality-based effluent limitations (WQBELs) below the limit of quantitation (LOQ), daily effluent values that are less than the LOQ, used to determine the monthly average effluent levels less than the LOQ, may be assigned a value of zero (0), unless, after considering the number of monitoring results that are greater than the limit of detection (LOD), and applying appropriate statistical techniques, a value other than zero (0) is warranted.

b.   For all other parameters for which the monthly average WQBEL is equal to or greater than the LOQ, calculations that require averaging of measurements of daily values (both concentration and mass) shall use an arithmetic mean. When a daily discharge value is below the LOQ, a value of zero (0) shall be used for that value in the calculation to determine the monthly average unless otherwise specified or approved by the Commissioner.

c.   Effluent concentrations less than the LOD shall be reported on the Discharge Monitoring Report (DMR) forms as < (less than) the value of the LOD.  For example, if a substance is not detected at a concentration of 0.1 µg/l, report the value as < 0.1 µg/l.

d.   Effluent concentrations greater than or equal to the LOD and less than the LOQ that are reported on a DMR shall be reported as the actual value and annotated on the DMR to indicate the value is not quantifiable.

e.   Mass discharge values which are calculated from concentrations reported as less than the value of the limit of detection shall be reported as less than the corresponding mass value.

f.   Mass discharge values that are calculated from effluent concentrations greater than the limit of detection shall be reported as the calculated value.

## C. REOPENING CLAUSES

In addition to the reopening clause provisions cited at 327 IAC 5-2-16, the following reopening clauses are incorporated into this permit:

1. This permit may be modified or, alternately, revoked and reissued after public notice and opportunity for hearing to incorporate effluent limitations reflecting the results of a wasteload allocation if the Department of Environmental Management determines that such effluent limitations are needed to assure that State Water Quality Standards are met in the receiving stream.

2. This permit may be modified due to a change in sludge disposal standards pursuant to Section 405(d) of the Clean Water Act, if the standards when promulgated contain different conditions, are otherwise more stringent, or control pollutants not addressed by this permit.

3. This permit may be modified, or, alternately, revoked and reissued, to comply with any applicable effluent limitation or standard issued or approved under section 301(b)(2)(C), (D) and (E), 304(b)(2), and 307(a)(2) of the Clean Water Act, if the effluent limitation or standard so issued or approved:

   a. contains different conditions or is otherwise more stringent than any effluent limitation in the permit; or

   b. controls any pollutant not limited in the permit.

4. This permit may be modified, or alternately, revoked and reissued after public notice and opportunity for hearing to include whole effluent toxicity limitations or to include limitations for specific toxicants if the results of the biomonitoring and/or the TRE study indicate that such limitations are necessary.

5. This permit may be modified or, alternatively, revoked and reissued after public notice and opportunity for hearing to incorporate effluent limitations for chloride, sulfate, fluoride, TDS, chromium, copper, iron, lead, zinc, phenols, nickel, cadmium and arsenic if the Department of Environmental Management determines that such effluent limitations are needed to assure that State Water Quality Standards are met in the receiving stream.

6. This permit may be modified or, alternatively, revoked and reissued after public notice and opportunity for hearing to incorporate reevaluated *E. coli* effluent limitations if the Indiana Water Pollution Control Board adopts revisions to the *E. coli* water quality standards and the Department of Environmental Management determines that such modification of effluent limitations for *E. coli* are not in violation of antibacksliding regulations.

7. This permit may be modified or, alternatively, revoked and reissued after public notice and opportunity for hearing to incorporate effluent limitations for mercury stemming from a streamlined mercury variance (SMV) application.

## D. SCHEDULE OF COMPLIANCE FOR AMMONIA-NITROGEN & TOTAL RESIDUAL CHLORINE

1. The permittee shall submit a written progress report to the Compliance Evaluation Section, Office of Water Quality six (6) months from the effective date of the permit. The progress report shall include, among other items, a description of the method(s) selected for meeting new final requirements for ammonia-nitrogen and total residual chlorine. The new effluent limits for ammonia-nitrogen and total residual chlorine are deferred for the term of this compliance schedule; however, the permittee must take steps to attempt to meet the new final limits as soon as possible. If the permittee determines prior to the conclusion of this compliance schedule that it can meet any of the new final limits, the permittee shall provide written notification to the Compliance Evaluation Section of OWQ. Monitoring and reporting of effluent ammonia-nitrogen and total residual chlorine is required during the interim period in accordance with Part I.A. of the permit.

2. The permittee shall submit a written progress report to the Compliance Evaluation Section, Office of Water Quality not later than twelve (12) months from the effective date of the permit.

3. The permittee shall submit a written progress report to the Compliance Evaluation Section, Office of Water Quality not later than twenty-four (24) months from the effective date of the permit.

4. The permittee shall submit a written progress report to the Compliance Evaluation Section, Office of Water Quality not later than thirty-five (35) months from the effective date of the permit.

5. The permittee shall comply with all final requirements no later than thirty-six (36) months from the effective date of the permit. The permittee shall submit a written progress report to the Compliance Evaluation Section, Office of Water Quality at this time.

6. If the permittee fails to comply with any deadline contained in the foregoing schedule, the permittee shall, within fourteen (14) days following the missed deadline, submit a written notice of noncompliance to the Compliance Evaluation Section of the Office of Water Quality stating the cause of noncompliance, any remedial action taken or planned, and the probability of meeting the date fixed for compliance with final effluent limitations.

E.  SCHEDULE OF COMPLIANCE FOR FINAL MERCURY LIMITS

The permittee shall comply with the new final limits for mercury as soon as reasonably possible, but no later than 60 months following the effective date of the permit.  In accordance with 327 IAC 5-2-12.1, progress reports shall be submitted to IDEM per the following schedule.

1.  The permittee shall submit a written progress report to the Compliance Evaluation Section, Office of Water Quality by no later than twelve (12) months from the effective date of the permit.

2.  The permittee shall submit a written progress report to the Compliance Evaluation Section, Office of Water Quality by no later than twenty-four (24) months from the effective date of the permit.

3.  The permittee shall submit a written progress report to the Compliance Evaluation Section, Office of Water Quality by not later than thirty-six (36) months from the effective date of the permit.

4.  The permittee shall submit a written progress report to the Compliance Evaluation Section, Office of Water Quality by not later than forty-eight (48) months from the effective date of the permit.

5.  The permittee shall comply with all final requirements no later than sixty (60) months from the effective date of the permit.

6.  If the permittee fails to comply with any deadline contained in the foregoing schedule, the permittee shall, within fourteen (14) days following the missed deadline, submit a written notice of noncompliance to the Compliance Evaluation Section of the Office of Water Quality stating the cause of noncompliance, any remedial action taken or planned, and the probability of meeting the date fixed for compliance with final effluent limitations.

F. CHRONIC BIOMONITORING PROGRAM REQUIREMENTS

The 1977 Clean Water Act explicitly states, in Section 101(3) that it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited. In support of this policy the U.S. EPA in 1995 amended the 40 CFR 136.3 (Tables IA and II) by adding testing methods for measuring acute and short-term chronic toxicity of whole effluents and receiving waters. To adequately assess the character of the effluent, and the effects of the effluent on aquatic life, the permittee shall conduct Whole Effluent Toxicity Testing. Part 1 of this section describes the testing procedures, Part 2 describes the Toxicity Reduction Evaluation which is only required if the effluent demonstrates toxicity, as described in paragraph 1. f.

1.  Whole Effluent Toxicity Tests

Within 90 days of the effective date of the permit, the permittee shall initiate the series of tests described below to monitor the toxicity of the discharge from Outfall 001. If toxicity is demonstrated as defined under paragraph f below, the permittee is required to conduct a toxicity reduction evaluation (TRE).

a.  Bioassay Test Procedures and Data Analysis

(1) All test organisms, test procedures and quality assurance criteria used shall be in accordance with the Short-term Methods for Estimating the Chronic Toxicity of Effluents and Receiving Water to Freshwater Organisms; Third Edition Section 13, Cladoceran (Ceriodaphnia dubia) Survival and Reproduction Test Method 1002.0; and Section 11, Fathead Minnow (Pimephales promelas) Larval Survival and Growth Test Method, (1000.0) EPA 821-R-02-013, 4th Edition, November 2002 or most recent update.

(2) Any circumstances not covered by the above methods, or that require deviation from the specified methods shall first be approved by the IDEM's Environmental Toxicology and Chemistry Section.

(3) The determination of effluent toxicity shall be made in accordance with the Data Analysis general procedures for acute and chronic toxicity endpoints as outlined in Section 9, and in Sections 11 and 13 of the respective Test Method (1000.0 and 1002.0) of Short-term Methods of Estimating the Chronic Toxicity of Effluent and Receiving Water to Freshwater Organisms EPA 821-R-02-013, 4th Edition, November 2002 or most recent update.

b.  Types of Bioassay Tests

The permittee shall conduct a 7-day Cladoceran (Ceriodaphnia dubia) Survival and Reproduction Test and a 7-day Fathead Minnow (Pimephales promelas) Larval Survival and Growth Test on samples of the final effluent. All tests will be conducted on 24-hour composite samples of final effluent. All test solutions shall be renewed daily. On days three and five fresh 24-hour composite samples of the effluent collected on alternate days shall be used to renew the test solutions.

If in any control more than 10% of the test organisms die in 96 hours, or more than 20% of the test organisms die in 7 days, that test (control and effluent) shall be repeated. In addition, if in the *Ceriodaphnia* test controls the number of newborns produced per surviving female is less than 15, or if 60% of females have less than three broods; and in the fathead minnow test if the mean dry weight of 7-day old surviving fish in the control group is less than 0.25 mg, that test shall also be repeated. Such testing will determine whether the effluent affects the survival, reproduction, and/or growth of the test organisms. Results of all tests regardless of completion must be reported to IDEM.

c.  Effluent Sample Collection and Chemical Analysis

(1) Samples for the purposes of Whole Effluent Toxicity Testing, will be taken at a point that is representative of the discharge, but prior to discharge. The maximum holding time for whole effluent is 36 hours for a 24 hour composite sample. Bioassay tests must be started within 36 hours after termination of the 24 hour composite sample collection. Bioassay of effluent sampling may be coordinated with other permit sampling requirements as appropriate to avoid duplication.

(2) Chemical analysis must accompany each effluent sample taken for bioassay test. The analysis detailed under Part I.A. should be conducted for the effluent sample. Chemical analysis must comply with approved EPA test methods.

d.  Testing Frequency and Duration

The chronic toxicity tests specified in paragraph b above shall be conducted monthly for a period of three months. If no toxicity is demonstrated as defined in paragraph f, the permittee may reduce the number of species tested to only include the species demonstrated to be most sensitive to the toxicity in the effluent and shall conduct chronic toxicity testing twice yearly thereafter for the duration of this permit.

If toxicity is demonstrated as defined under paragraph f, the permittee is required to conduct a toxicity reduction evaluation (TRE) as specified in Section 2 below.

e.  Reporting

   (1) Results shall be reported according to EPA 600/4-91-002, Section 10 (Report Preparation).  Two copies of the completed report for each test shall be submitted to the Data Management Section of the IDEM no later than sixty days after completion of the test.

   (2) For quality control, the report shall include the results of appropriate standard reference toxic pollutant tests for chronic endpoints and historical reference toxic pollutant data with mean values and appropriate ranges for the respective test species Ceriodaphnia dubia and Pimephales promelas.  Biomonitoring reports must also include copies of Chain-of-Custody Records and Laboratory raw data sheets.

   (3) Statistical procedures used to analyze and interpret toxicity data including critical values of significance used to evaluate each point of toxicity should be described and included as part of the biomonitoring report.

f.  Demonstration of Toxicity

   (1) Acute toxicity will be demonstrated if the undiluted effluent exceeds 1.0 $TU_a$ (acute toxic units) based on 100% effluent for the test organism in 48 and 96 hours for Ceriodaphnia dubia or Pimephales promelas, which ever is more sensitive

   (2) Chronic toxicity will be demonstrated if the effluent is observed to have exceeded 2.1 $TU_c$ (chronic toxic units) for Ceriodaphnia dubia or Pimephales promelas.

   (3) If chronic toxicity is found in any of the tests specified above, a confirmation toxicity test using the specified methodology and same test species shall be conducted within two weeks of the completion of the failed test to confirm results. If any two tests, including any and all confirmation tests, indicate the presence of toxicity, the permittee must begin the implementation of a Toxicity Reduction Evaluation (TRE) as described below.  The whole effluent toxicity tests required above may be suspended while the TRE is being conducted.

Page 27 of 59
Permit No. IN0022977

2. <u>Toxicity Reduction Evaluation (TRE) Schedule of Compliance</u>

The development and implementation of a TRE (including any post-TRE biomonitoring requirements) is only required if toxicity is demonstrated as defined by Paragraph 1.f.

a. Development of TRE Plan

Within 90 days of determination of toxicity, the permittee shall submit plans for an effluent toxicity reduction evaluation (TRE) to the Data Management Section of the IDEM. The TRE plan shall include appropriate measures to characterize the causative toxicant and the variability associated with these compounds. Guidance on conducting effluent toxicity reduction evaluations is available from EPA and from the EPA publications listed below:

(1) Methods for Aquatic Toxicity Identification Evaluations:

Phase I Toxicity Characterization Procedures, Second Edition (EPA/600/6-91/003), February 1991.

Phase II Toxicity Identification Procedures (EPA 600/3-88/035), February 1989.

Phase III Toxicity Confirmation Procedures (EPA/600/3-88/036), February 1989.

(2) Methods for Chronic Toxicity Identification
Phase I Characterization of Chronically Toxic Effluents EPA/600/6-91/005, June 1991.

(3) Generalized Methodology for Conducting Industrial Toxicity Reduction Evaluations (EPA/600/2-88/070), March 1989.

(4) Toxicity Reduction Evaluation Protocol for Municipal Wastewater Treatment Plants (EPA/600/2-88/062), April 1989.

b. Conduct the Plan

Within 30 days after submission of the TRE plan to the IDEM, the permittee must initiate an effluent TRE consistent with the TRE plan. Progress reports shall be submitted every 90 days to the Data Management and Compliance Evaluation Sections of the Office of Water Quality (OWQ) beginning 90 days after initiation of the TRE study.

c.  Reporting

Within 90 days of the TRE study completion, the permittee shall submit to the Data Management and Compliance Evaluation Sections of the Office of Water Quality (OWQ) the final study results and a schedule for reducing the toxicity to acceptable levels through control of the toxicant source or treatment of whole effluent.

d.  Compliance Date
The permittee shall complete items a, b, and c from Section 2 and reduce the toxicity to acceptable levels as soon as possible but no later than three years after the date of determination of toxicity.

e.  Post-TRE Biomonitoring Requirements (Only Required After Completion of a TRE)

After the TRE, the permittee shall conduct monthly toxicity tests with 2 or more species for a period of three months.  Should three consecutive monthly tests demonstrate no toxicity, the permittee may reduce the number of species tested to only include the species demonstrated to be most sensitive to the toxicity in the effluent, and conduct chronic tests every six months for the duration of the permit.

If toxicity is demonstrated as defined in paragraph 1.f after the initial three month period, testing must revert to a TRE as in Part 2 (TRE).  These tests shall be conducted in accordance with the procedures under the Whole Effluent Toxicity Testing Section.

Page 29 of 59
Permit No. IN0022977

## PART II

## STANDARD CONDITIONS FOR NPDES PERMITS

1. Duty to Comply

   The permittee shall comply with all terms and conditions of this permit in accordance with 327 IAC 5-2-8(1) and all requirements of 327 IAC 5-2-8.  Any permit noncompliance constitutes a violation of the Clean Water Act and IC 13 and is grounds for enforcement action or permit termination, revocation and reissuance, modification, or denial of a permit renewal application.

   It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of the permit.

2. Duty to Mitigate

   In accordance with 327 IAC 5-2-8(3), the permittee shall take all reasonable steps to minimize or correct any adverse impact to the environment resulting from noncompliance with this permit.  During periods of noncompliance, the permittee shall conduct such accelerated or additional monitoring for the affected parameters, as appropriate or as requested by IDEM, to determine the nature and impact of the noncompliance.

3. Duty to Provide Information

   The permittee shall submit any information that the permittee knows or has reason to believe would constitute cause for modification or revocation and reissuance of the permit at the earliest time such information becomes available, such as plans for physical alterations or additions to the facility that:

   a. could significantly change the nature of, or increase the quantity of, pollutants discharged; or

   b. the Commissioner may request to evaluate whether such cause exists.

   In accordance with 327 IAC 5-1-3(a)(5), the permittee must also provide any information reasonably requested by the Commissioner.

4.  Duty to Reapply

If the permittee wishes to continue an activity regulated by this permit after the expiration date of this permit, the permittee must obtain and submit a renewal of this permit in accordance with 327 IAC 5-3-2(a)(2).  It is the permittee's responsibility to obtain and submit the application.  In accordance with 327 IAC 5-2-3(c), the owner of the facility or operation from which a discharge of pollutants occurs is responsible for applying for and obtaining the NPDES permit, except where the facility or operation is operated by a person other than an employee of the owner in which case it is the operator's responsibility to apply for and obtain the permit.  The application must be submitted at least 180 days before the expiration date of this permit.  This deadline may be extended if:

   a.  permission is requested in writing before such deadline;
   b.  IDEM grants permission to submit the application after the deadline; and
   c.  the application is received no later than the permit expiration date.

As required under 327 IAC 5-2-3(g)(1) and (2), POTWs with design influent flows equal to or greater than one million (1,000,000) gallons per day and POTWs with an approved pretreatment program or that are to required to develop a pretreatment program, will be required to provide the results of whole effluent toxicity testing as part of their NPDES renewal application.  The whole effluent toxicity tests conducted in accordance with Part I.G. of this permit may be used to satisfy the renewal application requirement to provide the results of whole effluent toxicity testing.

5.  Transfers

In accordance with 327 IAC 5-2-8(4)(D), this permit is nontransferable to any person except in accordance with 327 IAC 5-2-6(c). This permit may be transferred to another person by the permittee, without modification or revocation and reissuance being required under 327 IAC 5-2-16(c)(1) or 16(e)(4), if the following occurs:

   a.  the current permittee notified the Commissioner at least thirty (30) days in advance of the proposed transfer date.

   b.  a written agreement containing a specific date of transfer of permit responsibility and coverage between the current permittee and the transferee (including acknowledgment that the existing permittee is liable for violations up to that date, and the transferee is liable for violations from that date on) is submitted to the Commissioner.

c. the transferee certifies in writing to the Commissioner their intent to operate the facility without making such material and substantial alterations or additions to the facility as would significantly change the nature or quantities of pollutants discharged and thus constitute cause for permit modification under 327 IAC 5-2-16(d). However, the Commissioner may allow a temporary transfer of the permit without permit modification for good cause, e.g., to enable the transferee to purge and empty the facility's treatment system prior to making alterations, despite the transferee's intent to make such material and substantial alterations or additions to the facility.

d. the Commissioner, within thirty (30) days, does not notify the current permittee and the transferee of the intent to modify, revoke and reissue, or terminate the permit and to require that a new application be filed rather than agreeing to the transfer of the permit.

The Commissioner may require modification or revocation and reissuance of the permit to identify the new permittee and incorporate such other requirements as may be necessary under the Clean Water Act or state law.

6.  Permit Actions

In accordance with 327 IAC 5-2-16(b) and 327 IAC 5-2-8(4), this permit may be modified, revoked and reissued, or terminated for cause, including, but not limited to, the following:

a.  Violation of any terms or conditions of this permit;
b.  Failure of the permittee to disclose fully all relevant facts or misrepresentation of any relevant facts in the application, or during the permit issuance process; or
c.  A change in any condition that requires either a temporary or permanent reduction or elimination of the authorized discharge controlled by the permittee (e.g., plant closure, termination of the discharge by connecting to a POTW, a change in state law or information indicating the discharge poses a substantial threat to human health or welfare).

Filing of either of the following items does not stay or suspend any permit condition: (1) a request by the permittee for a permit modification, revocation and reissuance, or termination, or (2) submittal of information specified in Part II.A.3 of the permit including planned changes or anticipated noncompliance.

The permittee shall submit any information that the permittee knows or has reason to believe would constitute cause for modification or revocation and reissuance of the permit at the earliest time such information becomes available, such as plans for physical alterations or additions to the permitted facility that:

1. could significantly change the nature of, or increase the quantity of, pollutants discharged; or

2. the commissioner may request to evaluate whether such cause exists.

7. Property Rights

Pursuant to 327 IAC 5-2-8(6) and 327 IAC 5-2-5(b), the issuance of this permit does not convey any property rights of any sort or any exclusive privileges, nor does it authorize any injury to persons or private property or an invasion of rights, any infringement of federal, state, or local laws or regulations. The issuance of the permit also does not preempt any duty to obtain any other state, or local assent required by law for the discharge or for the construction or operation of the facility from which a discharge is made.

8. Severability

In accordance with 327 IAC 1-1-3, the provisions of this permit are severable and, if any provision of this permit or the application of any provision of this permit to any person or circumstance is held invalid, the invalidity shall not affect any other provisions or applications of the permit which can be given effect without the invalid provision or application.

9. Oil and Hazardous Substance Liability

Nothing in this permit shall be construed to relieve the permittee from any responsibilities, liabilities, or penalties to which the permittee is or may be subject to under Section 311 of the Clean Water Act.

10. State Laws

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable state law or regulation under authority preserved by Section 510 of the Clean Water Act or state law.

11. Penalties for Violation of Permit Conditions

Pursuant to IC 13-30-4, a person who violates any provision of this permit, the water pollution control laws; environmental management laws; or a rule or standard adopted by the Water Pollution Control Board is liable for a civil penalty not to exceed twenty-five thousand dollars ($25,000) per day of any violation.

Pursuant to IC 13-30-5, a person who obstructs, delays, resists, prevents, or interferes with (1) the department; or (2) the department's personnel or designated agent in the performance of an inspection or investigation commits a class C infraction. Pursuant to IC 13-30-6, a person who intentionally, knowingly, or recklessly violates any provision of this permit, the water pollution control laws or a rule or standard adopted by the Water Pollution Control Board commits a class D felony punishable by the term of imprisonment established under IC 35-50-2-7(a) (up to one year), and/or by a fine of not less than five thousand dollars ($5,000) and not more than fifty thousand dollars ($50,000) per day of violation. A person convicted for a violation committed after a first conviction of such person under this provision is subject to a fine of not more than one hundred thousand dollars ($100,000) per day of violation, or by imprisonment for not more than two (2) years, or both.

12. Penalties for Tampering or Falsification

In accordance with 327 IAC 5-2-8(9), the permittee shall comply with monitoring, recording, and reporting requirements of this permit. The Clean Water Act, as well as IC 13-30-6-2 and IC 35-50-3-3, provides that any person who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under a permit shall, upon conviction, be punished by a fine of not more than ten thousand dollars ($10,000) per violation, or by imprisonment for not more than one hundred eighty (180) days per violation, or by both.

13. Toxic Pollutants

If any applicable effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is established under Section 307(a) of the Clean Water Act for a toxic pollutant injurious to human health, and that standard or prohibition is more stringent than any limitation for such pollutant in this permit, this permit shall be modified or revoked and reissued to conform to the toxic effluent standard or prohibition in accordance with 327 IAC 5-2-8(5). Effluent standards or prohibitions established under Section 307(a) of the Clean Water Act for toxic pollutants injurious to human health are effective and must be complied with, if applicable to the permittee, within the time provided in the implementing regulations, even absent permit modification.

14. Operator Certification

The permittee shall have the wastewater treatment facilities under the direct supervision of an operator certified by the Commissioner in a classification corresponding to the classification of the wastewater treatment plant as required by IC 13-18-11-11 and 327 IAC 5-22. In order to operate a wastewater treatment plant the operator shall have qualifications as established in 327 IAC 5-22-7.

Page 34 of 59
Permit No. IN0022977

The permittee shall designate one (1) person as the certified operator with complete responsibility for the proper operations of the wastewater facility. 327 IAC 5-22-10(b) provides that a certified operator may be designated as being in responsible charge of more than one (1) wastewater treatment plant, if it can be shown that he will give adequate supervision to all units involved. Adequate supervision means that sufficient time is spent at the plant on a regular basis to assure that the certified operator is knowledgeable of the actual operations and that test reports and results are representative of the actual operations conditions. In accordance with 327 IAC 5-22-3(10), "responsible charge" means the person responsible for the overall daily operation, supervision, or management of a wastewater facility.

Pursuant to 327 IAC 5-22-10(a), the permittee shall notify IDEM when there is a change of the person serving as the certified operator in responsible charge of the wastewater treatment facility. The notification shall be made no later than thirty (30) days after a change in the operator.

15. Construction Permit

Except in accordance with 327 IAC 3, the permittee shall not construct, install, or modify any water pollution treatment/control facility as defined in 327 IAC 3-1-2(24). Upon completion of any construction, the permittee must notify the Compliance Evaluation Section of the Office of Water Quality in writing.

16. Inspection and Entry

In accordance with 327 IAC 5-2-8(7), the permittee shall allow the Commissioner, or an authorized representative, (including an authorized contractor acting as a representative of the Commissioner) upon the presentation of credentials and other documents as may be required by law, to:

a. Enter upon the permittee's premises where a point source, regulated facility, or activity is located or conducted, or where records must be kept pursuant to the conditions of this permit;

b. Have access to and copy, at reasonable times, any records that must be kept under the terms and conditions of this permit;

c. Inspect at reasonable times any facilities, equipment or methods (including monitoring and control equipment), practices, or operations regulated or required pursuant to this permit; and

d.  Sample or monitor at reasonable times, any discharge of pollutants or internal wastestreams for the purposes of evaluating compliance with the permit or as otherwise authorized.

17.  <u>New or Increased Discharge of Pollutants</u>

a.  The permittee is prohibited from undertaking any deliberate action that would result in a new or increased discharge of a bioaccumulative chemical of concern (BCC) or a new or increased permit limit for a pollutant or pollutant parameter that is not a BCC, unless one (1) of the following is completed prior to the commencement of the action:

(1)  Information is submitted to the Commissioner demonstrating that the proposed new or increased discharge will not cause a significant lowering of water quality as defined under 327 IAC 5-2-11.3(b)(1). Upon review of this information, the Commissioner may request additional information or may determine that the proposed increase is a significant lowering of water quality and require the submittal of an antidegradation demonstration.

(2)  An antidegradation demonstration is submitted and approved in accordance with 327 IAC 5-2-11.3(b)(3) through (6).

(3)  The new or increased mass limit(s) for a conventional pollutant(s) or conventional pollutant parameter(s) have been based on a request for wet weather control under 327 IAC 5-2-11.6(g)(4). The granting of the increased mass limits does not constitute a significant lowering of water quality when the proposed increase is subject to the provisions of 327 IAC 5-2-11.3(b)(1)(C)(i)(AA) and 327 IAC 5-2-11.3(b)(1)(C)(iii)(GG) for high quality waters.

b.  The permittee is prohibited from allowing a new or increased discharge of a BCC from:

(1)  an existing industrial user proposing to increase or add a process wastestream; or

(2)  a proposed new industrial user that will have a process wastestream;

where the process wastestream contains a BCC at concentrations detectable using the most sensitive analytical method for the BCC contained in 40 CFR 136 or approved by the Commissioner, except as provided under subsection (c):

c.  A new or increased discharge of a BCC from an existing or proposed industrial user is not prohibited under subsection (b) if one (1) of the following is completed prior to commencement of the discharge:

(1) Information is submitted to the Commissioner demonstrating that the proposed new or increased discharge will not cause a significant lowering of water quality as defined under 327 IAC 5-2-11.3(b)(1). Upon review of this information, the Commissioner may request additional information or may determine that the proposed increase is a significant lowering of water quality and require the submittal of an antidegradation demonstration.

(2) An antidegradation demonstration is submitted and approved in accordance with 327 IAC 5-2-11.3(b)(3) through (6).

d. The permittee shall monitor for any BCC known or believed to be present in the discharge, whether or not the permit contains a limit for that pollutant. If there is an increase in the loading of a BCC, above normal variability and attributable to a deliberate action, the permittee shall notify the Commissioner of the increase unless either:

(1) the permittee has submitted the information required under 327 IAC 5-2-11.3(b)(2)(A)(i) for the increase; or

(2) an antidegradation demonstration for the increase has been approved under 327 IAC 5-2-11.3(b)(5).

If the increase is determined to be a significant lowering of water quality, as defined under 327 IAC 5-2-11.3(b)(1), the Commissioner shall require reduction or elimination of the increase.

e. If the permittee seeks to significantly lower water quality in a high quality water for any pollutant or pollutant parameter, the permittee must first submit an antidegradation demonstration for consideration and approval by the Commissioner, in accordance with 327 IAC 5-2-11.3(b).

**B.    MANAGEMENT REQUIREMENTS**

1.  <u>Facility Operation, Maintenance and Quality Control</u>

    a.  In accordance with 327 IAC 5-2-8(8), the permittee shall at all times maintain in good working order and efficiently operate all facilities and systems (and related appurtenances) for collection and treatment that are:

        (1)  installed or used by the permittee; and

        (2)  necessary for achieving compliance with the terms and conditions of the permit.

        Neither 327 IAC 5-2-8(8), nor this provision, shall be construed to require the operation of installed treatment facilities that are unnecessary for achieving compliance with the terms and conditions of the permit.

    b.  The permittee shall operate the permitted facility in a manner which will minimize upsets and discharges of excessive pollutants.  The permittee shall properly remove and dispose of excessive solids and sludges.

    c.  The permittee shall provide an adequate operating staff which is duly qualified to carry out the operation, maintenance, and testing functions required to ensure compliance with the conditions of this permit.

    d.  Maintenance of all waste collection, control, treatment, and disposal facilities shall be conducted in a manner that complies with the bypass provisions set forth below.

    e.  Any extensions to the sewer system must continue to be constructed on a separated basis.  Plans and specifications, when required, for extension of the sanitary system must be submitted to the Facility Construction Section, Office of Water Quality in accordance with 327 IAC 3-2-1.  There shall also be an ongoing preventative maintenance program for the sanitary sewer system.

2.  <u>Bypass of Treatment Facilities</u>

    Pursuant to 327 IAC 5-2-8(11):

    a.  Terms as defined in 327 IAC 5-2-8(11)(A):

        (1)  "Bypass" means the intentional diversion of a waste stream from any portion of a treatment facility.

(2) "Severe property damage" means substantial physical damage to property, damage to the treatment facilities which would cause them to become inoperable, or substantial and permanent loss of natural resources which can reasonably be expected to occur in the absence of a bypass. Severe property damage does not mean economic loss caused by delays in production.

b. Bypasses, as defined above, are prohibited, and the Commissioner may take enforcement action against a permittee for bypass, unless:

(1) The bypass was unavoidable to prevent loss of life, personal injury, or severe property damage, as defined above;

(2) There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass that occurred during normal periods of equipment downtime or preventive maintenance; and

(3) The permittee submitted notices as required under Part II.B.2.d; or

(4) The condition under Part II.B.2.f below is met.

c. Bypasses that result in death or acute injury or illness to animals or humans must be reported in accordance with the "Spill Response and Reporting Requirements" in 327 IAC 2-6.1.

d. The permittee must provide the Commissioner with the following notice:

(1) If the permittee knows or should have known in advance of the need for a bypass (anticipated bypass), it shall submit prior written notice. If possible, such notice shall be provided at least ten (10) days before the date of the bypass for approval by the Commissioner.

(2) The permittee shall orally report an unanticipated bypass within 24 hours of becoming aware of the bypass event. The permittee must also provide a written report within five (5) days of the time the permittee becomes aware of the bypass event. The written report must contain a description of the noncompliance (i.e. the bypass) and its cause; the period of noncompliance, including exact dates and times; if the cause of noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate and prevent recurrence of the bypass event.

e. The Commissioner may approve an anticipated bypass, after considering its adverse effects, if the Commissioner determines that it will meet the conditions listed above in Part II.B.2.b. The Commissioner may impose any conditions determined to be necessary to minimize any adverse effects.

f. The permittee may allow any bypass to occur that does not cause a violation of the effluent limitations in the permit, but only if it also is for essential maintenance to assure efficient operation. These bypasses are not subject to the provisions of Part II.B.2.b.,d and e of this permit. Removal of redundant treatment units upon discretion of the certified operator will not be considered bypassing as long as a reasonable demonstration is made that effluent quality will not suffer and best performance is achieved.

3. Upset Conditions

Pursuant to 327 IAC 5-2-8(12):

a. "Upset" means an exceptional incident in which there is unintentional and temporary noncompliance with technology-based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.

b. An upset shall constitute an affirmative defense to an action brought for noncompliance with such technology-based permit effluent limitations if the requirements of Paragraph c of this subsection, are met.

c. A permittee who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed, contemporaneous operating logs or other relevant evidence, that:

   (1) An upset occurred and the permittee has identified the specific cause(s) of the upset, if possible;

   (2) The permitted facility was at the time being operated in compliance with proper operation and maintenance procedures;

   (3) The permittee complied with any remedial measures required under "Duty to Mitigate", Part II.A.2; and

(4) The permittee submitted notice of the upset as required in the "Twenty-Four Hour Reporting Requirements," Part II.C.3, or 327 IAC 2-6.1, whichever is applicable.

4. Removed Substances

Solids, sludges, filter backwash, or other pollutants removed from or resulting from treatment or control of wastewaters shall be disposed of in a manner such as to prevent any pollutant from such materials from entering waters of the State and to be in compliance with all Indiana statutes and regulations relative to liquid and/or solid waste disposal.

a. Collected screenings, slurries, sludges, and other such pollutants shall be disposed of in accordance with provisions set forth in 329 IAC 10, 327 IAC 6.1, or another method approved by the Commissioner.

b. The permittee shall comply with existing federal regulations governing solids disposal, and with applicable provisions of 40 CFR Part 503, the federal sludge disposal regulation standards.

c. The permittee shall notify the Commissioner prior to any changes in sludge use or disposal practices.

d. The permittee shall maintain records to demonstrate its compliance with the above disposal requirements.

5. Power Failures

In accordance with 327 IAC 5-2-10 and 327 IAC 5-2-8(13) in order to maintain compliance with the effluent limitations and prohibitions of this permit, the permittee shall either:

a. provide an alternative power source sufficient to operate facilities utilized by the permittee to maintain compliance with the effluent limitations and conditions of this permit, or

b. shall halt, reduce or otherwise control all discharge in order to maintain compliance with the effluent limitations and conditions of this permit upon the reduction, loss, or failure of one or more of the primary sources of power to facilities utilized by the permittee to maintain compliance with the effluent limitations and conditions of this permit.

## C. REPORTING REQUIREMENTS

1. Planned Changes in Facility or Discharge

    Pursuant to 327 IAC 5-2-8(10)(F) and 5-2-16(d), the permittee shall give notice to the Commissioner as soon as possible of any planned alterations or additions to the facility (which includes any point source) that could significantly change the nature of, or increase the quantity of, pollutants discharged. Following such notice, the permit may be modified to revise existing pollutant limitations and/or to specify and limit any pollutants not previously limited. Material and substantial alterations or additions to the permittee's operation that were not covered in the permit (e.g., production changes, relocation or combination of discharge points, changes in the nature or mix of products produced) are also cause for modification of the permit. However those alterations which constitute total replacement of the process or the production equipment causing the discharge converts it into a new source, which requires the submittal of a new NPDES application.

2. Monitoring Reports

    Pursuant to 327 IAC 5-2-8(9), 327 IAC 5-2-13, and 327 IAC 5-2-15, monitoring results shall be reported at the intervals and in the form specified in "Data On Plant Operation", Part I.B.2.

3. Twenty-Four Hour Reporting Requirements

    Pursuant to 327 IAC 5-2-8(10), the permittee shall orally report to the Commissioner information on the following types of noncompliance within 24 hours from the time permittee becomes aware of such noncompliance. If the noncompliance meets the requirements of item b (Part II.C.3.b) or 327 IAC 2-6.1, then the report shall be made within those prescribed time frames.

    a. Any unanticipated bypass which exceeds any effluent limitation in the permit;

    b. Any noncompliance which may pose a significant danger to human health or the environment. Reports under this item shall be made as soon as the permittee becomes aware of the noncomplying circumstances by calling 317/233-7745 (888/233-7745 toll free in Indiana);

    c. Any upset (as defined in Part II.B.3 above) that exceeds any technology-based effluent limitations in the permit;

d.  Any discharge from the sanitary sewer system;

e.  Any dry weather discharge from a combined sewer overflow which is identified in this permit; or

f.  Violation of a maximum daily discharge limitation for any of the following toxic pollutants:  Mercury.

The permittee can make the oral reports by calling 317/232-8670 during regular business hours or by calling 317/233-7745 (888/233-7745 toll free in Indiana) during non-business hours.  A written submission shall also be provided within five (5) days of the time the permittee becomes aware of the circumstances.  The written submission shall contain:  a description of the noncompliance and its cause; the period of noncompliance, including exact dates and times, and, if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce and eliminate the noncompliance and prevent its recurrence.  The Commissioner may waive the written report on a case-by-case basis if the oral report has been received within 24 hours.  Alternatively the permittee may submit a "Bypass Overflow/Incident Report" or a "Noncompliance Notification Report", whichever is applicable, to IDEM at 317/232-8637 or 317/232-8406.  If a complete fax submittal is sent within 24 hours of the time that the permittee became aware of the occurrence, then the fax report will satisfy both the oral and written reporting requirements.

4.  <u>Other Noncompliance</u>

Pursuant to 327 IAC 5-2-8(10)(D), the permittee shall report any instance of noncompliance not reported under the "Twenty-Four Hour Reporting Requirements" in Part II.C.3, not related to the failure to report planned changes in the permitted facility, or not relating to any compliance schedules at the time the pertinent Discharge Monitoring Report is submitted.  The written submission shall contain: a description of the noncompliance and its cause; the period of noncompliance, including exact dates and times, and, if the noncompliance has not been corrected, the anticipated time it is expected to continue; and steps taken or planned to reduce, eliminate and prevent the noncompliance.

5.  <u>Other Information</u>

Pursuant to 327 IAC 5-2-8(10)(E), where the permittee becomes aware that it failed to submit any relevant facts or submitted incorrect information in a permit application or in any report to the Commissioner, the permittee shall promptly submit such facts or corrected information to the Commissioner.

Page 43 of 59
Permit No. IN0022977

6. <u>Signatory Requirements</u>

Pursuant to 327 IAC 5-2-22 and 327 IAC 5-2-8(14):

a. All reports required by the permit and other information requested by the Commissioner shall be signed and certified by a person described below or by a duly authorized representative of that person:

   (1) For a corporation: by a principal executive defined as a president, secretary, treasurer, any vice-president of the corporation in charge of a principal business function, or any other person who performs similar policy-making functions for the corporation or the manager of one or more manufacturing, production, or operating facilities employing more than two hundred fifty (250) persons or having gross annual sales or expenditures exceeding twenty-five million dollars ($25,000,000) (in second quarter 1980 dollars), if authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures.

   (2) For a partnership or sole proprietorship: by a general partner or the proprietor, respectively; or

   (3) For a federal, state, or local governmental body or any agency or political subdivision thereof: by either a principal executive officer or ranking elected official.

b. A person is a duly authorized representative only if:

   (1) The authorization is made in writing by a person described above.

   (2) The authorization specifies either an individual or a position having responsibility for the overall operation of the regulated facility or activity, such as the position of plant manager, operator of a well or a well field, superintendent, or position of equivalent responsibility. (A duly authorized representative may thus be either a named individual or any individual occupying a named position.); and

   (3) The authorization is submitted to the Commissioner.

c. <u>Certification</u>. Any person signing a document identified under paragraphs a and b of this section, shall make the following certification:

"I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

7. <u>Availability of Reports</u>

Except for data determined to be confidential under 327 IAC 12.1, all reports prepared in accordance with the terms of this permit shall be available for public inspection at the offices of the Indiana Department of Environmental Management and the Regional Administrator. As required by the Clean Water Act, permit applications, permits, and effluent data shall not be considered confidential.

8. <u>Penalties for Falsification of Reports</u>

IC 13-30 and 327 IAC 5-2-8(14) provides that any person who knowingly makes any false statement, representation, or certification in any record or other document submitted or required to be maintained under this permit, including monitoring reports or reports of compliance or noncompliance, shall, upon conviction, be punished by a fine of not more than $10,000 per violation, or by imprisonment for not more than 180 days per violation, or by both.

9. <u>Progress Reports</u>

In accordance with 327 IAC 5-2-8(10)(A), reports of compliance or noncompliance with, or any progress reports on, interim and final requirements contained in any compliance schedule of this permit shall be submitted no later than fourteen (14) days following each schedule date.

10. <u>Advance Notice for Planned Changes</u>

In accordance with 327 IAC 5-2-8(10)(B), the permittee shall give advance notice to IDEM of any planned changes in the permitted facility, any activity, or other circumstances that the permittee has reason to believe may result in noncompliance with permit requirements.

11.   Additional Requirements for POTWs and/or Treatment Works Treating Domestic Sewage

    a.   All POTWs shall identify, in terms of character and volume of pollutants, any significant indirect discharges into the POTW which are subject to pretreatment standards under section 307(b) and 307 (c) of the CWA.

    b.   All POTWs must provide adequate notice to the Commissioner of the following:

        (1)   Any new introduction of pollutants into the POTW from an indirect discharger that would be subject to section 301 or 306 of the CWA if it were directly discharging those pollutants.

        (2)   Any substantial change in the volume or character of pollutants being introduced into that POTW by any source where such change would render the source subject to pretreatment standards under section 307(b) or 307(c) of the CWA or would result in a modified application of such standards.

    As used in this clause, "adequate notice" includes information on the quality and quantity of effluent introduced into the POTW, and any anticipated impact of the change on the quantity or quality of the effluent to be discharged from the POTW.

    c.   This permit incorporates any conditions imposed in grants made by the U.S. EPA and/or IDEM to a POTW pursuant to Sections 201 and 204 of the Clean Water Act, that are reasonably necessary for the achievement of effluent limitations required by Section 301 of the Clean Water Act.

    d.   This permit incorporates any requirements of Section 405 of the Clean Water Act governing the disposal of sewage sludge from POTWs or any other treatment works treating domestic sewage for any use for which rules have been established in accordance with any applicable rules.

    e.   POTWs must develop and submit to the Commissioner a POTW pretreatment program when required by 40 CFR 403 and 327 IAC 5-19-1, in order to assure compliance by industrial users of the POTW with applicable pretreatment standards established under Sections 307(b) and 307(c) of the Clean Water Act. The pretreatment program shall meet the criteria of 327 IAC 5-19-3 and, once approved, shall be incorporated into the POTW's NPDES permit.

## D. ADDRESSES

1. <u>Cashiers Office</u>

   Indiana Department of Environmental Management
   Cashiers Office – Mail Code 50-10C
   100 N. Senate Avenue
   Indianapolis, Indiana  46204-2251

   The following correspondence shall be sent to the Cashiers Office:

   a.  NPDES permit applications (new, renewal or modifications) with fee

   b.  Construction permit applications with fee

2. <u>Municipal Permits Section</u>

   Indiana Department of Environmental Management
   Office of Water Quality – Mail Code 65-42
   Municipal Permits Section
   100 N. Senate Avenue
   Indianapolis, Indiana  46204-2251

   The following correspondence shall be sent to the Municipal Permits Section:

   a.  Preliminary Effluent Limits request letters

   b.  Comment letters pertaining to draft NPDES permits

   c.  NPDES permit transfer of ownership requests

   d.  NPDES permit termination requests

   e.  Notifications of substantial changes to a treatment facility, including new industrial
       sources

3. <u>Data & Information Services Section</u>

   Indiana Department of Environmental Management
   Office of Water Quality – Mail Code 65-42
   Data & Information Services Section
   100 N. Senate Avenue
   Indianapolis, Indiana 46204-2251

   The following correspondence shall be sent to the Data & Information Services Section:

   a. Gauging station and flow meter calibration documentation

   b. Discharge Monitoring Reports (DMRs), Monthly Reports of Operation (MROs), and Monthly Monitoring Reports (MMRs)

   c. CSO Discharge Monitoring Reports

   d. Whole Effluent Toxicity Testing reports

   e. Toxicity Reduction Evaluation (TRE) plans and progress reports

4. <u>Compliance Evaluation Section</u>

   Indiana Department of Environmental Management
   Office of Water Quality – Mail Code 65-42
   Compliance Evaluation Section
   100 N. Senate Avenue
   Indianapolis, Indiana 46204-2251

   The following correspondence shall be sent to the Compliance Evaluation Section:

   a. Compliance schedule progress reports

   b. Completion of Construction notifications

   c. Toxicity Reduction Evaluation progress reports

   d. Anticipated Bypass reports

Page 48 of 59
Permit No. IN0022977

5. <u>Wet Weather Section</u>

    Indiana Department of Environmental Management
    Office of Water Quality – Mail Code 65-42
    Wet Weather Section
    100 N. Senate Avenue
    Indianapolis, Indiana  46204-2251

    The following correspondence shall be sent to the Wet Weather Section:

    a.  Combined Sewer Overflow (CSO) Operational Plans

    b.  CSO Long Term Control Plans (LTCP)

    c.  Stream Reach Characterization and Evaluation Reports (SRCER)

6. <u>Pretreatment Group</u>

    Indiana Department of Environmental Management
    Office of Water Quality – Mail Code 65-42
    Compliance Evaluation Section – Pretreatment Group
    100 N. Senate Avenue
    Indianapolis, Indiana  46204-2251

    The following correspondence shall be sent to the Pretreatment Group:

    a.  Organic Pollutant Monitoring Reports

    b.  Significant Industrial User (SIU) Quarterly Noncompliance Reports

    c.  Pretreatment Program Annual Reports

    d.  Sewer Use Ordinances

    e.  Enforcement Response Guides (ERG)

    f.  Sludge analytical results

PART III

REQUIREMENT TO OPERATE
A PRETREATMENT PROGRAM

A.  CONDITIONS

The permittee, hereinafter referred to as the "Control Authority," is required to operate its
approved industrial pretreatment program approved on July 7, 1986, and any subsequent
modifications approved up to the issuance of this permit.  To ensure the program is operated
as approved and consistent with 327 IAC 5-16 through 5-21, the following conditions and
reporting requirements are hereby established.  The Control Authority (CA) shall:

1.  Legal Authority

    The CA shall develop, enforce and maintain adequate legal authority in its Sewer Use
    Ordinance (SUO) to fully implement the pretreatment program in compliance with State
    and local law.  As part of this requirement, the CA shall develop and maintain local limits
    as necessary to implement the prohibitions and standards in 327 IAC 5-18.

2.  Permit Issuance

    In accordance with 327 IAC 5-19-3(1) the CA is required to issue/reissue permits to
    Significant Industrial User(s) (SIU) as stated in the SUO.  The CA must issue permits to
    new SIUs prior to the commencement of discharge.  A SIU is defined in the SUO.

3.  Industrial Compliance Monitoring

    The CA is required to conduct inspection, surveillance, and monitoring activities to
    determine SIU compliance status with the approved program and the SUO independent of
    data supplied by the SIU.  SIU compliance monitoring performed by the CA will be
    conducted in accordance with the program plan or yearly program plan.  SIUs will be
    inspected once per year, at a minimum.

4.  Enforcement

    The CA is required to initiate the appropriate enforcement action against a SIU violating
    any provision of the SUO and/or discharge permit in accordance with the Enforcement
    Response Procedures (ERP) adopted by the CA.  The CA must investigate violations by
    collecting and analyzing samples and collecting other information with sufficient care to
    produce evidence admissible in enforcement proceedings or in judicial actions in
    accordance with 40 CFR 403.8(f)(1)(iii) and 327 IAC 5-19-3(1)(F).

5. <u>SIU Quarterly Noncompliance Report</u>

The CA is required to report the compliance status of each SIU quarterly. The report is due by the 28th of the following months: April, July, October, and January of each year. The report shall include a description of corrective actions that have or will be taken by the CA and SIU to resolve the noncompliance situations. This report is to be sent to the Compliance Branch of the Office of Water Quality.

6. <u>Public Participation and Annual Publishing of SIUs in Significant Noncompliance</u>

The CA is required to comply with the public participation requirements under 40 CFR 25 and 327 IAC 5-19-3(2)(L). The CA must publish annually, by January 28, in the largest daily newspaper in the area, a list of SIUs that have been in significant noncompliance (SNC) with the SUO during the calendar year. The CA shall include in the ANNUAL REPORT a list of the SIUs published along with the newspaper clipping.

7. <u>Annual Report</u>

The CA is required to submit an annual report to the Pretreatment Group by April 1, of each year. The annual report will be submitted in accordance with the State supplied "POTW PRETREATMENT PROGRAM ANNUAL REPORT GUIDANCE."

8. <u>Records Retention</u>

Pursuant to 327 IAC 5-16-5(d), the CA shall retain any pretreatment reports from an industrial user a minimum of three (3) years and shall make such reports available for inspection and copying by IDEM or the U.S. EPA. This period of retention shall be extended during the course of any unresolved litigation regarding the discharge of pollutants by the industrial user, the operation of the POTW pretreatment program or when requested by IDEM or the U.S. EPA.

9. <u>Confidentiality</u>

The CA is required to comply with all confidentiality requirements set forth in 40 CFR 403.14, as well as the procedures established in the SUO.

10. <u>Program Resources</u>

Pursuant to 327 IAC 5-19-3(3), The CA shall maintain sufficient resources and qualified personnel to carry out the pretreatment program requirements.

11. Interjurisdictional Agreements

The CA must maintain sufficient legal authority to ensure compliance with all applicable pretreatment limits and requirements by all SIUs discharging to the POTW, including SIUs within governmental jurisdictions outside the immediate jurisdiction of the POTW. The CA must maintain the interjurisdictional agreements necessary to ensure full compliance by SIUs located within other jurisdictions as discussed in 40 CFR 403.8(f)(1).

12. POTW Pretreatment Program Revision Requirements

The CA is required to update its pretreatment program and SUO in accordance with the Pretreatment Implementation Review Task Force (PIRT) revisions and the Domestic Sewage Study (DSS) rule. The updating shall be completed according to the following schedule:

a. The CA shall re-evaluate its pretreatment program for consistency with 40 CFR 403, particularly the PIRT and DSS revisions, then submit a draft of any program modification, with a request for approval of the modification under 40 CFR 403.18, to the Pretreatment Group and the U.S. EPA, Region 5, within nine months of the effective date of this permit. The program modification must include a technical re-evaluation of the local limits.

The request must identify or highlight the new provisions in the modification (or pre-existing provisions in the original program) that fulfill the requirements of the PIRT and DSS revisions. A guidance document is available from the Pretreatment Group that outlines the procedures for modifying POTW pretreatment programs and the PIRT and DSS provisions that must be in the programs.

b. The CA shall make any changes to its pretreatment program necessary for the program to be consistent with 40 CFR 403, particularly the PIRT and DSS revisions, within 90 days after approval by the approval authority.

c. The CA shall issue pretreatment permits to all SIUs (or modify existing SIU permits) that are affected by the revisions within one year after approval of the revisions by the approval authority.

13. Program Modification

Pursuant to 327 IAC 5-19-6 and 40 CFR 403.18, any significant proposed program modification shall be submitted to the Pretreatment Group and the U.S. EPA for approval.

Page 52 of 59
Permit No. IN0022977

A significant modification shall include, but not be limited to, any change in the SUO, major modification in the approval program's administrative procedures, a significant reduction in monitoring procedures, a significant change in the financial/revenue system, a significant change in the local limitations contained in the SUO, and a change in the industrial survey.

NOTE: A summary of the revisions to the General Pretreatment Regulations (40 CFR 403) is available from the Pretreatment Group of the Compliance Evaluation Section.

Page 53 of 59
Permit No. IN0022977

ATTACHMENT A

Precipitation-Related Combined Sewer Overflow Discharge Authorization Requirements

I. Discharge Requirements

A. Combined Sewer Overflows are point sources subject to both technology-based and water quality-based requirements of the Clean Water Act and state law.  The permittee is authorized to have wet weather discharges from outfalls listed below subject to the requirements and provisions of this permit, including Attachment A.

| Outfall | Location | Receiving Water |
|---|---|---|
| 004 | 15th Avenue & Elkhart Street (N 41°33'36", E 87°16'25") | West Branch Little Calumet River |
| 005 | 32nd Avenue & West Broadway Street (N 41°33'36", E 87°20'9") | West Branch Little Calumet River |
| 006 | Rhode Island Street at E. Interceptor (N 41°36'28", E 87°19'33") | East Branch Grand Calumet River |
| 007 | Alley 9 at E. Interceptor (N 41°36'28", E 87°19'42") | East Branch Grand Calumet River |
| 008 | Polk Street at E. Interceptor (N 41°36'27", E 87°21'0") | East Branch Grand Calumet River |
| 009 | Pierce Street at E. Interceptor (N 41°36'25", E 87°21'9") | East Branch Grand Calumet River |
| 010 | Bridge Street at E. Interceptor (N 41°36'32", E 87°22'19") | East Branch Grand Calumet River |
| 011 | Chase Street at E. Interceptor (N 41°36'26", E 87°22'30") | East Branch Grand Calumet River |
| 012 | Colfax Street at W. Interceptor (N 41°36'34", E 87°24'43") | East Branch Grand Calumet River |

| 013 | 25th Avenue and Louisiana Street (N 41°34'25", E 87°19'12") | West Branch Little Calumet River |
| 014 | 25th Avenue and Wisconsin Street (N 41°34'25", E 87°18'22") | West Branch Little Calumet River |
| 015 | 32nd Broadway and Alley 1 East (N 41°33'36", E 87°20'09") | West Branch Little Calumet River |

B. At all times the discharge from any and all CSO outfalls herein shall not cause receiving waters:

   1. including the mixing zone, to contain substances, materials, floating debris, oil, scum, or other pollutants:

      a. that will settle to form putrescent or otherwise objectionable deposits;
      b. that are in amounts sufficient to be unsightly or deleterious;
      c. that produce color, visible oil sheen, odor, or other conditions in such a degree as to create a nuisance;
      d. which are in amounts sufficient to be acutely toxic to, or otherwise severely injure or kill aquatic life, other animals, plants, or humans; and
      e. which are in concentrations or combinations that will cause or contribute to the growth of aquatic plants or algae to such a degree as to create a nuisance, be unsightly, or otherwise impair the designated uses.

   2. outside the mixing zone, to contain substances in concentrations which on the basis of available scientific data are believed to be sufficient to injure, be chronically toxic to, or be carcinogenic, mutagenic, or teratogenic to humans, animals, aquatic life, or plants.

C. Dry weather discharges from any portion of the sewer collection system, including the outfalls listed in Part I.A of this Attachment A, are prohibited. If a dry weather discharge occurs, the permittee shall notify the Office of Water Quality, Compliance Evaluation Section, by phone within 24 hours and in writing within five days of the occurrence in accordance with the requirements in Part II.C.3 of this permit. The correspondence shall include the duration and cause of the discharge as well as the remedial action taken to end the discharge.

II.  Monitoring and Reporting Requirements

    The permittee is required to monitor the flow from each CSO outfall. This monitoring of each CSO outfall shall include:

        1.  measurement of the flow volume,
        2.  the time that the CSO discharge began, and
        3.  the flow duration.

    The requirement for the measurement of flow volume may be accomplished by installing a flow measurement device or by utilizing a reliable method of estimating the flow volume. Within 120 days from the effective date of this permit, the permittee shall submit to IDEM a monitoring plan which describes the permittee's selected method of accomplishing this permit requirement. The permittee shall also update its CSO Operational Plan to incorporate the flow monitoring plan.

    The permittee shall also report the amount of precipitation for each day of the month. If multiple rain gauges are used, the information from each rain gauge shall be reported.

    All of the information described in this subsection shall be reported on the CSO Discharge Monitoring Report (CSO DMR) form provided by IDEM and submitted to IDEM prior to the 28th day of the following month. All submittals under this provision shall be subject to the reporting requirements of this permit, including, but not limited to, Part II, Section C.6 ("Signatory Requirements"), C.7 ("Availability of Reports"), and C.8 ("Penalties for Falsification of Reports") of this permit.

III. CSO Operational Plan

    A. The permittee shall comply with the following minimum technology-based controls, in accordance with the EPA 1994 National CSO Policy:

        1.  The permittee shall implement a proper operation and regular maintenance program for the sewer system and the CSOs. The purpose of the operation and maintenance program is to reduce the magnitude, frequency and duration of CSOs. The program shall consider regular sewer inspections; sewer, catch basin, and regulator cleaning; equipment and sewer collection system repair or replacement, where necessary; and disconnection of illegal connections.
        2.  The permittee shall implement procedures that will maximize the use of the collection system for wastewater storage that can be accommodated by the storage capacity of the collection system in order to reduce the magnitude, frequency and duration of CSOs.

3. The permittee shall review and modify, as appropriate, its existing pretreatment program to minimize CSO impacts from non-domestic users. The permittee shall identify all industrial users that discharge to the collection system upstream of any CSO outfalls; this identification shall also include the pollutants in the industrial user's wastewater and the specific CSO outfall(s) that are likely to discharge the wastewater.

4. The permittee shall operate the Publicly Owned Treatment Works (POTW) treatment plant at maximum treatable flow during all wet weather flow conditions to reduce the magnitude, frequency and duration of CSOs. The permittee shall deliver all flows to the treatment plant within the constraints of the treatment capacity of the POTW.

5. Dry weather overflows from CSO outfalls are prohibited. Each dry weather overflow must be reported to IDEM as soon as the permittee becomes aware of the overflow. When the permittee detects a dry weather overflow, it shall begin corrective action immediately. The permittee shall inspect the dry weather overflow each subsequent day until the overflow has been eliminated.

6. The permittee shall implement measures to control solid and floatable materials in CSO discharges.

7. The permittee shall implement a pollution prevention program focused on reducing the impact of CSOs on receiving waters.

8. The permittee shall implement a public notification process to inform citizens of when and where CSO discharges occur and their impacts. This notification must also be done in accordance with 327 IAC 5-2.1.

9. The permittee shall monitor to effectively characterize CSO impacts and the efficacy of CSO controls.

B. The permittee's implementation of each of the minimum controls in Part III.A of this Attachment A shall be documented in its CSO Operational Plan (CSOOP), which was approved August 12, 1998. The permittee shall commence immediate implementation of the CSOOP upon written notification by IDEM. The permittee shall update the CSOOP to reflect changes in its operation or maintenance practices; measures taken to implement the above minimum requirements; and changes to the treatment plant or collection system, including changes in collection system flow characteristics, collection system or WWTP capacity or discharge characteristics (including volume, duration, frequency and pollutant concentration). Beginning twelve (12) months from the effective date of this permit, the permittee shall annually evaluate its CSOOP and update it, as necessary. The permittee shall submit the CSOOP updates to IDEM, Office of Water Quality, Wet Weather Section.

The CSOOP update(s) shall include a summary of the proposed revisions to the CSOOP as well as a reference to the page(s) that have been modified. Any CSOOP updates shall not result in:

1. a lower amount of flow being sent to and through the plant for treatment, or
2. more discharges (measured either by volume, duration, frequency, or pollutant concentration) occurring from the CSO outfalls.

The permittee shall maintain a current CSO Operational Plan, including all approved updates, on file at the POTW.

C. The permittee shall maximize the volume of flows transported to and through the wastewater treatment plant (WWTP) for treatment before and during a CSO discharge in accordance with the wet weather operation standard operating procedure included in the approved CSOOP. The permittee shall also maximize the volume of flow through the relevant portion of the collection system before collection system overflows may occur. The maximization of flow must continue for the duration of the discharge or diversion.

## IV. Sewer Use Ordinance Review/Revision

The permittee's Sewer Use Ordinance must contain provisions which: (1) prohibit introduction of inflow sources to any sanitary sewer; (2) prohibit construction of new combined sewers outside of the existing combined sewer service area; and (3) provide that for any new building the inflow/clear water connection to a combined sewer shall be made separate and distinct from sanitary waste connection to facilitate disconnection of the former if a separate storm sewer subsequently becomes available. The permittee shall continuously enforce these provisions.

## V. Stream Reach Characterization and Evaluation Report

The permittee has submitted a Stream Reach Characterization and Evaluation Report (SRCER), which was developed to characterize the impacts of CSO discharges to the Grand Calumet and Little Calumet Rivers.

Along with characterizing CSO impacts to the Grand Calumet and Little Calumet Rivers, a SRCER was developed to characterize the efficacy of implemented CSO controls listed within the Operational Plan as well as providing baseline conditions for the determination of necessary long-term CSO controls. Results from the permittee's characterization and evaluation will aid in determining the extent of long-term CSO controls needed to comply with the Clean Water Act (CWA). If a determination cannot be made, the permittee may be required to perform additional testing of individual CSOs to determine water quality impacts. The necessary long-term controls shall be contained within a LTCP as required in Part VI of this Attachment A.

VI. Long-term CSO Requirements

The permittee shall develop a CSO LTCP that conforms with U.S. EPA's 1994 CSO Policy, sets forth controls necessary for ensuring its CSO discharges will comply with the technology-based and water quality-based requirements of the Clean Water Act (CWA) (including section 402(q) of the CWA) and state law (IC 13-11-2-120.5 and applicable state water quality standards), and contains a schedule for implementing those controls that is as expeditious as possible.

The LTCP shall be submitted to the Indiana Department of Environmental Management, Office of Water Quality, WWS within 12 months of the receipt by GSD of the TMDL model for the Grand Calumet and Little Calumet Rivers

The minimum elements of the LTCP include the following:

A. Characterization, Monitoring, and Modeling of the CSS;

B. Consideration of Sensitive Areas;

C. Evaluation of Alternatives;

D. Cost/Performance Considerations;

E. Revised CSO Operational Plan;

F. Maximizing Treatment at WWTP;

G. Implementation Schedule;

H. Post-Construction Compliance Monitoring Program; and

I. Public Participation.

VII. Reopening Clauses

A. After LTCP implementation, if IDEM has evidence that a CSO discharge is causing or contributing to exceedances of water quality standards, then additional control measures, effluent limitations, and/or monitoring requirements may be imposed on the CSO through a modification of this permit, after public notice and opportunity for hearing.

B. This permit may be reopened to address changes in the EPA National CSO Policy or state or federal law, rule, regulation, or policy.

C.  The permit may be reopened, after public notice and opportunity for hearing, to incorporate elements of an approved LTCP.

D.  The permit may be reopened, after public notice and opportunity for hearing, to incorporate applicable provisions of IC 13-18.

Fact Sheet
June 10, 2004
Amended
25 January 2006

Gary Sanitary District
Wastewater Treatment Plant
3600 West 3rd Avenue
Gary, Indiana 46406

NPDES Permit No. IN0022977

Background

The Gary Sanitary District's Wastewater Treatment Plant is a 60 MGD, single-stage Class
IV facility consisting of a trash rack, four mechanical bar screens, two grit tanks followed
by raw sewage pumps with wet well, 10 primary settling tanks, a scum concentration tank,
six aeration tanks, twenty-four secondary settling tanks followed by dual wet wells and 10
granular media filters with mud well. Phosphorus removal is provided using chemical
precipitation. Disinfection is by sodium hypochlorite followed by dechlorination utilizing
sodium bisulfite. Sludge is thickened by gravity thickeners (primary sludge) and gravity
belt thickeners (waste activated sludge) followed by anaerobic digestion and belt filter
presses and is ultimately disposed of in a sanitary landfill. The final effluent is discharged
through parallel Outfalls 001 A & B emanating from the chlorine contact tanks. Mass limits
are based on the peak design flow of 180 MGD.

Receiving Stream

The classification of the receiving stream, the East Branch of the Grand Calumet River, has
changed with the passage of the new water quality standards. 327 IAC 2-1.5-5 designates
the Grand Calumet River as waters:
• Which shall be capable of full-body contact recreation,
• For industrial water supply,
• Which shall be capable of supporting a well-balanced, warm water aquatic community.

In addition to the above-referenced use designations, the Indiana portion of the open waters
of Lake Michigan is also designated as water which shall be capable of supporting a
salmonid fishery.

There is no natural flow in the East Branch of the Grand Calumet River during critical dry
weather periods; however, upstream of the Gary SD WWTP, the river is the receiving
stream of several large non-contact cooling water discharges from the U.S. Steel Company.

Solids Disposal

The Gary SD is required to dispose of its sludge in accordance with 329 IAC 10, 327 IAC
6.1 or 40 CFR Part 503. Currently, the finished sludge is landfilled.

2

<u>Industrial Contributors</u>

There are 18 industrial contributors to the Gary SD collection system that were identified in
the NPDES permit application of March 2, 1999. In addition, the Gary SD accepts flow
from the largely sanitary sources of the Town of Merrillville, Buffington Harbor Casino
Resort, the City of Lake Station, the City of Hobart, Flying J, and the Travel Center. The
percentage of flow due to the industrial and domestic sources is estimated at 23 % of the
total flow.

 A reasonable potential analysis was conducted as part of the wasteload allocation for the
Gary SD. Only those parameters currently monitored as part of the permit conditions were
examined. The results of the analysis indicate limits are required for mercury. All other
metals and/or organic parameters limited and/or monitored in the permit issued September
30, 1994 were found not to have a reasonable potential to exceed the water quality criterion
and shall be monitored at a rate of once quarterly in this permit for the purpose of
conducting reasonable potential at the next permit renewal, except for cyanide which shall
be monitored once weekly.

<u>Compliance Status</u>

There are currently no enforcement actions originating from IDEM for the Gary Sanitary
District, however, the Gary Sanitary District is currently under a federal consent decree.
The permittee has had difficulty meeting several of its current permit limits, especially the
salts.

<u>Collection  System</u>

The collection system of the Gary SD contains approximately 360 miles of sewers ranging
from 8 inches to 132 inches in diameter with 12 CSO overflow points. The sewers are
predominately constructed of brick, vitrified clay, reinforced concrete and steel. The
majority of the sewers flow by gravity to a pump station and is conveyed either to the
treatment plant or a receiving stream.

<u>Mass Limits for Conventional Parameters</u>

The permittee requested wet weather mass limits based on regulation cite 327 IAC 5-2-
11.6(g)(4). Ordinarily, water quality-based effluent limitations (WQBELs) for facilities in
the GLI area must be calculated in accordance with the provisions of 327 IAC 5-2-
11.4(a)(9) which would require that the alternate effluent flow value be used in the
wasteload allocation study for determining both the concentration and mass limits.
Additionally, 327 IAC 5-2-11.6(g) requires that the WQBELS be expressed as both a
concentration value and a corresponding mass loading rate.

In reviewing Indiana statutes, IDEM has determined that statute cite IC 13-18-19-2(a)(2)
overrides these rule provisions. It gives IDEM the authority to provide increased mass
limitations for POTWs that

3

(1) are capable of treating wastewater flows that exceed the design flow used to calculate normal WQBELs, and

(2) as a result of the increased limitations, can reduce the volume of discharge of wastewater from plant bypasses or combined sewer overflows.

However, because of federal Great Lakes regulations, this Indiana statute has limited applicability and only applies to the conventional parameters that are listed in 40 CFR 132.6, Table 5.

Antidegradation Statement/Justification for discharges to High Quality Waters

This proposed increase in the mass limits has been reviewed to ensure that it complies with the antidegradation rules. The granting of the increased mass limits does not constitute a significant lowering of water quality, because the proposed increase is subject to the provisions of 327 IAC 5-2-11.3(b)(1)(C)(i)(AA) and 5-2-11.3(b)(1)(C)(iii)(GG) for high quality waters.

Antidegradation Statement/Justification for discharges to tributaries of OSRWs:

This proposed increase in the mass limits has been reviewed to ensure that it complies with the antidegradation rules. The granting of increased mass limits does not constitute a significant lowering of water quality, because the proposed increase is subject to the provisions of 327 IAC 5-2-11.7(a)(2)(C)(i). This provision references the provisions of 327 IAC 5-2-11.3(b)(1)(C)(i)(AA) and 327 IAC 5-2-11.3(b)(1)(C)(iii)(GG) for high quality waters.

CSO Requirements

Statutory or Regulatory Basis for Permit Provisions:

CSOs are point sources subject to NPDES permit requirements, including both technology-based and water quality-based requirements of the CWA and state law. Thus the permit contains provisions IDEM deems necessary to meet water quality standards, as well as technology-based treatment requirements, operation and maintenance requirements, and best management practices. This permit is based on various provisions of state and federal law, including (1) Title 13 of the Indiana Code; (2) the water quality standards set forth in 327 IAC 2-1.5; (3) the NPDES rules set forth in 327 IAC 2 and 327 IAC 5, including 327 IAC 5-2-8 and 327 IAC 5-2-10; and (4) section 402(q) of the CWA (33 USC § 1342), which requires all permits or orders issued for discharges from municipal CSOs to conform with the provisions of EPA's National CSO Control Policy (58 Fed. Reg. 18688, April 19, 1994).

EPA's CSO Policy contains provisions that, among other things, require permittees to develop and implement minimum technological and operational controls and long term control plans to meet state water quality standards. The permit's penalty provisions are based in large part on IC 13-30.

4

In addition to the regulatory provisions previously cited, the data collection and reporting requirements are based in part on 327 IAC 5-1-3, 327 IAC 5-2-13 and section 402(q) of the CWA. The long term control plan provisions were included to ensure compliance with water quality standards. The Gary Sanitary District (GSD) has a deadline to submit a LTCP document to IDEM within one year of the receipt by GSD of the TMDL models for the Grand Calumet and Little Calumet Rivers. IDEM staff will perform a substantive review of the LTCP document to determine whether it meets the requirements of state and federal law.

Explanation of Effluent Limitations and Conditions:

The effluent limitations set forth in Part I of Attachment A are derived in part from the narrative water quality standards set forth in 327 IAC 2-1.5-8. The narrative standards are minimum standards that apply to all waters at all times, and therefore are applicable to all discharges of pollutants. Because EPA has not issued national effluent limitation guidelines for this category of discharges, the technology-based BAT/BCT provisions are based on best professional judgment (BPJ) in addition to section 402(q) of the CWA. (CSO discharges are not subject to the secondary treatment requirements applicable to publicly owned treatment works because overflow points have been determined to not be part of the treatment plant. Montgomery Environmental Coalition v. Costle, 646 F.2d 568 (D.C. Cir. 1980).)

Effluent Limitations and Rationale

The effluent parameters to be limited and/or monitored include: flow, $CBOD_5$, TSS, ammonia-nitrogen, phosphorus, oil and grease, pH, dissolved oxygen, E. coli, total residual chlorine, free cyanide, mercury, chlorides, sulfate, fluoride, total dissolved solids, chromium, copper, iron, lead, zinc, phenols (4AAP), nickel, cadmium and arsenic. Effluent limits are based on a wasteload allocation (WLA) provided by the Permits Technical Support Section on April 23, 2004. Monitoring frequencies are based upon facility size, type and compliance history.

The summer monitoring period runs from May 1 through November 30 of each year, the winter monitoring period runs from December 1 through April 30 of each year. The disinfection season runs from April 1 through October 31 annually.

## FINAL EFFLUENT LIMITATIONS

Flow:

Plant discharge flow is to be monitored and reported daily as a 24-hour total. Flow must be measured by a flow meter. Reporting of flow is required by 327 IAC 2-4-1 and 327 IAC 5-2-13(a)(2). This requirement is the same as the requirement found in the facility's permit issued September 30, 1994.

5

**CBOD$_5$:**

CBOD$_5$ shall be limited to 5.0 mg/l (7511 lbs/day) as a monthly average and 7.5 mg/l (11266 lbs/day) as a weekly average during the summer monitoring period and to 8.8 mg/l (13218 lbs/day) as a monthly average and 13.2 mg/l (19828 lbs/day) as a weekly average during the winter monitoring period. Monitoring is to be conducted daily by 24-hour composite sampling. This requirement is the same as the requirement found in the facility's permit issued September 30, 1994.

**TSS:**

TSS shall be limited to 6.0 mg/l (9013 lbs/day) as a monthly average and 9.0 mg/l (13519 lbs/day) as a weekly average during the summer monitoring period. During the winter monitoring period TSS is limited to 9.6 mg/l (14420 lbs/day) as a monthly average and 14.4 mg/l (21630 lbs/day) as a weekly average. Monitoring is to be conducted daily by 24-hour composite sampling. This requirement is the same as the requirement found in the facility's permit issued September 30, 1994.

**Ammonia-nitrogen:**

Ammonia-nitrogen shall be limited to 2.0 mg/l (3004 lbs/day) as a monthly average and 3.0 mg/l (4506 lbs/day) as a weekly average during the interim summer monitoring period and to 2.4 mg/l (3605 lbs/day) as a monthly average and 3.6 mg/l (5408 lbs/day) as a weekly average during the interim winter monitoring period. Thence, ammonia-nitrogen is limited to 1.00 mg/l (1502 lbs/day) as a monthly average and 2.33 mg/l (3500 lbs/day) as a daily maximum during the final summer monitoring period and to 1.13 mg/l (1697 lbs/day) as a monthly average and 2.63 mg/l (3951 lbs/day) as a daily maximum during the final winter monitoring period.

The ammonia-nitrogen limits included in this permit have been impacted due to a 2002 U.S. Army Corps of Engineers survey that characterized flow stratification and lake intrusion near the mouth of the Indiana Harbor Ship Canal. The flow stratification measurements resulted in a reduction of lake intrusion from 1000 cfs to 138 cfs. Monitoring is to be conducted daily by 24-hour composite sampling. A 36-month schedule of compliance has been included for this parameter.

**Total Phosphorus:**

Phosphorus reduction was originally included in the Gary SD permit issued September 30, 1994. It was proposed to continue to incorporate the performance limits from the September 30, 1994 issuance permit based on 327 IAC 5-2-10(11)(B)(v). The East Chicago SD, during the course of their permit renewal, had indicated some inconsistencies in the statistical methods utilized to calculate these limits. These same statistical procedures were used to derive the Gary SD phosphorus limit in the September 30, 1994 permit renewal. Therefore, it is proposed to incorporate limits based on 327 IAC 5-2-10(11)(B)(iii).

6

Phosphorus removal facilities shall achieve a degree of reduction in total phosphorus content of the monthly average wastewater to produce an effluent containing no more than 1.0 mg/l total phosphorus (P) on a monthly average for any month that the average phosphorus level in the raw sewage is greater than 5 mg/l. Levels less than 5 mg/l are subject to a sliding scale of reduction. Monitoring is to be conducted daily by 24-hour composite sampling.

Oil and Grease:

Oil and grease reduction was originally included in the Gary SD permit issued September 30, 1994. Oil and grease removal shall achieve a degree of reduction in total content of the wastewater to produce an effluent containing no more than 10.0 mg/l of oil and grease. Monitoring is to be conducted fives times weekly by grab sampling. These effluent limitations and monitoring requirements are identical to those contained in the permit issued September 30, 1994.

pH:

The pH of the final effluent must be between 6.0 and 9.0 standard units. The pH limitations have been set in accordance with 327 IAC 2-1.5-8(c)(2) and 327 IAC 5-2-11.4(d)(1). Monitoring is to be conducted daily by grab sampling. These effluent limits and monitoring requirements are the same as those found in the facility's NPDES permit issued September 30, 1994.

Dissolved Oxygen:

Dissolved oxygen content of the final effluent shall be limited to 6.0 mg/l as a daily minimum average during the summer monitoring period and 5.0 mg/l as a daily minimum average during the winter monitoring period. Monitoring is to be conducted daily by grab sampling. The reported daily average concentration of dissolved oxygen in the effluent shall be the arithmetic mean determined by summation of the twelve daily grab sample results and dividing this sum by twelve. These effluent limits and monitoring requirements are the same as those found in the facility's NPDES permit issued September 30, 1994.

Bacteriological Requirements:

The effluent shall be disinfected on a continuous basis such that excursions above the *E. coli* limitations do not occur from April 1 through October 31, annually. The monthly average *E. coli* value shall be calculated as a geometric mean. *E. coli* shall be monitored and reported during the disinfection/recreation season of April 1 through October 31, annually. During this season, *E. coli* shall not exceed 125/100 ml as a monthly average calculated as a geometric mean based on daily samples not to exceed 235/100 ml. The bacteriological standards are incorporated from 327 IAC 2-1.5-8(e)(2) and 327 IAC 5-2-11.4(d)(2). These effluent limits and monitoring requirements are the same as those found in the facility's NPDES permit issued September 30, 1994.

7

Total Residual Chlorine:

Total Residual Chlorine (TRC) shall be limited to 0.02 mg/l (30 lbs/day) as a monthly average and 0.04 mg/l (60 lbs/day) as a daily maximum during the interim monitoring period. Thence, TRC is limited to 0.008 mg/l (12.0 lbs/day) as a monthly average and 0.018 mg/l (27.0 lbs/day) as a daily maximum. Monitoring is to be conducted daily by grab sampling. A 36- month schedule of compliance has been included for this parameter.

The water quality-based interim daily maximum limitation for total residual chlorine is equal to or greater than the limit of detection (LOD), but is less than the limit of quantitation (LOQ), and the interim monthly average water quality based effluent limitation for this parameter is equal to or greater than the LOD, but less than the limit of quantitation. Compliance with these interim effluent limitations will be demonstrated if the measured effluent concentrations are less than the limit of quantitation.

The final monthly average water quality based effluent limit (WQBEL) for total residual chlorine is less than the limit of quantitation (LOQ). Compliance with the total residual chlorine concentration limitations will be demonstrated if the monthly average effluent level is less than or equal to the monthly average WQBEL. For the purpose of calculating the monthly average value, the daily effluent values that are less than the LOQ may be assigned a value of zero (0), unless, after considering the number of monitoring results that are greater than the limit of detection (LOD), and applying appropriate statistical techniques, a value other than zero (0) is warranted.

The final daily maximum WQBEL for total residual chlorine is less than the LOD value specified in the permit. Compliance with this effluent limitation will be demonstrated if the measured daily effluent concentrations are less than the LOQ. For daily maximum mass limitations based on WQBELs which are less than the LOQ value, compliance with the daily maximum mass value is based on the LOQ value. Compliance with the daily maximum mass value will be demonstrated if the calculated mass value is less than **90.1** lbs/day

Case-Specific MDL For TRC

The permittee may determine a case-specific method detection level (MDL) using the analytical method specified above. The MDL shall be derived by the procedure specified for MDLs contained in 40 CFR Part 136, Appendix B, and the limit of quantitation shall be set equal to 3.18 times the MDL. Other methods may be used if first approved by the U.S. EPA and IDEM.

Non Conventional Pollutants

Iron, Phenols (4AAP), Sulfate and Total Dissolved Solids:

The pollutants iron, phenols (4AAP), sulfate and total dissolved solids currently do not have water quality standards assigned to them in the receiving water for the Gary Sanitary District.

8

While there are water quality standards for iron, sulfate and total dissolved solids for Lake Michigan, a data review of the TMDL studies indicates the Lake Michigan criteria will not be exceeded by the existing discharge of the Gary Sanitary District. Iron, phenols (4AAP), sulfate and total dissolved solids shall be monitored once quarterly in this permit for the purpose of conducting reasonable potential at the next permit renewal.

Nickel, Zinc, Fluoride, Chloride, Cadmium, Lead, Arsenic, Zinc, Chromium, Copper and, Iron:

These pollutants were examined for reasonable potential to exceed water quality standards. None of the aforementioned parameters have been found to exhibit the probable potential to exceed, thus, these parameters shall be monitored once quarterly in this permit for the purpose of conducting reasonable potential at the next permit renewal and to ensure continuing compliance with the pretreatment program requirements.

Hexavalent Chromium:

Hexavalent chromium is a pollutant of concern primarily for industrial discharges. The Gary Sanitary District does not accept a large volume of industrial waste when compared to the total discharge flow, thus, any hexavalent chromium present in the influent from industrial sources is expected to be oxidized by the presence of organic material in the wastewater during treatment. Based on this, hexavalent chromium is not considered a pollutant of concern for the Gary SD and will be no longer limited or monitored.

Mercury:

Mercury is currently limited to 0.00003 mg/l as a monthly average and 0.00007 mg/l as a daily maximum in the permit issued September 30, 1994. These limits shall remain in effect for a maximum of 60 months during the schedule of compliance for this parameter, thence, mercury is limited to 1.30 ng/l (0.00065 lbs/day) as a monthly average and 3.16 ng/l (0.0016 lbs/day) as a daily maximum. While an examination of influent and effluent sampling data would show the concentration value generally at and/or below the limit of detection associated with EPA Method 245.2 for this parameter, examination for reasonable potential is inconclusive due to the LOD associated with the mercury test methods prior to the adoption of EPA Method 1631; thus, RPE for this parameter is based on 1999 TMDL data.

Mercury monitoring shall be conducted bi-monthly (i.e. every other month) for the term of the permit. Bi-monthly monitoring shall be conducted in the months of February, April, June, August, October, and December of each year. EPA Test Method 245.1 or 245.2 for mercury may only be utilized for a maximum of twelve (12) months following the effective date of this permit. Beginning no later than twelve (12) months from the effective date of the permit, the permittee shall begin using EPA Test Method 1631, Revision E. If EPA Test Method 1631, Revision E is further revised during the term of the permit, the permittee and/or its contract laboratory are required to utilize the most current version of the method immediately after approval by EPA.

9

Cyanide:

Cyanide is currently limited to 0.008 mg/l as a monthly average and 0.019 mg/l as a daily maximum in the permit issued September 30, 1994.  This parameter was subjected to RPE analysis utilizing effluent free cyanide data obtained from the various TMDL studies. Although the data showed the effluent to be below detection level, the detection limit utilized was high; thus, effluent monitoring for free cyanide is being required for this permit term utilizing the existing monitoring frequency of weekly testing in the permit issued September 30, 1994.

Significant Lowering of Water Quality

Antidegradation review under 327 IAC 5-2-11.3:

The East Branch of the Grand Calumet River has been reviewed for the possibility of antidegradation under 327 IAC 5-2-11.3 and IDEM has determined that it is a high quality water under 327 IAC 2-1.5-4(b) for mercury because the existing water quality for the river exceeds, (that is, it is better than) the water quality criteria for that pollutant.  Therefore, the antidegradation implementation procedures for high quality waters at 327 IAC 5-2-11.3(b) were considered for this parameter.   Since the final limits for mercury are more stringent than those contained in the facility's NPDES permit which was issued September 30, 1994, IDEM believes all aspects of 327 IAC 5-2-11.3 are satisfied.

As part of its antidegradation evaluation for high quality waters, IDEM determined whether the proposed effluent limits for the above-mentioned parameters would result in a significant lowering of water quality.   A significant lowering of water quality, in accordance with 327 IAC 5-2-11.3(b)(1), occurs when there is a new or increased loading of a bioaccumulative chemical of concern (BCC) from the permitted facility; or a new or increased permit limit for a non-BCC where the new or increased permit limits results in both a calculated increase in the ambient concentration of a pollutant in the receiving water body, and a lowering of water quality greater than a de minimis lowering of water quality.

If the permittee plans to pursue any increase in design flow by plant expansion during the term of this permit, then the need for submission of an antidegradation demonstration would be reevaluated.  As required by 327 IAC 5-2-11.3(b)(2), the permit renewal (Part II.A.17) specifically prohibits the permittee from taking deliberate actions that would result in new or increased discharges of BCCs or new or increased permit limits for non-BCCs without first proving that the new or increased discharge would not result in a significant lowering of water quality, or by submission and approval of an anti-degradation demonstration to the IDEM.

Antidegradation Review under 327 IAC 5-2-11.7:

Because the effluent from the Gary Sanitary District WWTP provides water for the Indiana Ship Harbor Canal, thence discharging into Lake Michigan, the East Branch of the Grand Calumet River is considered a tributary of an outstanding state resource water (OSRW) and thence subject to the antidegradation implementation procedures as set out in 327 IAC 5-2-11.7.

10

For a new or increased discharge of a pollutant or pollutant parameter from a new or existing Great Lakes discharger into a tributary of an OSRW for which a new or increased permit limit would be required, the discharge shall not cause a significant lowering of water quality in the OSRW (327 IAC 5-2-11.7(a)(2)(A) and 11.7(a)(2)(B)). None of the limited parameters exhibits an increased loading and thus a determination of whether the discharge will cause a significant lowering of water quality in the OSRW is unnecessary.

Toxicity Testing

The Indiana Water Quality Standards require that a discharge not cause acute toxicity, as measured by whole effluent toxicity tests, at any point in the waterbody (327 IAC 2-1.5-8(b)(1)(E)(ii)) and that a discharge not cause chronic toxicity, as measured by whole effluent toxicity tests, outside of the applicable mixing zone (327 IAC 2-1.5-8(b)(2)(A)(iv)). The monitoring required for the whole effluent toxicity should indicate whether there are toxicity-causing pollutants in the effluent.

Additionally, 327 IAC 5-2-3(g) and 40 CFR 122.21(j) require that all POTW's (Publicly Owned Treatment Works) with design influent flows equal to or greater than one million gallons per day and those, regardless of size, with approved pretreatment programs, or those required to develop a pretreatment program, must provide the results of valid whole effluent biological toxicity tests.

Since the Gary SD has significant industrial contribution and a number of metals and/or organic parameters will no longer be limited in the final effluent, having been subjected to a determination for reasonable potential to cause an excursion above ambient criteria utilizing effluent data, the toxicity tests specified shall be conducted monthly for a period of three months and, provided no toxicity is shown, twice per year thereafter for the duration of the permit. If toxicity is found after the three-month period, testing must revert to the monthly monitoring schedule with two or more species.

After three monthly tests have been completed, the permittee may reduce the number of species tested to only include the species demonstrated to be most sensitive to the toxicity in the effluent. Compliance with the requirement for chronic toxicity is demonstrated if the waterbody does not exceed 1.0 $TU_c$ at the edge of the mixing zone (327 IAC 2-1.5-8(b)(2)(A)(iv)). To ensure that this requirement is met, a wasteload allocation for chronic whole effluent toxicity was calculated using the procedure in 327 IAC 5-2-11.4(c). The resulting wasteload allocation for chronic whole effluent toxicity is 2.1 $TU_c$. Chronic toxicity will be demonstrated if the discharge exceeds the wasteload allocation for chronic whole effluent toxicity. Acute toxicity will be demonstrated if the discharge exceeds 1.0 $TU_a$.

Backsliding

None of the limitations included in this permit conflict with the antibacksliding requirements as specified in 327 IAC 5-2-10(11).

11

Permit Term

A five-year NPDES permit renewal is proposed.

Drafted by Roger Rylatt

POST PUBLIC NOTICE ADDENDUM: 24 March 2006

The draft renewal of this NPDES permit was made available for public comment as part of Public Notice 2005-11B-RD from November 11, 2005 thru December 12, 2005 and Public Notice 2006-2E-RD from February 20, 2006 through March 20, 2006. Written comments were received by this office on January 9, 2006 and March 22, 2006 from Mr. Charles G. Peller, Jr., P.E. on behalf of the Gary Sanitary District. All comments have been taken into consideration in preparation of the final permit. Issues resolved by the second draft are not discussed.

Comment 1:      The proposed permit establishes a daily maximum limit for *E. coli*. The GSD contends that this limit cannot be reliably met. The GSD cannot accept a permit in which the GSD is not assured the limit can be met 100% of the time. The GSD supports proposed rule changes to allow a limited number of exceedances of the daily maximum limit.

Response 1:      The *E. coli* daily maximum is specified in 327 IAC 2-1.5-8(e) and cross referenced in 327 IAC 5-2-11.4(d)(2). In light of the wording of these rules, this Office cannot grant the GSD's request to delete and/or modify the portions of the permit affected by these rules.

Comment 2:      The City of Gary requests specific language be inserted into the permit within the compliance schedule for mercury regarding the streamlined mercury variance (SMV). This language, in effect, allows the GSD to only comply with the interim mercury limits pending a final determination on the SMV during appeal if one should be made.

Response 2:      This Office has added a reopening clause for the streamlined mercury variance (SMV). The schedule of compliance for mercury is already at 60 months in the November 4, 2005 public notice of the proposed permit. The additional language would effectively grant a stay on the mercury parameter prior to an appeal. This office does not have legal authority to grant such a request. Such power resides with the Environmental Law Judge within the Office of Environmental Adjudication when a stay is specifically requested under the procedures contained within IC 4-21.5-3-7 within 18 days of a permit decision. An outline of the current appeal procedure is enclosed with each issued permit and/or permit modification.

12

Comment 3:    Prior monitoring data for cyanide, chlorides, sulfate, fluoride, TDS, chromium, copper, iron, lead, zinc, phenols, nickel, cadmium, and arsenic have indicated that reasonable potential to exceed the water quality criterion (RPE) does not exist. As GSD has a well established industrial pretreatment monitoring program and stringent local limits, GSD requests that the proposed monitoring (influent and effluent) for the above-mentioned parameters be stricken from the permit.

Response 3:    The Technical Support Document for Water Quality-based Toxics Control published by EPA states that, at a minimum, the permitting authority must make an RPE determination at each permit reissuance. Although the above-mentioned parameters have been found to not exhibit RPE, the question of data collection for the next permit cycle must be considered. Quarterly monitoring of the effluent is considered the minimum acceptable frequency in light of the degree of industrialization in the GSD service area. Also of concern is that GSD commented it is unable to verify pretreatment program requirements outside of its geographical boundaries, which include Lake Station, Hobart and the Merrillville CD. Influent monitoring, generally used for calculation of removal rates and fluctuations in industrial discharges, is required in accordance with 327 IAC 5-2-13(b).

Comment 4:    EPA 2000 manual for WET testing gives guidance for nominal rate adjustments for changing alpha value from 0.05 to 0.01 when performing statistical analysis on test results. We request IDEM approve this change in alpha value for evaluating chronic toxicity.

Response 4:    Bioassay test procedures and data analysis is required to be conducted with the most recent update of EPA's guidance for WET testing. This would be the one published by EPA in October 2002 for "Short-term Methods…….". (4th Edition, EPA-821-R-02-013) for chronic toxicity testing of effluents and not the one referenced above.

In chronic toxicity tests for data analysis for significance testing, such as in student's t test (Dunnett's test) or for Null Hypothesis testing (Chi-Square or $X^2$ test) both EPA and IDEM recommend to use probability (P) levels of 5% or alpha value of 0.05 and not 0.01 to pass the significance test or reject the null hypothesis. To do otherwise allows for a high student t or the Chi-Square (or $X^2$) value. This would allow greater variability in the toxicity data that is not acceptable. This would be true even in nonparameteric significance tests such as Steel's Many-one Rank Test or Wilcoxon's Rank Sum Test. But in other than the above significance tests, such as for normality testing of the data by Shapiro Wilk's test or Kolmogorov "D" test and for homogeneity testing of the data by Bartlett's test, it would be acceptable to use the probability level of 0.01.

13

**Comment 5:** The proposed permit requires WET testing initially for three months. Currently, GSD conducts Biomonitoring twice yearly. GSD believes that the initial series of tests is unnecessary and requests the proposed permit be revised to continue twice yearly testing. GSD further requests that if no toxicity is evident after two consecutive tests, WET testing be conducted only once annually on the most sensitive species.

**Response 5:** No changes were made to the permit in response to this comment. The Assessment Branch of the Office of Water Quality recommends each permittee conduct the initial first three monthly tests of whole effluent with two species upon renewal of a NPDES permit. (This is particularly warranted considering the significant industrial contributions GSD receives) Provided no toxicity is demonstrated The permittee may then reduce the testing frequency to at least once every 6 months (but not only once annually) to using the one test species determined to be most sensitive.

**Comment 6:** The GSD requests that Part II.A.17.a., New or Increased Discharge of Pollutants, have the phrase inserted at the beginning of this provision, "Except as provided by 327 IAC 5-2-11.3(b)(1)(C),".

**Response 6:** In light of the recently adopted protocol for setting mass limits on conventional parameters for CSO communities located in areas of the State of Indiana impacted by the Great lakes Inititive, additional language has been inserted within this provision of the permit to mirror language and intent contained within the Fact Sheet for this permit.

**Comment 7:** The GSD proposes the last sentence of Part II.B.1., Facility Operation, Maintenance, and Quality Control, be revised to read "...such that neither 327 IAC 5-2-8(8) and 327 IAC 5-2-8(11) nor the provision of this section of the permit be construed to require operation of installed treatment facilities that are unnecessary for achieving compliance with the terms and conditions of the permit."

**Response 7:** This Office cannot grant this request as these two rule provisions, 327 IAC 5-2-8(8) and 327 IAC 5-2-8(11), are considered to stand independently of each other.

**Comment 8:** The GSD requests that Part II.B.2., Bypass of Treatment Facilities, be modified to add the word "or" in the sixth line following the word "maintenance". As an alternative, GSD requests clarifying language be inserted in Part II.B. specifying removal of redundant treatment components does not constitute a bypass if volume and quantity of process discharge is not adversely affected.

14

Response 8:     This request has been granted.  Part II.B.2.(f), in conformance with other GLI permits, has been modified with the following additional language: "Removal of redundant treatment units upon discretion of the certified operator will not be considered bypassing as long as a reasonable demonstration is made that effluent quality will not suffer and best performance is achieved."

Comment 9:      GSD requests that the notice of any new introduction of pollutants or any substantial change in the volume or character of pollutants into the POTW, as required under Part II.C.11.b., be submitted with the SIU Quarterly Non-compliance Report stipulated in Part III of the permit.

Response 9:     This request cannot be granted.  The City is responsible for pass through agents or other non conventional pollutants that might contribute to a plant upset or instream violation of water quality standards.  As the aforementioned report is submitted on a quarterly basis, this Office considers the time frame to report to be excessive.  In addition, a permit shield is not considered to exist until discharges of pollutants have been adequately disclosed to the permitting authority.

Comment 10:     Part III of the permit requires GSD to have enforceable agreements with its municipal contract customers which give GSD the authority to investigate IU's and verify pretreatment program requirements outside of GSD's geographical boundaries.  GSD has attempted and continues to attempt to acquire such agreements but various municipal customers have not been willing to allow GSD jurisdiction.  GSD cannot meet this requirement.

Response 10:    IDEM appreciates the difficult circumstances that GSD is encountering in obtaining needed cooperation from neighboring governmental entities.  As GSD is the entity legally bound as the "Control Authority", GSD is responsible for securing these agreements with its various contract customers.  It is suggested that GSD confer with Region V EPA on the best methodology on this approach.

Comment 11:     The Fact Sheet includes in its discussion under the receiving stream heading a statement that Lake Michigan is designated a salmonid fishery.  GSD does not believe this reference is germane to the proposed permit and requests its deletion..

Response 11:    327 IAC 2-1-3(a)(2) indicates, in part, where natural temperatures will permit, receiving streams will be capable of supporting put-and-take trout fishing.  In addition, 327 IAC 2-1.5-5(a)(3)(G) designates the Indiana portion of the open waters of Lake Michigan to be capable of supporting a salmonid fishery.  As the primary purpose of IDEM's NPDES permitting program is the protection of aquatic species, IDEM feels this information does have some degree of bearing on the permitting process and, as such, has left the language intact.

15

Comment 12:   The Fact Sheet includes an antidegradation review under 327 IAC 5-2-11.3.
GSD feels this discussion is not necessary because no new or increased
discharges of pollutants is contemplated in the permit.   IDEM should simply
indicate that a determination of whether the discharge will cause a
significant lowering has been made.

Response 12:   This discussion has been intended not only for GSD but also for interested
members of the general public.  For those casual readers which do not have
a significant background in this particular issue, IDEM has included
additional detail on this process.  As such, this section of the Fact Sheet has
been left unchanged.

Comment 13:   In the Fact Sheet, IDEM has determined that the receiving stream for GSD's
discharge is a high quality water under 327 IAC 2-1.5-4(b) for mercury.  It
is GSD's understanding that the East Branch of the Grand Calumet River is
listed on the 2004 303(d) list of impaired waters for mercury for which a
fish consumption advisory exists.  A similar listing is proposed on the public
notice draft of the 2006 303(d) list.  Given this information, GSD requests
the rationale related to the analysis that led to this conclusion.

Response 13:   IDEM determines a water to be of high quality under the definition
contained in 327 IAC 2-1.5-1(a)(45).  This determination is made by
comparing the receiving water's background concentration to the water
quality criterion for a particular pollutant.  When the existing water quality
for the receiving waters exceeds, (that is, it is better than) the water quality
criteria for a pollutant, the receiving waters are referred to as high quality.
In the case of mercury, the wildlife criterion of 1.3 ng/l was compared to
values obtained in the East Branch of the Grand Calumet River.  The
wasteload allocation on which the Fact Sheet is based on predates the
aforementioned 303(d) lists and as such all the information contained within
the Fact Sheet is based on the information available at the time of its
drafting.   Although some question exists as to whether the high quality
determination should remain for mercury since 327 IAC 2-1.5-1(a)(45) also
makes mention of nontransient aquatic organisms; a change in this
determination would not impact permit limitations.  Application of 327 IAC
5-2-11.3(b)(1)(A) for antidegradation concerns would not apply but
antidegradation under 327 IAC 5-2-11.7(a)(2)(B) would.  In addition, this
information would likely result in the application of 327 IAC 5-2-11.5(b)(5)
in the determination of reasonable potential to exceed the water quality
criterion for mercury.  Based upon this information, no change has been
made to the Fact Sheet.

Drafted by Roger Rylatt
29 March 2006

Comments pertaining to the CSO portion of the permit:

Comment 14:  Part I.B. of Attachment A, Page 56 of 61 - The District has reviewed 327 IAC 2-1.5-8(b)(1) and believes that paragraph e. under Part I. B.1. is not consistent with that provision of the code.  We believe that reexamination of the provision will indicate that the provisions are not identical and that paragraph e. should be revised as follows:

    e.  which are in concentrations or combinations that will cause or contribute to the growth of aquatic plants or algae to such a degree as to create a nuisance, be unsightly, or otherwise impair the designated uses.

Response 14:  Attachment A, Part I.B., of the issued permit has been changed to be consistent with the narrative language found in Part I of the main body of the NPDES permit.  Along with making for a more consistent permit, IDEM believes this change will satisfy GSD's comment.

Comment 15:  GSD requests that the following phrase be added to end of the first sentence of Attachment A, Part III.C., "…in accordance with the wet weather operation standard operating procedure included in the CSOOP."

Response 15:  IDEM incorporated this change in the issued permit, however, the word "approved" has been added to the phrase as follows:  "…in accordance with the wet weather operation standard operating procedure included in the approved CSOOP."

Comment 16:  GSD requests that the following phrase be added to end of the sentence of Attachment A, Part VII.B., "… rule, regulation, or policy."

Response 16:  IDEM incorporated this change in the issued permit.

Comment 17:  GSD requests that a new provision be added to the end of Attachment A to provide for a compliance schedule with the following language: "…the prohibition of Part I of this Attachment A on discharges from CSOs causing or contributing to violations of water quality standards shall not apply to:  (i) the numeric *E. coil* criteria set forth in 327 IAC 2-1.5-8(e); or (ii) to the narrative criteria set forth in 327 IAC 2-1.5-8(b) to the extent such narrative criteria implicitly incorporate such numeric *E. coli* criteria or otherwise restrict bacterial concentrations in relation to recreational use in a manner comparable to such numeric criteria."

Response 17:  No numeric effluent limitations for *E. coli* have been placed on CSO discharges in the Attachment.  Therefore, a compliance schedule is not appropriate at this time in accordance with 327 IAC 5-2-12.1.  Attachment A does require that CSOs comply with the narrative standards found at 327 IAC 2-1.5-8.

17

These narrative standards were in effect on July 1, 1977. Therefore, IDEM cannot provide a compliance schedule for the narrative standards pursuant to section 301(b)(1)(C) of the Clean Water Act. Once the GSD Long Term Control Plan is approved, the GSD NPDES permit will be modified to include an approved implementation schedule for additional CSO controls and attainment of water quality standards.

Drafted by Dave Tennis
15 May 2006

# STATE OF INDIANA
## DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

### PUBLIC NOTICE NO. <u>2006 - 6E - F</u>

### DATE OF NOTICE: <u>June 13, 2006</u>

The Office of Water Quality issues the following **NPDES FINAL PERMIT:**

## <u>MAJOR - RENEWAL</u>

**GARY SANITARY DISTRICT,** Permit No. IN0022977, LAKE COUNTY, 3600 W Third Av, Gary, IN. This municipal facility discharges 60.0 million gallons per day of treated sanitary wastewater into the East Branch of the Grand Calumet River. Permit Writer: Roger Rylatt at 317/232-8619.

---

## APPEAL PROCEDURES FOR FINAL PERMITS

The Final Permit is available for review & copies at IDEM, Indiana Government Center, North Bldg, 100 N Senate Ave, Indianapolis, IN, Rm 1203, Office of Water Quality/NPDES Permit Section, from 9 – 4, M - F (copies 10¢ per page). The Final Permit is also available at the local County Health Department. Please tell others you think would be interested in this matter.

**Appeal Procedure:** Any person affected by the issuance of the Final Permit may appeal by filing a Petition for Administrative Review with the Office of Environmental Adjudication <u>within</u> eighteen (18) days of the date of this Public Notice. Any appeal request must be filed in accordance with IC 4-21.5-3-7 and must include facts demonstrating that the party requesting appeal is the applicant, a person aggrieved or adversely affected or is otherwise entitled to review by law.

**Timely filing:** The Petition for Administrative Review must be received by the Office of Environmental Adjudication (OEA) <u>within</u> 18 days of the date of this Public Notice; either by U.S. Mail postmark or by private carrier with dated receipt. This Petition for Administrative Review represents a request for an Adjudicatory Hearing, therefore must:
- ➢ state the name and address of the person making the request;
- ➢ identify the interest of the person making the request;
- ➢ identify any persons represented by the person making the request;
- ➢ state specifically the reasons for the request;
- ➢ state specifically the issues proposed for consideration at the hearing;
- ➢ identify the Final Permit Rule terms and conditions which, in the judgment of the person making the request, would be appropriate to satisfy the requirements of the law governing this NPDES Permit rule.

If the person filing the Petition for Administrative Review desires any part of the NPDES Final Permit Rule to be stayed pending the outcome of the appeal, a Petition for Stay must be included in the appeal request, identifying those parts to be stayed. Both Petitions shall be mailed or delivered to the address here: **Phone: 317/232-8591.**

Environmental Law Judge
Office of Environmental Adjudication
IGC – North Building- Rm 1049
100 N. Senate Avenue
Indianapolis   IN 46204

**Stay Time frame:** If the Petition (s) are filed <u>within</u> eighteen (18) days of the mailing of this Public Notice, the effective date of any part of the permit, within the scope of the Petition for Stay is suspended for fifteen (15) days. The Permit will become effective again upon expiration of the fifteen (15) days, unless or until an Environmental Law Judge stays the permit action in whole or in part.

**Hearing Notification:** Pursuant to Indiana Code, when a written request is submitted, the OEA will provide the petitioner or any person wanting notification, with the Notice of pre-hearing conferences, preliminary hearings, hearing stays or orders disposing of the Petition for Administrative Review. Petition for Administrative Review must be filed in compliance with the procedures and time frames outlined above. Procedural or scheduling questions should be directed to the OEA at the phone listed above.

# IDEM   INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
*We make Indiana a cleaner, healthier place to live.*

*Mitchell E. Daniels, Jr.*
Governor

July 2, 2007

100 North Senate Avenue
Indianapolis, Indiana 46204
(317) 232-8603
(800) 451-6027
www.IN.gov/idem

*Thomas W. Easterly*
Commissioner

<u>VIA CERTIFIED MAIL</u>                    7002 0510 0003 0027 3059

Ms. Lucy L. Horton
Acting Director, Gary Sanitary District
3600 West 3rd Avenue
Gary, Indiana 46402

Re:  Draft Modification NPDES Permit No.
IN0022977 for the Gary Sanitary District's
Wastewater Treatment Plant
Lake County

Dear Ms. Horton:

The Indiana Department of Environmental Management has initiated a permit modification in response to the June 1, 2007 Agreed Judgment pertaining to the Gary Sanitary District's Wastewater Treatment Plant's NPDES permit.  This modification has been reviewed and processed in accordance with rules adopted under 327 IAC 5.  Enclosed is the draft modification of NPDES Permit No. IN0022977 which applies to the discharge from the Gary Sanitary District's Wastewater Treatment Plant (WWTP).  The enclosed Pages 1 and 58 of 59 are intended to replace the corresponding pages in the facility's current permit.

Pursuant to IC 13-15-5-1, a general notice will be published in the newspaper with the largest general circulation within Lake County.  A 30-day comment period is available in order to solicit input from interested parties, including the general public.  Please review this document carefully and become familiar with the proposed terms and conditions.  Comments concerning the draft permit should be submitted in accordance with the procedure outlined in the enclosed public notice form.  If you have any questions concerning this modification, please contact Roger Rylatt at 317/232-8619.

Sincerely,

Jerry Dittmer, Chief
Municipal NPDES Permits Section
Office of Water Quality

Enclosures
cc:    Lake County Health Department
       U.S. EPA, Region V
       Northwest Regional Office, IDEM
       The Honorable Rudolph Clay, Mayor

*Recycled Paper* ♲          An Equal Opportunity Employer          *Please Recycle* ♻

## STATE OF INDIANA

## DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

## AMENDED AUTHORIZATION TO DISCHARGE UNDER THE

## NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM

In compliance with the provisions of the Federal Water Pollution Control Act, as amended, (33 U.S.C. 1251 et seq., the "Act"), Title 13 of the Indiana Code, and regulations adopted by the Water Pollution Control Board, the Indiana Department of Environmental Management (IDEM) is issuing this permit to the

### GARY SANITARY DISTRICT

hereinafter referred to as "the permittee." The permittee owns and/or operates a major municipal wastewater treatment plant located at 3600 West 3rd Avenue, Gary, Indiana. The permittee is hereby authorized to discharge from the outfalls identified in Part I of this permit to receiving waters named the East Branch of the Grand Calumet River in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in the permit. The permittee is also authorized to discharge from combined sewer overflow outfalls listed in Attachment A of this permit, to receiving waters named the West Branch Little Calumet River and the East Branch of the Grand Calumet River in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in the permit.

The permit, as issued on June 13, 2006 is hereby amended as contained herein. The amended provisions shall become effective _____. All terms and conditions of the permit not modified at this time remain in effect. Further, any existing condition or term affected by the modifications will remain in effect until the modified provisions become effective.

This permit and authorization to discharge, as amended, shall expire at midnight, June 30, 2011. In order to receive authorization to discharge beyond the date of expiration, the permittee shall submit such information and forms as are required by the Indiana Department of Environmental Management no later than 180 days prior to the date of expiration.

Issued on _____ for the Indiana Department of Environmental Management.


_____
Bruno Pigott
Assistant Commissioner
Office of Water Quality

VI. <u>Long-term CSO Requirements</u>

The permittee shall develop a CSO LTCP that conforms with U.S. EPA's 1994 CSO Policy, sets forth controls necessary for ensuring its CSO discharges will comply with the technology-based and water quality-based requirements of the Clean Water Act (CWA) (including section 402(q) of the CWA) and state law (IC 13-11-2-120.5 and applicable state water quality standards), and contains a schedule for implementing those controls that is as expeditious as possible.

IDEM recognizes that the collection system and receiving stream network for the GSD system is complex. As a result, the models used to simulate this system require thorough calibration and verification before being utilized for the GSD Long Term Control Plan development. Therefore, the LTCP shall be submitted to the Indiana Department of Environmental Management, Office of Water Quality, Wet Weather Section, within 12 months following receipt of written notification from EPA approving the use of the calibrated and verified XP-SWMM collection system hydraulic model for development of the LTCP. The calibrated/verified XP-SWMM collection system model shall be submitted to EPA no later than six (6) months from the effective date of this permit.

The minimum elements of the LTCP include the following:

    A. Characterization, Monitoring, and Modeling of the CSS;
    B. Consideration of Sensitive Areas;
    C. Evaluation of Alternatives;
    D. Cost/Performance Considerations;
    E. Revised CSO Operational Plan;
    F. Maximizing Treatment at WWTP;
    G. Implementation Schedule;
    H. Post-Construction Compliance Monitoring Program; and
    I. Public Participation.

VII. <u>Reopening Clauses</u>

    A. After LTCP implementation, if IDEM has evidence that a CSO discharge is causing or contributing to exceedances of water quality standards, then additional control measures, effluent limitations, and/or monitoring requirements may be imposed on the CSO through a modification of this permit, after public notice and opportunity for hearing.

    B. This permit may be reopened to address changes in the EPA National CSO Policy or state or federal law, rule, regulation, or policy.

Fact Sheet
6 June 2007

Gary Sanitary District
Wastewater Treatment Plant
3600 West 3rd Avenue
Gary, Indiana  46406

NPDES Permit No. IN0022977

Requested Modification

In response to an Agreed Judgement; Cause No. 06-W-J-3739, regarding the objection to the issuance of the NPDES permit of June 6, 2006 to the Gary Sanitary District (GSD); the IDEM is modifying NPDES Permit No. IN0022977 to conform to the Agreed Judgment.

The GSD, in response to this modification, has agreed not to continue the challenge of any remaining issues raised in the petition of June 27, 2006 and further has agreed to dismiss the above-mentioned petition for Administrative Review and Stay of Effectiveness.

Proposed Modification

The permit is being modified such that:

Page 1 of 59 reflects the standard page one for a permit modification.

Page 58 of 59 of NPDES Permit states that the LTCP shall be submitted to the Indiana Department of Environmental Management, Office of Water Quality, Wet Weather Section, within 12 months following receipt of written notification from EPA approving the use of the calibrated and verified XP-SWMM collection system hydraulic model for development of the LTCP.  The calibrated/verified XP-SWMM collection system model shall be submitted to EPA no later than six (6) months from the effective date of this permit.

No other changes have been made.

Expiration Date

This modification will expire on June 30, 2011.

Drafted by: Roger Rylatt

# STATE OF INDIANA
## DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

### PUBLIC NOTICE NO.  2007 – 7A - RD

### DATE OF NOTICE:   JULY 6, 2007

### DATE RESPONSE DUE:  AUGUST 6, 2007

**The Office of Water Quality proposes the following NPDES DRAFT PERMIT action:**

## MAJOR – MODIFICATION

**GARY SANITARY DISTRICT WWTP,** Permit No. IN0022977, LAKE COUNTY, 3600 W 3RD Ave, Gary, IN.  This municipal permit modification reflects the incorporation of the June 1, 2007 Agreed Judgment into Attachment A.  Permit Writer: Roger Rylatt at 317/232-8619.  Published in the Post-Tribune and The Times.

## PROCEDURES TO FILE A RESPONSE

Draft documents are available for inspection at IDEM, Office of Water Quality/NPDES Permit Section, 12th floor/Rm 1203, 100 N. Senate Av, Indianapolis, IN from 9 – 4, M - F, (copies 10¢ per page).  A copy of the Draft Permit is on file at the local County Health Department.  Please tell others you think would be interested in this matter. For information about your rights and responsibilities pertaining to the Public Notice process and timeframes, please refer to the following IDEM websites: http://www.in.gov/idem/water//public_notice/index.html and http://www.in.gov/idem/guides/publicparticipation/permits/index.html.

**Response Comments:**  The proposed decision to issue a permit is tentative. Interested persons are invited to submit written comments on the Draft permit. All comments must be postmarked no later than the Response Date noted to be considered in the decision to issue a Final permit.  Deliver or mail all requests or comments to the attention of the Permit Writer at the above address, (mail code 65-42 PS).

**To Request a Public Hearing:**
Any person may request a public hearing. A written request must be submitted to the above address on or before the Response Date noted. The written request shall include: the name and address of the person making the request, the interest of the person making the request, persons represented by the person making the request, the reason for the request and the issues proposed for consideration at the hearing. The Department will determine whether to hold a public hearing based upon the comments and the rationale for the request. Public Notice of such a hearing will be circulated in at least one newspaper in the geographical area of the discharge and to those persons submitting comments and/or on the mailing list at least 30 days prior to the hearing.

 **INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT**
*We make Indiana a cleaner, healthier place to live.*

*Mitchell E. Daniels, Jr.*
Governor

*Thomas W. Easterly*
Commissioner

AUGUST 22, 2007

100 North Senate Avenue
Indianapolis, Indiana 46204
(317) 232-8603
(800) 451-6027
www.IN.gov/idem

<u>VIA CERTIFIED MAIL</u>          7002 0510 0003 0027 2779

Ms. Lucy L. Horton
Acting Director, Gary Sanitary District
3600 West 3rd Avenue
Gary, Indiana  46402

Re:    Final Modification of NPDES Permit
No. IN0022977 for the Gary Sanitary District's Wastewater
Treatment Plant
Lake County

Dear Ms. Horton:

Your request for modification of the above-referenced discharge permit has been processed in accordance with Section 402 and 405 of the Federal Water Pollution Control Act, as amended (33 U.S.C. 1251, et seq.), and IDEM's permitting authority under IC 13-15 (formerly IC 13-7).

The enclosed Pages 1 and 58 of 59 are intended to replace the corresponding pages of the existing permit.  This modification, initiated by IDEM, is to reflect the incorporation of the Agreed Judgment language of June 1, 2007 into Attachment A.  The enclosed NPDES permit amendment covers your existing NPDES Permit No. IN0022977.  All discharges from the referenced facility shall be consistent with the terms and conditions of this permit, as amended.

Please note that this permit modification can be appealed.  An appeal must be filed under procedures outlined in IC 13-15-7, IC 4-21.5, and the enclosed public notice.  The appeal must be initiated by you within 18 days from the date this letter is postmarked, by filing a request for an adjudicatory hearing with the Office of Environmental Adjudication (OEA), at the following address:

Office of Environmental Adjudication
Indiana Government Center North
100 North Senate Avenue, Room 1049
Indianapolis, IN 46204

Please send a copy of any such appeal to me at 100 North Senate Avenue, Indianapolis, Indiana 46204-2251.

*Recycled Paper* ♻          An Equal Opportunity Employer          *Please Recycle* ♻

Ms. Lucy L. Horton
Page 2


If you have any questions concerning this modification, please contact Roger Rylatt at 317/232-8619. Questions concerning appeal procedures should be directed to the Office of Environmental Adjudication at 317/232-8591.


                              Sincerely,



                              Bruno Pigott
                              Assistant Commissioner
                              Office of Water Quality


cc:    Lake County Health Department
       U.S. EPA, Region V
       Northwest Regional Office, IDEM
       The Honorable Rudolph Clay, Mayor

Page 1 of 59
Permit No. IN0022977

STATE OF INDIANA

DEPARTMENT OF ENVIRONMENTAL MANAGEMENT

AMENDED AUTHORIZATION TO DISCHARGE UNDER THE

NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM

In compliance with the provisions of the Federal Water Pollution Control Act, as amended, (33 U.S.C. 1251 et seq., the "Act"), Title 13 of the Indiana Code, and regulations adopted by the Water Pollution Control Board, the Indiana Department of Environmental Management (IDEM) is issuing this permit to the

**GARY SANITARY DISTRICT**

hereinafter referred to as "the permittee." The permittee owns and/or operates a major municipal wastewater treatment plant located at 3600 West 3rd Avenue, Gary, Indiana. The permittee is hereby authorized to discharge from the outfalls identified in Part I of this permit to receiving waters named the East Branch of the Grand Calumet River in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in the permit. The permittee is also authorized to discharge from combined sewer overflow outfalls listed in Attachment A of this permit, to receiving waters named the West Branch Little Calumet River and the East Branch of the Grand Calumet River in accordance with the effluent limitations, monitoring requirements, and other conditions set forth in the permit.

The permit, as issued on June 13, 2006 is hereby amended as contained herein. The amended provisions shall become effective   OCTOBER 1, 2007 . All terms and conditions of the permit not modified at this time remain in effect. Further, any existing condition or term affected by the modifications will remain in effect until the modified provisions become effective.

This permit and authorization to discharge, as amended, shall expire at midnight, June 30, 2011. In order to receive authorization to discharge beyond the date of expiration, the permittee shall submit such information and forms as are required by the Indiana Department of Environmental Management no later than 180 days prior to the date of expiration.

Issued on   AUGUST 22, 2007           for the Indiana Department of Environmental Management.

Bruno Pigott
Assistant Commissioner
Office of Water Quality

Page 58 of 59
Permit No. IN0022977
Amended:

## VI. Long-term CSO Requirements

The permittee shall develop a CSO LTCP that conforms with U.S. EPA's 1994 CSO Policy, sets forth controls necessary for ensuring its CSO discharges will comply with the technology-based and water quality-based requirements of the Clean Water Act (CWA) (including section 402(q) of the CWA) and state law (IC 13-11-2-120.5 and applicable state water quality standards), and contains a schedule for implementing those controls that is as expeditious as possible.

IDEM recognizes that the collection system and receiving stream network for the GSD system is complex. As a result, the models used to simulate this system require thorough calibration and verification before being utilized for the GSD Long Term Control Plan development. Therefore, the LTCP shall be submitted to the Indiana Department of Environmental Management, Office of Water Quality, Wet Weather Section, within 12 months following receipt of written notification from EPA approving the use of the calibrated and verified XP-SWMM collection system hydraulic model for development of the LTCP. The calibrated/verified XP-SWMM collection system model shall be submitted to EPA no later than six (6) months from the effective date of this permit.

The minimum elements of the LTCP include the following:

    A. Characterization, Monitoring, and Modeling of the CSS;
    B. Consideration of Sensitive Areas;
    C. Evaluation of Alternatives;
    D. Cost/Performance Considerations;
    E. Revised CSO Operational Plan;
    F. Maximizing Treatment at WWTP;
    G. Implementation Schedule;
    H. Post-Construction Compliance Monitoring Program; and
    I. Public Participation.

## VII. Reopening Clauses

A. After LTCP implementation, if IDEM has evidence that a CSO discharge is causing or contributing to exceedances of water quality standards, then additional control measures, effluent limitations, and/or monitoring requirements may be imposed on the CSO through a modification of this permit, after public notice and opportunity for hearing.

B. This permit may be reopened to address changes in the EPA National CSO Policy or state or federal law, rule, regulation, or policy.

<u>Fact Sheet</u>
6 June 2007

Gary Sanitary District
Wastewater Treatment Plant
3600 West 3rd Avenue
Gary, Indiana  46406

NPDES Permit No. IN0022977

<u>Requested Modification</u>

In response to an Agreed Judgement; Cause No. 06-W-J-3739, regarding the objection to the issuance of the NPDES permit of June 6, 2006 to the Gary Sanitary District (GSD); the IDEM is modifying NPDES Permit No. IN0022977 to conform to the Agreed Judgment.

The GSD, in response to this modification, has agreed not to continue the challenge of any remaining issues raised in the petition of June 27, 2006 and further has agreed to dismiss the above-mentioned petition for Administrative Review and Stay of Effectiveness.

<u>Proposed Modification</u>

The permit is being modified such that:

Page 1 of 59 reflects the standard page one for a permit modification.

Page 58 of 59 of NPDES Permit states that the LTCP shall be submitted to the Indiana Department of Environmental Management, Office of Water Quality, Wet Weather Section, within 12 months following receipt of written notification from EPA approving the use of the calibrated and verified XP-SWMM collection system hydraulic model for development of the LTCP.  The calibrated/verified XP-SWMM collection system model shall be submitted to EPA no later than six (6) months from the effective date of this permit.

No other changes have been made.

<u>Expiration Date</u>

This modification will expire on June 30, 2011.

Drafted by: Roger Rylatt

**STATE OF INDIANA**
**DEPARTMENT OF ENVIRONMENTAL MANAGEMENT**

**PUBLIC NOTICE NO.  2007 – 8E - F**

**DATE OF NOTICE: <u>AUGUST 22, 2007</u>**

**The Office of Water Quality issues the following NPDES FINAL PERMIT.**

## <u>MAJOR – MODIFICATION</u>

**GARY SANITARY DISTRICT WWTP,** Permit No. IN0022977, LAKE COUNTY, 3600 W 3RD Ave, Gary, IN.
This municipal permit modification reflects the incorporation of the June 1, 2007 Agreed Judgment into Attachment
A.  Permit Writer: Roger Rylatt at 317/232-8619.

---

### APPEAL PROCEDURES FOR FINAL PERMITS

Regarding your rights and responsibilities pertaining to the Public Notice process and timeframes, please refer to IDEM
websites: <u>http://www.in.gov/idem/permits/water/wastewater/public_notice/appeal.html</u> and
<u>http://www.in.gov/idem/your_environment/community_involvement/publicparticipation/index.html</u>.

The Final Permit is available for review & copies at IDEM, Indiana Government Center, North Bldg, 100 N Senate Ave,
Indianapolis, IN, Rm 1203, Office of Water Quality/NPDES Permit Section,  from 9 – 4, M - F (copies 10¢ per page).  The Final
Permit is also available at the local County Health Department.   Please tell others you think would be interested in this matter.

**Appeal Procedure:**  Any person affected by the issuance of the Final Permit may appeal by filing a Petition for Administrative
Review with the Office of Environmental Adjudication **<u>within</u>** eighteen (18) days of the date of this Public Notice. Any appeal
request must be filed in accordance with IC 4-21.5-3-7 and must include facts demonstrating that the party requesting appeal is
the applicant; a person aggrieved or adversely affected or is otherwise entitled to review by law.
**Timely filing:**  The Petition for Administrative Review must be received by the Office of Environmental Adjudication (OEA)
**<u>within</u>** 18 days of the date of this Public Notice; either by U.S. Mail postmark or by private carrier with dated receipt.  This
Petition for Administrative Review represents a request for an Adjudicatory Hearing, therefore must:
  - ➢ state the name and address of the person making the request;
  - ➢ identify the interest of the person making the request;
  - ➢ identify any persons represented by the person making the request;
  - ➢ state specifically  the reasons for the request;
  - ➢ state specifically the issues proposed for consideration at the hearing;
  - ➢ identify the Final Permit Rule terms and conditions which, in the judgment of the person making the request, would be
    appropriate to satisfy the requirements of the law governing this NPDES Permit rule.

If the person filing the Petition for Administrative Review desires any part of the | Environmental Law Judge
NPDES Final Permit Rule to be stayed pending the outcome of the appeal, a | Office of Environmental Adjudication
Petition for Stay must be included in the appeal request, identifying those parts | IGC – North Building- Rm 1049
to be stayed.  Both Petitions shall be mailed or delivered to the address here: | 100 N. Senate Avenue
**Phone: 317/232-8591.** | Indianapolis  IN 46204

**Stay Time frame:**   If the Petition (s) is filed **<u>within</u>** eighteen (18) days of the mailing of this Public Notice, the effective date of
any part of the permit, within the scope of the Petition for Stay is suspended for fifteen (15) days.  The Permit will become
effective again upon expiration of the fifteen (15) days, unless or until an Environmental Law Judge stays the permit action in
whole or in part.

**Hearing Notification:**   Pursuant to Indiana Code, when a written request is submitted, the OEA will provide the petitioner or
any person wanting notification, with the Notice of pre-hearing conferences, preliminary hearings, hearing stays or orders
disposing of the Petition for Administrative Review.   Petition for Administrative Review must be filed in compliance with the
procedures and time frames outlined above.  Procedural or scheduling questions should be directed to the OEA at the phone listed
above.



**IDEM**  INDIANA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT
*We Protect Hoosiers and Our Environment.*

*Mitchell E. Daniels, Jr.*
**Governor**

*Thomas W. Easterly*
**Commissioner**

100 North Senate Avenue
Indianapolis, Indiana 46204
(317) 232-8603
Toll Free (800) 451-6027
www.idem.IN.gov

September 16, 2008

<u>VIA CERTIFIED MAIL</u>        7002 0510 0002 5825 3998

Mr. Gregory Ciaccio, Superintendent
Gary Sanitary District
3600 West 3rd Avenue
Gary, Indiana 46402

Dear Mr. Ciaccio:

Re:   Correction to NPDES Permit No. IN0022977
      Gary Sanitary District's Wastewater Treatment Plant
      Lake County

Per your request of September 11, 2008, due to a recent rulemaking concerning *E. coli* standards and requirements, this Office is revising NPDES Permit No. IN0022977 to include revised language concerning how compliance will be determined with the current *E. coli* daily maximum limitations. Enclosed are revised Pages 3 through 5 of 59 that are to replace the corresponding pages in the final permit. The effective date shall remain July 1, 2006. If you have any questions concerning your NPDES Permit, please contact Trisha Williams at 317/234-4795.

Sincerely,

Jerry Dittmer, Chief
Municipal NPDES Permit Section
Office of Water Quality

Enclosures
cc:   Lake County Health Department
      U.S. EPA, Region V
      Northwest Regional Office, IDEM
      The Honorable Rudolph Clay, Mayor

*Recycled Paper* ♻        An Equal Opportunity Employer        *Please Recycle* ♻

Page 3 of 59
Permit No. IN0022977

## TABLE 2

| Parameter | Quality or Concentration | | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|
| | Daily Minimum | Monthly Average | Daily Maximum | Units | Measurement Frequency | Sample Type |
| pH [6] | 6.0 | ---- | 9.0 | s.u. | Daily | Grab |
| Dissolved Oxygen [5] | | | | | | |
| Summer [2] | 6.0 | ---- | ---- | mg/l | Daily | 12 Grabs/24-Hrs. |
| Winter [3] | 5.0 | ---- | ---- | mg/l | Daily | 12 Grabs/24-Hrs. |
| Oil & Grease | ---- | ---- | 10.0 | mg/l | 5 X Weekly | Grab |
| E. coli [11] | ---- | 125 [12] | 235 [13] | colonies/100 ml | Daily | Grab |
| Phosphorus [4] | ---- | 1.0 | ---- | mg/l | Daily | 24-Hr. Composite |

## TABLE 3

| Parameter | Quantity or Loading | | | Quality or Concentration | | | Monitoring Requirements | |
|---|---|---|---|---|---|---|---|---|
| | Monthly Average | Daily Maximum | Units | Monthly Average | Daily Maximum | Units | Measurement Frequency | Sample Type |
| Ammonia-nitrogen [*] | | | | | | | | |
| Summer [2] | 1502 | 3500 | lbs/day | 1.00 | 2.33 | mg/l | Daily | 24-Hr. Composite |
| Winter [3] | 1697 | 3951 | lbs/day | 1.13 | 2.63 | mg/l | Daily | 24-Hr. Composite |
| Total Residual Chlorine [7, 10] [*] | | | | | | | | |
| Interim [9] | 30 | 60 | lbs/day | 0.02 | 0.04 | mg/l | Daily | Grab |
| Final [8] | 12 | 27 | lbs/day | 0.008 | 0.018 | mg/l | Daily | Grab |

[*] Refer to the Schedule of Compliance in Part I.D of this permit.

[1] Effluent flow measurement is required per 327 IAC 5-2-13. The flow meter(s) shall be calibrated at least once annually.

[2] Summer limitations apply from May 1 through November 30 of each year.

[3] Winter limitations apply from December 1 through April 30 of each year.

[4] In accordance with 327 IAC 5-10-2(b), the facility must produce an effluent containing no more than 1.0 mg/l total phosphorus (P) any month that the average phosphorus level in the raw sewage is greater than 5 mg/l. Otherwise, a degree of reduction, as prescribed below, must be achieved. Such reduction is to be calculated based on monthly average raw and final concentrations.

| Phosphorus (P) Level in Raw Sewage (mg/l) | Required Removal (%) |
|---|---|
| greater than or equal to 4 | 80% |
| less than 4, greater than or equal to 3 | 75% |
| less than 3, greater than or equal to 2 | 70% |
| less than 2, greater than or equal to 1 | 65% |
| less than 1 | 60% |

[5] The daily minimum concentration of dissolved oxygen in the effluent shall be reported as the arithmetic mean determined by summation of the twelve daily grab sample results divided by the number of daily grab samples. These samples are to be collected over equal time intervals.

[6] If the permittee collects more than one grab sample on a given day for pH, the values shall not be averaged for reporting daily maximums or daily minimums. The permittee must report the minimum or maximum pH value of any individual sample during the month on the Discharge Monitoring Report forms.

[7] The effluent shall be disinfected on a continuous basis such that violations of the applicable bacteriological limitations for *E. coli* do not occur from April 1 through October 31, annually. If the permittee uses chlorine for any reason, at any time including the period from November 1 through March 31, then the limits and monitoring requirements in Table 3 for total residual chlorine shall be in effect whenever sodium hypochlorite is used.

[8] The final monthly average water quality based effluent limit (WQBEL) for total residual chlorine is less than the limit of quantitation (LOQ) as specified below. Compliance with the total residual chlorine concentration limitations will be demonstrated if the monthly average effluent level is less than or equal to the monthly average WQBEL. For the purpose of calculating the monthly average value, the daily effluent values that are less than the LOQ may be assigned a value of zero (0), unless, after considering the number of monitoring results that are greater than the limit of detection (LOD), and applying appropriate statistical techniques, a value other than zero (0) is warranted.

The finalvdaily maximum WQBEL for total residual chlorine is greater than or equal to the LOD value, but less than the LOQ value specified in the permit. Compliance with this effluent limitation will be demonstrated if the measured daily effluent concentrations are less than the LOQ. For daily maximum mass limitations based on WQBELs which are less than the LOQ value, compliance with the daily maximum mass value is based on the LOQ value. Compliance with the daily maximum mass value will be demonstrated if the calculated mass value is less than **90.1** lbs/day.

[9] The water quality-based interim daily maximum limitation for total residual chlorine is equal to or greater than the limit of detection (LOD), but is less than the limit of quantitation (LOQ), and the interim monthly average water quality-based effluent limitation for this parameter is equal to or greater than the LOD, but less than the limit of quantitation. Compliance with these effluent limitations will be demonstrated if the measured effluent concentrations are less than the limit of quantitation.

[10] At present, two methods are acceptable to IDEM measure total residual chlorine: amperometric and DPD colorimetric methods.

| Parameter | LOD | LOQ |
|-----------|-----|-----|
| Chlorine | 0.02 mg/l | 0.06 mg/l |

## Case-Specific MDL

The permittee may determine a case-specific method detection level (MDL) using the analytical method specified above. The MDL shall be derived by the procedure specified for MDLs contained in

40 CFR Part 136, Appendix B, and the limit of quantitation shall be set equal to 3.18 times the MDL. Other methods may be used if first approved by the U.S. EPA and IDEM.

[11] The *Escherichia coli (E. coli)* limitations apply from April 1 through October 31 annually. IDEM has specified the following methods as allowable for the detection and enumeration of *Escherichia coli (E. coli)*:
  1. Coliscan MF® Method
  2. EPA Method 1103.1 using original m-TEC agar.
  3. EPA revised Method 1103.1 using modified m-TEC agar.
  4. *Standard Methods* 20th Edition Method 9223 B using Colilert®

[12] The monthly average *E. coli* value shall be calculated as a geometric mean. Per 327 IAC 5-10-6, the concentration of *E. coli* shall not exceed one hundred twenty-five (125) cfu or mpn per 100 milliliters as a geometric mean of the effluent samples taken in a calendar month. No samples may be excluded when calculating the monthly geometric mean.

[13] If less than ten samples are taken and analyzed for *E. coli* in a calendar month, no samples may exceed two hundred thirty-five (235) cfu or mpn as a daily maximum. However, when ten (10) or more samples are taken and analyzed for *E. coli* in a calendar month, not more than ten percent (10%) of those samples may exceed two hundred thirty-five (235) cfu or mpn as a daily maximum. When calculating ten percent, the result must not be rounded up. In reporting for compliance purposes on the Discharge Monitoring Report (DMR) form, the permittee shall record the highest non-excluded value for the daily maximum.

**ATTACHMENT B**

**REQUEST FOR INFORMATION PURSUANT TO 33 U.S.C. §1318**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

RECEIVED

MAR 2 6 2010

Greeley and Hansen

REPLY TO THE ATTENTION OF:   WC-15J

**CERTIFIED MAIL**   7001 0320 0005 9024 9772
**RETURN RECEIPT REQUESTED**

Rinzer Williams III, Director
Gary Sanitary District
3600 West 3rd Avenue
Gary, Indiana 46402

RECEIVED

MAR 2 6 2010

GREELEY AND HANSEN

GSD & GSWMD
RECEIVED
MAR 2 4 2010
ADMINISTRATION OFFICE
Gary Sanitary District
Gary Storm Water Management District
Gary, Indiana

Subject:   Gary Sanitary District, NPDES Permit No. IN0022977
Request for Information Pursuant to 33 U.S.C. § 1318
Docket No: V-W-10-308-19

Dear Mr. Williams:

Protecting water quality is a high priority of the U.S. Environmental Protection Agency. Pollutants such as bacteria discharged to waterways from sewer overflows contribute to poor water quality and impairment of uses of those waterways.

As authorized by the Clean Water Act (CWA or the "Act"), the National Pollutant Discharge Elimination System (NPDES) permit program controls water pollution by regulating point sources that discharge pollutants into waters of the United States. As you know, the Indiana Department of Environmental Management (IDEM) issued permit number IN0022977 to the Gary Sanitary District. The permit authorizes discharge to waters of the United States, in accordance with effluent limitations, monitoring requirements, and other conditions set forth in the permit. This request seeks information related to sanitary sewer overflows, combined sewer overflows, bypassing, the condition of equipment at the wastewater treatment plant, and the maintenance of that equipment.

EPA is authorized under Section 308 of the CWA, 33 U.S.C. § 1318, to require reports and other information necessary to carry out the purpose of the Act. Accordingly, pursuant to Section 308 of the Act, you are directed to provide EPA with the information requested in the enclosure.

Please submit the information requested in the accompanying documents with a statement certifying that all representations contained therein are true and accurate to the best of your knowledge and belief using the certification language provided. Please exercise care to assure that responses are complete and accurate, because Section 309(c)(2) of the Act, 33 U.S.C. § 1319(c)(2), provides for the imposition of criminal penalties where false information is knowingly provided to EPA.

Recycled/Recyclable ● Printed with Vegetable Oil Based Inks on 100% Recycled Paper (50% Postconsumer)

Thank you for your cooperation in this matter. Should you have any questions, please call Mark Koller, Associate Regional Counsel, at (312) 353-2591, or William Jones at (312) 886-6058. Please send your written responses to the address specified in the enclosed documents, within thirty (30) days of receipt of this letter.

Sincerely,

Tinka G. Hyde
Director, Water Division

Enclosures

cc:    Iva Ziza, U.S. Department of Justice (via email)
       Beth Admire, IDEM
       Holly Zurcher, IDEM

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 5

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | PROCEEDING UNDER SECTION |
| | ) | 308(a) OF THE CLEAN WATER ACT |
| GARY SANITARY DISTRICT, | ) | 33 U.S.C. § 1318(a) |
| | ) | |
| RESPONDENT. | ) | |
| | ) | DOCKET NO.: V-W-10-308- *1 9* |

These requests for information and maintenance of records are made pursuant to the authority vested in the Administrator of the .U.S. Environmental Protection Agency by Section 308(a) of the Clean Water Act (CWA), 33 U.S.C. § 1318(a), and duly re-delegated to the undersigned Director of the EPA, Region 5 Water Division. The information requested herein must be provided notwithstanding the possibility that the information requested may be characterized as confidential information or trade secrets. Should you so request, however, any information (other than public information) which the Administrator of EPA determines to constitute methods, processes, or other business information entitled to protection as trade secrets will be maintained as confidential or trade secret. A request for confidential treatment must be made when information or access to records is provided, since any information not so identified will not be accorded this protection by EPA.

EPA has the authority to use the requested information and records in an administrative, civil, or criminal action. There are significant civil and criminal penalties for failing to respond to requests issued pursuant to Section 308(a) in a timely, complete, and accurate manner.

Your response to these requests must be signed by an official or authorized agent who shall provide the following certification:

I certify under penalty of perjury that these responses to the U.S. Environmental Protection Agency's requests for information were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information contained in these responses. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering this information, the information contained in these responses is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant civil and criminal penalties for submitting false or incomplete information, including the possibility of fine and imprisonment for knowing violations.

Please submit all information pursuant to this request within **30 calendar days** to:

William Jones
Water Enforcement Branch (WC-15J)
Water Division
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard
Chicago, Illinois 60604

with a copy to:

Chief
Water Enforcement Section
Office of Enforcement
Indiana Department of Environmental Management
Government Center North
100 North Senate Avenue
Indianapolis, Indiana 46204-2251

## DEFINITIONS

Unless otherwise defined herein, terms used in these requests shall have the meaning given to those terms in: Section 502 of the Clean Water Act, 33 U.S.C. § 1362, the regulations promulgated thereunder at 40 C.F.R. § 122, 327 IAC 5-1-1 *et seq.*, Gary Sanitary District's (GSD) NPDES Permit No. IN0022977 issued September 30, 1994, GSD NPDES Permit No. IN0022977 issued June 13, 2006, and any renewals, amendments or modifications thereof. Whenever the terms set forth below are used in these requests, the following definitions shall apply:

1.    "1994 Permit" means the National Pollutant Discharge Elimination System (NPDES) Permit No. IN0022977, issued on September 30, 1994 by the IDEM, and effective from November 1, 1994 to April 31, 1999, including any renewals, amendments or modifications to such permit.

2.    "2006 Permit" means the NPDES Permit No. IN0022977, issued on June 13, 2006 by the IDEM, and effective as of July 1, 2006, including any renewals, amendments and modifications to such permit.

3.    "Any," "all," "each," and "every" means each and every.

4.    "CSO" or "Combined Sewer Overflow" means any discharge from any outfall identified in Attachment A, Part I.A.1 of the 1994 Permit, and Attachment A, Part I.A of the 2006 Permit, and any other overflow of combined sewage from the collection system.

5.    "Combined Sewer Overflow Report" means the EPA uniform national form that the GSD is required to submit to the EPA Regional Administrator pursuant to Part I.B.3 of the 1994 Permit and Part I.B.3 of the 2006 Permit.

6.    "CSO Outfall" means the outfall from which CSOs are discharged.  "Outfall" followed by an Arabic number means the Outfall assigned that number in the permit provisions identified in Paragraph 4.

7.    "CWA" means the Clean Water Act, 33 U.S.C. § 1251 *et seq.*

8.    "Discharge" means "discharge of a pollutant" into the waters of the State as defined in 327 IAC 5-1.5-11 and "discharge of a pollutant" into navigable waters of the United States as defined in 33 U.S.C. § 1362(12).

9.    "Discharge Monitoring Report" or "DMR" means the EPA uniform national form that GSD is required to submit to the EPA Regional Administrator pursuant to Part I.B.3 of the 1994 Permit and Part I.B.3 of the 2006 Permit.

10.    "Document" means any writing of any kind, including the originals and all non-identical copies (whether different from the originals by reason of any notation made on such copies or otherwise) of correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, contracts, reports, studies, statements, summaries, pamphlets, books, interoffice and intra-office communications, notations of any conversations (including, without limitation, telephone calls, meetings, and other communications), bulletins, printed matter, computer printouts, teletypes, telefax, invoices, worksheets, graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, microfiche, microfilm, videotapes, recordings and motion pictures), electronic, mechanical, or electric records or representations of any kind (including, without limitation, electronic documents, tapes, cassettes, discs, and recordings), all electronically stored information (ESI), and all drafts, alterations, modifications, changes and amendments of any of the foregoing.

11.    "GSD" shall mean the Gary Sanitary District and any agents, contractors, governmental bodies or other entities that have performed work or acted in any way on behalf of or at the direction of the Gary Sanitary District.

12.    "IDEM" shall mean the Indiana Department of Environmental Management.

13.    "Identify" when used with respect to a fact or facts includes, in addition to the recitation of such specific fact or facts, (1) the identification of all documents which substantiate the fact or from which the fact(s) is drawn; and (2) the identification of any oral communication(s) upon which your knowledge of the fact(s) is founded or which supports the fact(s), including identifying between or among whom the oral communication(s) occurred, when such communication(s) occurred, and the substance of the communication(s).

14.    "Including" means including, but not limited to.

15.    "Indiana" or "State" shall mean the State of Indiana.

16.    "Monthly Operating Report" or "MOR" shall mean the EPA uniform national form that GSD is required to submit to the EPA Regional Administrator pursuant to Part I.B.3 of the 1994 Permit and Part I.B.3 of the 2006 Permit.

17.    "Refer to," "referring to," or "refers to" means mentioning, discussing, making reference to or relating to in any way.

18.    "Relate to," "relating to," or "relates to" means constituting, defining, concerning, embodying, reflecting, identifying, stating, referring to, dealing with, or in any way pertaining to.

19.    "Sanitary sewer" means a sewer that conveys liquid and water-carried wastes from residences, commercial buildings, industrial plants, and institutions, and to which storm, surface, and ground waters are not intentionally allowed to enter.

20.    "Sanitary sewer overflow" or "SSO" means any discharge, release and/or overflow, from the sanitary sewer system operated by the GSD. This term shall include (i) any discharge to waters of Indiana or the United States from the sanitary sewer system; and (ii) any release of wastewater from the sanitary sewer system to public or private property (including Building/Private Party Backups) that does not reach waters of the United States or Indiana. This term shall also include discharges from pump and lift stations within the sanitary sewer system.

21.    "Sewer system" means the wastewater collection and conveyance system owned or operated by the GSD (including all pipes, force mains, gravity sewer segments, pump stations, manholes, and appurtenances thereto) that is designed to collect and convey municipal sewage (domestic, commercial, or industrial) to the WWTP or to a CSO Outfall.

22.    "EPA" or "U.S. Environmental Protection Agency" shall mean the United States Environmental Protection Agency and any successor departments, agencies or instrumentalities of the United States.

23.    "Wastewater" means discharge or release from the GSD's sewer system that includes untreated sewage.

24.    "Wet weather periods" means any period of rainfall or snowmelt or period after rainfall or snowmelt when the wastewater collection system is still receiving flows from surface runoff.

25.    "WWTP" means the wastewater treatment plant owned and operated by the GSD located at 3600 West 3rd Avenue, Gary, Indiana.

## REQUESTS FOR INFORMATION

I.    Information Pertaining to Sanitary Sewer Overflows.

26.    Identify and describe in detail all overflows, releases, and discharges from the GSD's sanitary sewer system, both dry-weather and/or wet-weather related, since February 2003. This request includes sanitary sewer overflows identified in the cover sheets to the DMRs, CSO reports, and MORs submitted by the GSD to the EPA for May 2009, June 2009, July 2009, and August 2009. This request includes backups into private and public buildings.

27.    For each sanitary sewer overflow, release, and discharge identified in Paragraph 26, describe its location, cause, measured frequency (if recurring), duration, characteristics, and volume, and any remediation measures taken in response, including any cleanup or containment action(s). If the GSD does not have the requested information, provide an estimate of the location, cause, frequency (if recurring), duration, characteristics, and volume of the discharge, backup, overflow and/or release, along with an explanation of the basis for these estimates.

28. For each sanitary sewer overflow, release, and discharge identified in Paragraph 26, provide any related documents, including customer complaints or reports of the discharge, overflow and/or release, any related work orders, and any correspondence with any customer, City, County, State or Federal government entity regarding such overflow, release, and/or discharge.

II. Information Pertaining to Compliance with Minimum Narrative Limitations in the 2006 Permit.

29. Describe the steps taken to assure compliance with the requirements of Part I.A.2 of the 2006 Permit since July 1, 2006. This includes any inspections of and/or visits to Outfalls 001 A and B, and any related sampling and other tests performed. Provide any documents related to those steps, including photographs of the receiving waters inside and outside of the mixing zone, and sampling and test results. If these documents were already provided to EPA, then the specific document can be referenced instead of being provided again. If no steps were taken to assure compliance, explain why.

III. Information Pertaining to Discharges from Combined Sewer Overflows Identified in Attachment A to the 1994 Permit and Attachment A to the 2006 Permit.

30. For each CSO outfall identified in Attachment A to the 1994 Permit and Attachment A to the 2006 Permit, identify each date since February 2003 on which there were any discharges of pollutants from the outfall. Describe the steps taken to assure compliance with the requirements identified in Attachment A, Part I.A.1 of the 1994 Permit and Attachment A, Part I.B of the 2006 Permit on or following those dates. This includes any inspections of and/or visits to the outfall sites, and any related sampling and other tests performed. Provide all documents related to those steps, including photographs of the receiving waters inside and outside of the mixing zone, and sampling and test results. If these documents were already provided to EPA, then the specific document can be referenced instead of being provided again. If no steps were taken to assure compliance, explain why.

31. The GSD shall also submit copies of operator logs recording CSO discharges for the past two years. These logs provide the date, location, and two-hour observation interval.

32. For each discharge identified in response to Paragraph 30, state whether the discharge caused or contributed to violations of water quality standards, including exceedances or violations of water quality criteria for *E. coli* bacteria. If the GSD maintains that any discharge did not cause or contribute to violations of water quality standards, explain the basis for the GSD's position and identify all documents that support the GSD's position.

33. Identify all documents which relate to complaints or other inquiries from the public, or any city, county, state, or federal governmental entity or any private or quasi

governmental entity since February 2003 regarding the odor, color, safety, inconvenience or public health risks of any discharge from any outfall identified in Attachment A to the 1994 Permit and Attachment A to the 2006 Permit. The GSD's response should include, but not be limited to, written correspondence to the GSD from the public or any governmental entity, or from the GSD to the public or any governmental entity, telephone logs or telephone memoranda generated in response to phone calls from the public or any other governmental entity, and any other records generated by the GSD relating to such complaints or inquiries.

34. For each discharge identified in response to Paragraph 30, identify and describe in detail all measures, if any, that were taken to control solid and floatable materials in the discharge, as well as any other measures that were taken to control any other pollutants in the discharge. If no such measures were taken for a particular discharge, explain in detail why the GSD did not take such measures.

35. Since February 2003, identify and describe in detail the water quality of the waters into which any of the outfalls identified in Attachment A to 1994 Permit and Attachment A to the 2006 Permit, including a detailed description of whether those waters meet water quality standards and whether those waters violate any numeric criteria applicable to such waters for *E. coli* bacteria.

36. For each discharge identified in response to Paragraph 30, state whether the volume of flows transported to and through the WWTP was maximized before any discharge occurred, in accordance with the requirements set forth in Attachment A, Part III.C of the 2006 Permit and Attachment A, Part V.B of the 1994 Permit. If the volume of flow was not maximized when any such discharge occurred, explain why and provide related documents. If the GSD maintains that the maximum volume of flows for the WWTP was at any point less than a peak design flow of 180 MGD specified in the 2006 Permit, explain why and provide any related data and documents.

37. For any discharge listed in Table 1 (see Attachment 1 to this Request), state whether the discharge constituted a "dry weather discharge" as that term is used in Attachment A to the 1994 Permit and Attachment A to the 2006 Permit. Provide a detailed explanation for why you believe that the discharge did or did not constitute a "dry weather discharge" and provide all information and data which supports your contention.

38. If you state that any discharge on any of the dates identified in Table 1 was not a "non-precipitation flow" within the meaning of Attachment A, Part I.D, of the 1994 Permit, or that it was "precipitation-related" within the meaning of Attachment A to the 2006 Permit, provide relevant documents, including all weather information and data which supports your contention, including information and data regarding: rainfall, rain gauges, snow fall, and temperature; and the dates and times of any rainfall, snow fall or increase in temperature.

## III. Information Pertaining to Equipment Condition and Maintenance.

39. Identify and state the date of any repair, maintenance or replacement of the facilities and equipment installed and/or used by the GSD in the operation of the sewage system and/or the WWTP since February 2003, including equipment used in headworks, primary settling basins, aeration basins, activated sludge building, square secondary clarifiers, blower building, circular secondary clarifiers, effluent sand filter facility, disinfection facility, sludge storage facility, sludge dewatering facility, boiler facility, chemical facility and anaerobic digesters. Include equipment that is currently out of service. Provide any information regarding the amount of time any part of equipment was out of order, and if and whether any replacement was provided for such equipment.

40. Identify the specific GSD fund and/or account that provided funding for any repair, replacement and/or maintenance of the equipment identified in Paragraph 39, and identify the date on which such funding was approved. Identify the cost of repair. Provide all related documents.

41. Provide a copy of the operation and maintenance manuals for the plant and the collection system.

42. Provide a copy of GSD's CSO Operational Plan and any updates to that document.

## IV. Miscellaneous

43. Identify all bypass events since February 2003. For each bypass, identify a specific provision of the applicable permit that allowed such a bypass and explain why. Provide a copy of all notices provided to the Commissioner of IDEM. Provide all related documents.

44. Is GSD measuring raw influent as required by Section I.B.2 of the 2006 Permit by utilizing the influent flow meter located in the influent channel area ahead of the bar screens? Identify and state the date of repair, maintenance or replacement of this equipment since the effective date of the 2006 Permit. If this equipment was ever out of service since the effective date of the 2006 Permit, identify the period(s) of time the equipment was out of service. Provide all related documents.

45. Explain how the GSD measures effluent flow as required by Section I.A.1 of the 2006 Permit. If the GSD utilizes a flow meter(s) to measure effluent flow, indicate how often the flow meter(s) is calibrated. Provide documentation that records the date of calibration.

46. Explain whether the GSD has submitted any of the written progress reports for final mercury limits as required by Sections I.E.1 – 4 of the 2006 Permit. If so, provide the date(s) that the GSD made the submission(s). Provide a copy of the submission(s).

47. Provide a copy of any amendments or modifications to 2006 Permit, except for the final permit modification issued on August 22, 2007 and the correction to the permit dated September 16, 2008.

48. Provide a copy of any NPDES Permit applications that GSD has submitted since February 2003.

Electronic submission (e.g., on a CD-ROM) of information is acceptable provided the information is accessible by using a program such as Adobe Acrobat Reader or a program in the Microsoft Office suite.

This information request is not subject to the Paperwork Reduction Act.

Please contact William Jones of my staff at (312) 886-6058, or Mark Koller in the Office of Regional Counsel at (312) 353-2591, if you have any question about this request.

Tinka G. Hyde
Director, Water Division
EPA, Region 5

3-18-10
Date

Attachment 1/ Table 1.

| DATE | CSO OUTFALL POINTS (004-015) |
|---|---|
| November 20, 2003 | 15 |
| March 12-13 2004 | 15, 5 |
| January 15, 2005 | 10, 12, 15 |
| February 3-6, 2005 | 8 |
| April 16, 2006 | 8, 9 |
| July 30, 2006 | 13 |
| September 15, 2006 | 11, 12 |
| December 2, 3, 15 & 24, 2006 | 12, 5, 4 |
| January 6, 7 & 8, 2007 | 9, 5, 4 |
| April 28 & 29, 2007 | 12, 15, 5 |
| May 2, 2007 | 10, |
| January 12, 13, 14 & 15, 2008 | 8, 9, 11, |
| April 12, 2008 | 9 |
| September 16-30, 2008 | 8, 9, 10, 11, 12, 15, 5, 4, 13 |
| December 29 & 30, 2008 | 8,9,10, 12, 5 |
| March 8, 10, 12-17, 2009 | 6 |

Attachment

## AUTHORITY AND CONFIDENTIALITY PROVISIONS

### Authority

Information requests are made under authority provided by Section 308 of the Clean Water Act, 33 U.S.C. 1318. Section 308 provides that: "Whenever required to carry out the objective of this Act, ...the Administrator shall require the owner or operator of any point sources to (i) establish and maintain such records, (ii) make such reports, (iii) install, use and maintain such monitoring equipment and methods (including where appropriate, biological monitoring methods), (iv) sample such effluent... and (v) provide such other information as he may reasonably require; and the Administrator or his authorized representative, upon presentation of his credentials, shall have a right of entry to...any premises in which an effluent source is located or in which any records...are located, and may at reasonable times have access to and copy any records...and sample any effluents..."

Please be advised that the submission of false statements is subject to federal prosecution under 18 U.S.C. §1001 and that this or any other failure to comply with the requirements of Section 308 as requested by U.S. EPA may result in enforcement action under the authority of Section 309 of the Clean Water Act, which provides for specified civil and/or criminal penalties.

### Confidentiality

U.S. EPA regulations concerning confidentiality and treatment of business information are contained in 40 CFR Part 2, Subpart B. Information may not be withheld from the Administrator or his authorized representative because it is viewed as confidential. However, when requested to do so, the Administrator is required to consider information to be confidential and to treat it accordingly, if disclosure would divulge methods or processes entitled to protection as trade secrets (33 U.S.C. §1318(b) and 18 U.S.C. §1905), except that effluent data (as defined in 40 CFR §2.302(a)(2)) may not be considered by U.S. EPA as confidential.

The regulations provide that one may assert a business confidentiality claim covering part or all of any trade secret information furnished to U.S. EPA at the time such information is provided to the Agency. The manner of asserting such claims is specified in 40 CFR §2.203(b). In the event that a request is made for release of information covered by such claim of confidentiality or the Agency otherwise decides to make determination as to whether or not such information is entitled to such confidential treatment, notice will be provided to the claimant prior to any release of the information. However, if no claim of confidentiality is made when information is furnished to U.S. EPA, any information submitted to the Agency may be made available to the public without prior notice.

Note:    This information request is not subject to the approval requirements of the Paperwork Reduction Act of 1995, 44 U.S.C. § 3501 et seq.

## CERTIFICATE OF SERVICE

I hereby certify that on this date a copy of the foregoing Complaint was served by first-class mail, postage prepaid, upon the following attorney for the Settling Defendants:

James Banks
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004

June 4, 2014

_s/ Iva Ziza_
Iva Ziza